MaddeN, Judge,
delivered the opinion of the court:
This is a suit by the Lac du Flambeau, Lac Courte Oreilles and Bad River Bands of Lake Superior Chippewa Indians of Wisconsin. It relates to swamp lands lying within the separate reservations of these three bands of Indians. The complaint of the Indians is that the United States, when it created their reservations, granted to them areas of land which included land which it had, some years before, granted to the State of Wisconsin, and that as a result of the conflicting grants the plaintiffs have been deprived of some of the land within their reservations, and of the proceeds of the timber which had been cut from these lands.
In an earlier stage in the proceedings in this case the court concluded that, since the alleged conflicting rights of the State of Wisconsin were an important element in the plaintiffs’ case, the State should be notified of the proceeding, and advised of its right to intervene, pursuant to the Act of July 1, 1944, 58 Stat. 649, 668, 41 U. S. C. 114. The State has filed a petition to intervene in which it asserts that it is the owner of the swamp lands in question and is entitled to the proceeds of timber cut from the lands. The case *481 went to a hearing before a commissioner of this court and the plaintiff, the intervenor and the defendant presented their evidence. We have made extensive findings, based upon that evidence and our commissioner’s report of it. In this opinion we will recite only such facts as seem necessary to make the opinion intelligible.
The Chippewa Nation as a whole, including the three plaintiff bands and many others, occupied a large area which extended both east and west of the Mississippi Liver in the northern parts of Wisconsin and Minnesota. By the Treaty of July 29, 1837, 7 Stat. 536, the Chippewa Nation ceded to the United States a strip of land approximately 100 miles wide (from north to south) and nearly 200 miles long (from east to west). All of this land lay east of the Mississippi Liver. The consideration for the cession was certain payments to be made by the United States. The intent of the treaty was that the Chippewas would withdraw to their other lands which lay west of the Mississippi. Article 5 of the treaty said:
The privilege of hunting, fishing, and gathering the wild rice, upon the lands, the rivers and the lakes included in the territory ceded, is guaranteed to the Indians, during the pleasure of the President of the United States.
By the Treaty of October 4, 1842, 7 Stat. 591, another large area of land east of the Mississippi Liver was ceded by the Chippewa Nation to the United States, upon terms similar to those of the treaty of 1837.
The Chippewas were slow to move to their lands west of the Mississippi. On February 6, 1850, President Zachary Taylor issued an Executive Order revoking the privilege of the Indians to occupy, and hunt and fish and gather wild rice on, the lands ceded by the Chippewas to the United States by the Treaties of 1837 and 1842. Intensive efforts were made to effectuate the removal of the Indians. Some 2,000 of them were removed within a period of three years. But by 1854 the Commissioner of Indian Affairs was recommending exceptions to the policy of removal. And by the Treaty of September 30,1854,10 Stat. 1109, it was provided, among other things, that the United States would grant. *482 reservations, on lands east of the Mississippi River which had been ceded to the United States by the Chippewas, to the three bands of Chippewas who are our present plaintiffs. The boundaries of the reservation for the La Pointe (Bad River) Band were defined in the treaty. The boundaries of the Lac du Flambeau and Courte Oreilles Reservations were to be later agreed upon or fixed by the President. Each of the latter two reservations was to contain an area of three townships.
We now go back to September 28, 1850, on which date the Swamp Land Act, 9 Stat. 519, was approved. It provided that, in order to enable the state to construct the necessary levies and drains to reclaim the swamp and overflowed lands,
the whole of those swamp and overflowed lands, made unfit thereby for cultivation, which shall remain unsold at the passage of this act, shall be, and the same are hereby, granted to said State.
Section 2 of the Swamp Land Act provided that it should be the duty of the Secretary of the Interior, as soon as practicable, to make out an accurate list and plats of the swamp lands in the States, and transmit such lists to the governors of the States, and, at the request of the governors, cause patents to be issued to the States for the swamp lands.
We can now see the basis for the conflicting claims of the Indians and the State of Wisconsin for such of the lands of the Indians’ reservations as were swamp lands.
The Government urges that none of the lands of the reservations passed to the State of Wisconsin by the Swamp Land Act of 1850. The Swamp Land Act of course only granted to the States land.which was owned by the United States. The Government says that the land ceded by the Chippewa Nation to the United States by the Treaties of 1837 and 1842 did not become the property of the United States until it was vacated by the Indians; that the land included in the reservations never was vacated by the Indians; that they occupied it in 1850 when the Swamp Land Act was passed; that the Treaty of 1854 granting their reservations was, in effect, only a relinquishment of the power of the President, reserved in the earlier treaties, to require them to vacate the land and thus perfect the title of the United States.
*483 We do not agree with the Government’s analysis. As onr findings show, the intention of the parties to the Treaties of 1837 and 1842 was that the United States was to have the title to the land, and the Indians were to have only a revocable license to use the land until the President required them to vacate it. We think the land was, in 1850, public land of the United States to which the Swamp Land Act applied.
Since the Treaty of 1854, granting to the Indians their reservations, as, indeed, before that time, they have had complete and exclusive use of the reservation land, subject to the usual Government supervision of the cutting and marketing of timber. They have had the proceeds of the sale of the timber, except that the sum of $119,450.50 plus accumulated interest, proceeds of the sale of timber from the Lac du Flambeau reservation, is being held by the Government on interest, to await the determination of its ownership. What, then, are the Indians suing for, except for this sum of money ? The theory of their suit seems to be that the Government sold them land in 1854 that it did not own, and should pay them for what it sold them but did not deliver to them. But, as we have seen, they have, for more than 100 years, had the undisturbed possession of what the Government purported to sell them in 1854. Their damages, at least up to the present time, could be only such damages as resulted from a cloud upon their title, and no such damages have been proved.
The story of the actions of the United States and the State of Wisconsin with regard to the swamp lands both within and outside these reservations is told in detail in our findings. The State, during most of the 100 years since the grant of the swamp lands, has insisted that it had rights in the lands, but has not been willing to disturb its citizens to whom the United States has granted such lands, outside the reservation, nor the Indians, within the reservations, in their possession of the lands. At times, the State, or important officials of the State, have expressed the opinion that the State did not own the swamp lands.
The position of the United States has, likewise, not been consistent. During part of the time it has denied that the State had any rights in the swamp lands in the reservations. *484 Its officials have, at other times, sought to induce Congress to pay the State for the swamp lands within the reservations.
As we have said, the State of Wisconsin was notified by the court of the pendency of the suit of the Indians, and of its right to intervene in the suit, should it desire to do so. The reason for the notice was that it had become evident to the court that the conflicting grants were an important feature of the case. The State did file a petition, as an inter-venor. In its petition the State denied the jurisdiction of this court over either the subject matter of the litigation, i. e., the title to the lands, or the state itself, in its sovereign capacity. However, because of the peril that it would run, if it failed to intervene, i. e., that a judgment that it had no rights in the land might be entered against it, it felt bound to intervene, reserving its rights to challenge our jurisdiction. It then asked for a judgment against the United States decreeing the title to the swamp lands in the reservations to be in the State of Wisconsin, and giving it a judgment against the United States for the proceeds of the timber cut and sold from those lands.
Since the State denies our jurisdiction, and only intervenes and asks relief because of the peril that it might be mistaken as to the question of our jurisdiction, we will not, of course, consider its petition or its prayer for relief unless it is necessary to do so in order to decide the issues between the plaintiffs and the United States. We do not find it necessary to do so, for reasons hereinafter stated, and will therefore dismiss the State’s petition. Its participation in the trial has been helpful and instructive to the court.
When the United States granted the reservations to the Indians in 1854, it became obligated to them to secure to them the enjoyment of the lands and of the proceeds of the lands. This was so, whether or not the United States then had good title to the lands which it purported to grant. If the title had failed and the Indians had lost the possession of the lands, the United States would have been liable to compensate them for their loss. If one with a better title had taken the timber from the lands, the United States would have had to compensate them for the timber. Whether or not the State of Wisconsin ever has owned or does now own *485 the swamp lands in the reservations is immaterial to the question of the obligation of the United.States to the Indians, under the Treaty of 1854.
As we have said, the Indians have had the possession and ■enjoyment of the reservation lands, and have received the proceeds of the timber cut from the lands, except that the ■sum of $119,450.50, the proceeds of timber cut from the Lac •du Flambeau Beservation during a certain period, has been held by the United States at interest to await a determination of the right to that money.
The Lac du Flambeau Band is entitled to recover the proceeds of timber cut from their reservation, to the extent that such proceeds have not already been paid over to them, together with the interest which has accumulated upon such unpaid proceeds.
The case is remanded to a commissioner of this court for -a determination of the amount to which the Lac du Flambeau Band is entitled, in accordance with this opinion, and for a determination of the amount of offsets, if any, to which the United States may be entitled.
As to the Lac Courte Oreilles Band and the Bad Liver or La Pointe Band, the petition is dismissed.
The intervening petition of the State of Wisconsin is •dismissed without prejudice.
LaRamobe. Judge; Whitaker, Judge; Littleton, Judge; and Jones, OMef Judge, concur.
FINDINGS OF FACT*
The court, having considered the evidence, the report of ^Commissioner W. Ney Evans, and the briefs and arguments ■of counsel, makes findings of fact as follows:[1]
1. Under the authority of the Act of August 30, 1935, 49 Stat. 1049, a petition was filed, on April 1, 1940, by the six bands of Lake Superior Chippewa Indians of Wisconsin who are named as plaintiffs in the caption of this case. On August 30, 1940, an intervenors’ petition was filed in the *486 original case, which had been numbered 45162, in behalf of the three bands of Lake Superior Chippewa Indians of Mimiesota whose names are carried in the caption as inter-venors.
On November 22, 1944, a separate, amended petition was-filed in behalf of the Lac du Flambeau, Lac Court Oreilles, and Bad River Bands to recover “damages for the value of' the land claimed by Wisconsin as swamp land and the timber thereon * * The amended petition carried the names of all the parties listed in the title hereinabove, except the State of Wisconsin. This case, presenting the claims of the three bands above listed for the swamp lands lying within their respective reservations, is numbered 45162 (I).
On February 21, 1945, another separate, amended petition was filed in behalf of the Lac du Flambeau, Bad River, and Red Cliff Bands to recover for timber alleged to have been wrongfully taken by third parties from so-called school land sections. The amended petition carried the names of alii the parties listed in the title hereinabove, except the State' of Wisconsin. The case presenting the school land claims-of the three bands above listed was numbered 45162 (II).. It was adjudicated by the court’s decision of February 7, 1949,113 C. Cls. 16, wherein the petition was dismissed.
The petition in the original case (numbered 45162) was also dismissed by the court’s decision of November 3, 1953, 126 C. Cls. 596.
In the meantime, the present case (absent the State of Wisconsin) was heard and reported by a commissioner of the court. The parties filed their exceptions and briefs, and the case was argued and submitted. The findings and argument brought to the court’s attention the possible rights of the State of Wisconsin, and the court, on October 12, 1948, caused to be sent to the Governor and the Attorney General of Wisconsin a notice of the pendency of the suit, and of the right of the State to intervene. On February 28, 1949, the State of Wisconsin filed its petition as intervenor.
Thereafter, defendant moved to dismiss the State’s petition on the ground that any claim Wisconsin might have to the swamp lands within the Indian reservations or to the proceeds of the timber cut from such lands was barred by the *487 statute of limitations. The motion to dismiss was denied on July 11, 1949, 114 C. Cls. 71, and Wisconsin was accorded the status of a party in the case.
Therefore, the interested parties in this action, which presents the last of the claims pending here under the jurisdictional act of 1935, are: (1) three bands of Lake Superior Chippewa Indians of Wisconsin (the Lac du Flambeau, Lac Court Oreilles, and Bad Elver Bands, who are sometimes hereinafter referred to as the plaintiffs or as the plaintiff bands) ; (2) the State of Wisconsin (sometimes referred to as the intervenor) ; and (3) the United States (which, as defendant, is sometimes referred to as the Government). No other party listed in the caption has any interest in the case.
2. The Jurisdictional Act of August 30, 1935, 49 Stat. 1049, provided:
* * * That all claims of whatsoever nature which the Chippewa * * * Indians of Wisconsin may have against the United States, which have not heretofore been determined by the Court of Claims or the Supreme Court of the United States, may be submitted to the Court of Claims with the right of appeal * * *, for determination of the amount, if any, due said Indians from the United States under any treaties, agreements, or laws of Congress, or for the misappropriation or waste of any of the funds or lands of said Indians * * *, or for the failure of the United States to pay said Indians any money or other property due; and jurisdiction is hereby conferred upon the Court of Claims * * * to hear and determine all legal and equitable claims, if any, of said Indians against the United States, and to enter judgment thereon. * * * [2]
* * * If any claim or claims be submitted to said courts they shall settle the rights therein, both legal and equitable, of each and all of the parties thereto, not *488 withstanding lapse of time or statutes of limitations * * ❖ [3]
3. The separate, amended petition of the plaintiff bands, filed on November 22, 1944, asserted that “* * * this proceeding is brought to determine the rights and claims of "these petitioners to the swamp lands lying within their respective reservations.” Separate allegations in behalf of each of the three bands repeated the following (in substance) : (a) that defendant, in violation of plaintiffs’ rights, caused to be transferred to the State of Wisconsin, under the Swamp Land Act of 1850, certain lands within the boundaries of plaintiffs’ reservations, and failed to pay the value thereof, or to account for the proceeds therefrom; (b) that, at the time the lands were acquired by Wisconsin, timber was standing thereon; (c) that such timber has since been cut; and (d) that defendant now holds the proceeds ■derived from the sale of such timber. In their prayer for relief, plaintiffs demand: (i) damages for the value of the land claimed by Wisconsin as swamp land and the timber thereon; (ii) such interest as the Court shall find due; and (iii) such other and further relief as may be just.[4]
4. (a) The intervenor’s petition, filed on February 28, 1949, quoted the first and fourth sentences of subsection (b), ■section 14, Contract Settlement Act of 1944, 58 Stat. 649, '663; 41U. S. C. 114, and then asserted:
* * * Intervenor denies that this court has jurisdiction over either the subject matter of its claim, or of inter-venor, in its sovereign capacity, as a party. * * *
* * * A justiciable controversy exists between plaintiffs and defendant, and between intervenor and defendant, with respect to the title to all [swamp] lands located within the three reservations * * *. A determination of the * * * issue in the claim of * * * Wisconsin to the title to * * * said lands * * * is a prerequisite * * * to the final judgment of this court sought by plaintiffs against defendant. * * *
*489 Subject to the foregoing, the intervenor’s petition set forth; two causes of action, one based upon Wisconsin’s claim to the-swamp lands lying within plaintiffs’ reservation, and the other upon the State’s claim to the proceeds of timber cut from such swamp lands.
In its prayer for relief, made “subject to its reservation of the right to challenge the jurisdiction of this court over the subject matter of the suit and the ‘person’ of inter-venor,” the State demanded judgment against defendant “(1) * * * decreeing the fee simple title in * * * Wisconsin to all swamp * * * lands located within the * * *' Reservations * * * [and] (2) adjudging * * * that the-intervenor * * * recover * * * the proceeds of sale of timber cut from said lands * *
(b) Following is a quotation from the opinion of the court denying the Government’s motion to dismiss Wisconsin’s petition, 114 C. Cls. 71, 74:
Wisconsin, by its petition to intervene, as modified by statements made by counsel in argument and in a later written communication to the Court, takes the position that it is the owner of the swamp lands in question by virtue of the Swamp Lands Act of * * * 1850, and that a justiciable controversy exists between the plaintiff Indians and the Government, and between Wisconsin and the Government with respect to those lands, but that this Court does not have jurisdiction to quiet title to those lands in the State. It * * * asserts its right to * * * proceeds [of timber cut from such lands],. with interest, as a claim founded upon a contract with the United States. It asks for such other and further relief as may be justified. * * *
* * * If it acquired title to the swamp lands by the Act of * * * 1850, whether it has since that time lost that title by the running of the statute of limitations-will depend upon the facts which have occurred since,, and the applicable law. * * * Also, as to the proceeds of the timber, * * * Whether there was such an agreement as Wisconsin asserts, and what later events may have occurred to start the statute of limitations to run against Wisconsin must be shown by evidence. * * *
(c) The following are excerpts from the opening statement of the attorney for intervenor at the beginning of the-, trial:
*490 The primary purpose of tbe state in presenting its evidence is to support the proposition that the state is entitled to recover the proceeds received by the United States for the timber removed from the swamp lands claimed by the state on the * * * reservations. * * *
* * * The state will prove that it is entitled to all of the proceeds of timber cut from swamp lands which were received by the United States from the three reservations, pursuant to the Act of May 18,1916.
Further, the state will show that some timber had been cut and removed from swamp lands * * * within sections 16 on * * * [two of the] reservations, and that the United States * * * has not accounted to the state for the proceeds * * *.[5]
5. Among the Indians who inhabited North America when European colonization of this continent was begun in the 16th century was a large group which has since come to be known, because of linguistic features as Northern Algonquians. This linguistic group included such smaller and better known groups as the Chippewas, Delawares, Illinois, Miamis, Ottawas, Pottawatamies, and Shawanoes.
The Chippewas were in the area of the Great Lakes and the Mississippi in the 17th and 18th centuries, and were known as a distinct cultural group to the explorers, traders, and settlers who pressed into that region during the latter part of the 18th and early part of the 19th centuries.
White men in the Northwest Territory found the Chippewas to be a nomadic people who lived by hunting and fishing. While they shared a common cultural heritage, they lived in small groups, usually composed of a chieftain or headman and his brothers or other close relatives and their women and children. When any group became too large for its support to be readily drawn from the immediate hunting or fishing grounds, part of the group would split off into a separate village and occupy other lands, usually nearby. In this manner clusters of villages developed, and have come to be known *491 as bands, frequently named from the geographic area ■occupied.
The areas occupied by the Chippewas south of Lake ■Superior, in what are now the States of Wisconsin and Minnesota, were characterized by large stands of pine timber in which there was little or no underbrush. The portions of rivers and streams traversing these stands of timber were devoid of fish. The pine forests were therefore sterile, from the standpoint of the Indians, since conifer supported neither game nor fish. Interspersed among the pine forests were ■stands of deciduous trees and open spaces where game was plentiful and fish were abundant in the lakes and rivers. There the Indians lived in small groups or villages, moving from time to time from one hunting or fishing ground to another.
Within the area above described the three bands of Chippewa Indians who are plaintiffs in this case occupied lands in the lake region, in which there were sizable patches of wild rice, which Indians had learned to harvest and on which they relied as a staple of their food supply.
The lands here in controversy lie within the lake region where the plaintiff bands have lived for centuries past.
6. When the first voyages of discovery of the New World were made at the close of the 15th century, the principle of ■extending sovereignty by discovery was known to and observed by European monarchs.[6] Its use was continued throughout the 16th and into the 17th centuries.
The colonization which followed discovery was also made under royal dispensations. The English and French grants were uniformly predicated on sovereign right over the territory granted, albeit the territory was occupied by Indians.
During the initial period of colonization the European monarchs were primarily concerned with the competition among themselves to establish living evidence of the discoveries upon which their asserted extensions of sovereignty were based. The Indians’ rights, if any, were of no concern to them. The lands could be taken from the Indians by con *492 quest, if necessary, and the royal suzerainty would thus become de jure on a de facto foundation.
The colonists found conquest an uncertain and dangerous adventure. They soon abandoned it in favor of amicable adjustments as far as possible. Moreover, fairness demanded recognition by them of moral, if not legal, rights inherent in the initial occupancy by the Indians. Agreements between colonists and Indians, covering sizable areas of land and affecting many persons, had to be made on a group basis* The English colonists, following the patterns of law and government known to them, treated with the Indians for agreements in the nature of treaties between their colonies on the[1] one hand and the Indian tribes or nations on the other. The development of this technique was well under way when the American colonies declared their independence of the British Crown.
7. At the time of the American Revolution the Chippewa Indians had spread over a wide area and were found, with other tribes of Indians, in territory now included in the States of Ohio, Michigan, Indiana, Illinois, Wisconsin, Minnesota, and the Dakotas.
8. Upon the commencement of hostilities with the British,, the Continental Congress assumed the full powers of sovereignty needed by the central government to wage war; On November 15, 1777, the Articles of Confederation were adopted by the Continental Congress for submission to the States. Three and a half years passed before the Articles went into operation on March 1, 1781. The delay was primarily due to the inability of the States to agree upon the disposition to be made of the lands included in what later became the Northwest Territory, a region ceded to the United States by the British in the treaty of 1783, which included the present State of Wisconsin.
The lands within the Northwest Territory were the subject of conflicting claims of ownership, based on grants from the Crown and claims of conquest of Indian tribes, by the States of New York, Virginia, Connecticut, and Massachusetts. The other States maintained that the entire region should belong to the whole Union and should be administered for the common good. The dispute was finally resolved on *493 that basis. The ordinance for the government of the territory northwest of the Ohio Biver was adopted by the Continental Congress on July 13, 1787, and confirmed by the succeeding first Congress of the United States under the Constitution (Act of August 7,1789,1 Stat. 50).
At that time large parts of the lands included in the Northwest Territory, including the lands here in controversy, were occupied exclusively by Indians.[7]
9. Within 50 years after the adoption in 1787 of the Northwest Ordinance the United States made more than 200 agreements with the Indians. A substantial portion of the total was concerned with Indians living in the region which comprised or had comprised the Northwest Territory, and Chippewa Indians were parties to 23 of them.
From the outset the parties to these treaties and conventions undertook to draw lines of demarcation which would •delineate lands “ceded” to the United States by the Indians from lands of which the Indians had made no relinquishment. The technique of extinguishing Indian title by ■treaty was recognized by Congress as early as 1793.[8]
Within another decade the technique of treating with the Indians for the extinguishment of their title subject to continued temporary and permissive occupancy by them of ceded lands, had been developed,[9] and was soon thereafter (1804) augmented by a long range policy for the eventual removal of all Indians living east of the Mississippi to lands lying west of that river.
*494 10. (a) The Act of March 26,1804, 2 Stat. 277, provided:
* * * the powers vested by law in the surveyor-general, shall extend over all the public lands of the United States to which the Indian title has been or shall hereafter be extinguished, north of the river Ohio, and east of the river Mississippi; and it shall be the duty of the said surveyor-general to cause the said lands to be surveyed into townships, six miles square, * * *. * * *' also * * * to ascertain by astronomical observations the positions of such places north of the river Ohio and east of the river Mississippi, as may be deemed necessary for the correctness of the surveys, and to be the most important points of the geography of the country. * * *
(b) For the purposes of this narrative the first and most important line located by the surveyors was the fourth principal meridian of longitude, which runs approximately through the middle of Wisconsin, and appears o,n modern maps as 90 degrees west of Greenwich.
(c) The Act of February 11, 1805, 2 Stat. 313, provided:
* * * the surveyor-general shall cause * * * those lands * * * which * * * were subdivided,[10] by running through the townships, parallel lines each way, at the end of every two miles, and by marking a corner on each of the said lines, at the end of every mile; to be subdivided into sections, by running straight lines from the mile corners thus marked, to the opposite corresponding corners, and by marking on each of the said lines, intermediate corners as nearly as possible equidistant from the corners of the sections on the same. * * *[11]
(d) The Act of April 25, 1812, 2 Stat. 716, created the General Land Office in the Department of the Treasury, and made it the duty of the commissioner “* * * to superintend, execute and perform, all such acts and things, touching or respecting the public lands * * * as have heretofore been * * * done * * *” by the Departments of State, Treasury, and War.
11. (a) The Northwest Territory became the Indiana Territory in 1800, embracing all its original area except Ohio.[12] Michigan Territory was severed from the Indiana *495 Territory in 1805.[13] Indiana became a separate territory, in preparation for statehood, in 1809, and the remainder of the old Northwest Territory became Illinois Territory.[14] Illinois was severed, in preparation for statehood, in 1818, and the remainder of the old Northwest Territory was attached to and made a part of Michigan Territory.[15]
(b) Lewis Cass was appointed territorial governor of Michigan in 1816, and began negotiations with the Indians of that area in 1817. By the time Cass went to Michigan, responsible officials of the United States (including Cass) realized that success in treating with the Indians required councils with headmen who could command the following of all the Indians occupying the area concerned.[16]
(c) In 1818, by the territorial laws of Michigan, the area now embraced in the State of Wisconsin was divided into two counties, using the Wisconsin Liver as the dividing line. The area east of the river was placed in Brown County, while the name Crawford was given to the county west of the river.
(d) In 1820, Henry L. Schoolcraft joined the staff of Lewis Cass as a geologist. In 1822, he began his work as Indian agent at Sault Ste. Marie, Michigan (Territory). School-craft spent 30 years among the Indians and came to know them, particularly the Chippewas, as well as any man of Ms time.
Early in Ms work Schoolcraft realized the importance of being able to identify roving bands of Indians by tribes and by the geographical areas in- which they usually resided. Shortly after the opening of the Indian Agency at Sault Ste. Marie, he began the task, in which he persevered over the years with unremitting care, of identifying and listing Indians of the Michigan-Wisconsin-Minnesota area according to tribes, bands, and customary habitat. This task was *496 ¡rendered more important by the necessity for him, as administrative officer in charge of arrangements, to determine the identity of individuals as well as bands who were proper and legal recipients of the various annuities required by treaty •and provided by Congress.[17]
12. (a) The Act of May 28, 1830, 4 Stat. 411, authorized •the President “* * * to cause so much of any territory belonging to the United States, west of the * * * Mississippi, not included in any state or organized territory, and to which the Indian title has been extinguished, as he may judge necessary, to be divided into * * * districts, for the reception of such tribes or nations of Indians as may choose to exchange the lands where they now reside, and remove there * * [18]
(b) On June 30,1834, a new act to regulate trade and intercourse with the Indians became effective, 4 Stat. 729.[19] Following are excerpts from the act:
* * * all that part of the United States west of the Mississippi, and not within the states of Missouri and Louisiana, or the territory of Arkansas, and, also, that part of the United States east of the Mississippi river, and not within any state to which the Indian title has not been extinguished, for the purposes of this act, be taken and deemed to be the Indian country.
* * * if any person shall sell, exchange, or give, barter, or dispose of, any spirituous liquor or wine to an Indian (in the Indian country), such person shall forfeit and pay the sum of five hundred dollars * * *.[20]
*497 (c) Simultaneously with, the adoption of the foregoing . trade and intercourse act, the management of Indian affairs was reorganized (by the Act of June 30,1834, 4 Stat. 735). This act provided, in part, as follows:
* * * the duties of the governor of the territory of Michigan, as superintendent of Indian affairs, shall cease from and after the establishment of a new territory, embracing the country west of Lake Michigan, should such a territory be established. And while the governor of the said territory of Michigan continues to act as superintendent of Indian affairs, he shall receive * * * compensation for services in said capacity.
(d) The Act of April 20, 1836, 5 Stat. 10, organized the Territory of Wisconsin “from and after the third day of July next” to include lands within the boundaries of the present States of Wisconsin, Minnesota, and Iowa, and parts of Michigan[1] and the Dakotas. The act provided that the territorial governor “shall perform the duties and receive the emoluments of superintendent of Indian affairs * *
Henry Dodge became the territorial governor, and, ex officio, Superintendent of Indian Affairs.
(e) One of the first acts of the newly formed territorial government of Wisconsin was the creation in 1836 of 15 new counties in the southeastern part of Brown County.[2] The tier of new counties extended from the mouth of the Wisconsin Liver (where it joins the Mississippi) northeastwardly, almost to the present site of Green Bay. White settlements in the region so organized were then populous enough to require the greater extent of local government. Crawford County, which included the lands subsequently set aside as reservations for the plaintiff bands, was unaffected by these measures.
13. (a) The Act of March 3, 1837, 5 Stat. 158, making appropriations for the Indian Department, carried an item of $10,000 “for holding treaties with the various tribes of *498 Indians east of the Mississippi river, for the cession of lands held by them * * * and for their removal west of the Mississippi * * *.”
(b) On May 13, 1837, the Office of Indian Affairs addressed to the two commissioners (of whom Governor Dodge was one) who had been appointed by the President “* * * to hold a treaty with the Chippewa Indians of the Mississippi, * * *” a memorandum “* * * to communicate to [them] the particular objects of the Government, and its views as to the mode in which they may be accomplished.” The memorandum continued:
The tract which it is considered desirable to procure from these Indians, is that part of their country which lies east of the Mississippi river, and south of the 46th meridian of longitude.[3] It is understood, that this tract is valuable for the pine woods which cover it, but is unfit for cultivation. Its acquisition by the TJ. S. will be beneficial to both parties. To the United States, by .opening to its citizens an extensive wood land, important especially from the rapidity with which settlements are multiplying: to the Indians by giving them an ample consideration in money * * * and other means of improvement. If the Indians retain this land, experience has shewn that they will part with the most valuable of the timber to individuals, for at best very inadequate remuneration. * * *
(c) It.was the purpose of the Government, in arranging for the treaty with the Chippewas, to negotiate for the purchase of the Indian lands, in the sense of extinguishment of their title, to the end that such lands could be opened to white settlement at such time as the Government might deem it desirable to do so.
14. (a) On June 5, 1837, Governor Dodge forwarded written instructions to the subagent for the Chippewa Indians to send messimgers to the Chippewas in specified localities “to notify them of the time [July 20] and place [Fort Snelling] of the treaty * * The instructions said:
* * * It is a subject of great importance that the different bands of the Chippewas should be represented to prevent discontent among those who may not attend. *499 It will satisfy these Indians that the Government is disposed to do justice to all. * * *
(b) The council was held as scheduled, “near Fort Snelling, at the confluence of the St. Peters and Mississippi rivers,” commencing on July 20 and extending through July 29,1837. The treaty was signed by Governor Dodge and the Indians on the last day of the council.
Indians attending the council, as evidenced by the signatures to the treaty, included chiefs from 13 localities; and among them were chiefs from Lac du.' Flambeau, “Lake Courteoville,” and La Pointe.
According to the Journal of the Proceedings of the Council, Governor Dodge told the Indians in his opening statement that he had been sent by the President to propose to them the purchase of some of their lands east of the Mississippi ; and the Indians understood that the proposition before them related to the sale of certain areas of their land. In the course of negotiations the Governor specifically requested the chiefs from Lac du Flambeau and Lac “Coutereille” to come forward and examine the map with him. Before the treaty was signed Governor Dodge had it read to the Indians.
15. The Treaty of July 29, 1837, 7 Stat. 536, between the United States and “the Chippewa nation of Indians * * contained the following provisions:[4]
Article 1. The said Chippewa nation cede to the United States all that tract of country included within the following boundaries: * * *
Article 2. In consideration of the cession aforesaid, the United States agree to make the Chippewa nation' * * * the following payments. * * *
Article 5. The privilege, of hunting, fishing, and gathering the wild rice, upon the lands, the rivers and the lakes included in the territory ceded, is guaranteed [sic] to the Indians, during the pleasure of the President of the United States. * * *
16. In negotiating and signing the Treaty of July 29, 1837, the United States commissioner intended to buy and the *500 Indians intended to sell the Indians’ original right of oecupancy of the lands.
17. (a) The northern boundary of the Wisconsin land so ceded was south of the Canadian border (by distances varying from 20 to 40 miles). The ceded strip was approximately 100 miles wide (north and south) and nearly 200 miles long (east and west). It included the area which was subsequently set aside as the Lac Court Oreilles Reservation, which, in turn, included some of the lands here in controversy.
(b) If .any surveys had been made in the ceded area at the time of the treaty of cession, they were general in nature. Four or five years after the 1837 treaty, the surveys of townships in Crawford County had been extended only three tiers north of the Wisconsin River on the. fourth principal meridian. The numbering of townships, north, had been started at the southern boundary of the territory (the line between Wisconsin and Illinois), which is approximately halfway between the parallels of latitude marking 42 and 43 degrees north of the equator. Ranges were numbered east in sequence from the fourth principal meridian, and also west from that line. The basic pattern of survey thus established was continued, so that ultimately there were 51 townships north (306 miles), 28 ranges east, and 32 ranges west (making 360 miles across, the State)-.
18. (a) The Chippewa Indians who remained on the lands ceded by the Treaty of July 29, 1837, insisted upon the exclusion of other Indians (including related bands of Chippewas) living north and east of the ceded area from the benefits (payments and services) provided by the treaty.
(b) As white men pressed into and through the ceded lands, the supplying of intoxicants to the Indians in and around the area became a source of irritation and concern to white settlers and officials.[5]
*501 (c) By 1840, the Indian subagent at La Pointe was concerned over the necessity for and the nature of provisions for the removal and resettlement of the bands living in the ceded area. In that year (1840) a new county (St. Croix) was carved out of the western part of Crawford County, and a year later still another county (Chippewa) was.taken from the center of Crawford, while a third new county (Portage) took the eastern edge of Crawford and the western edge of Brown County to encompass the Wisconsin River along the first 140 miles of its course. Within another two years La Pointe County had taken over the northern section of St. Croix .and Chippewa Counties, making a total of seven counties[6] within the area originally assigned to Crawford County, five of which reflected the influx of white settlers into what had recently been Indian country.
19. (a) The Act of March 3, 1841, 5 Stat. 417, appropriated $5,000 “* * * to defray the expenses of holding treaties with the Indian tribes for the. extinguishment of their titles to their lands within the limits of the State of Michigan.”
(b) On August 1,1842, the Office of Indian Affairs wrote to the Acting Superintendent of Indian Affairs for Michigan:
The Congress * * ■* having * * * appropriated $5,000 to defray the expenses of holding treaties with the Indian tribes for the extinguishment of the titles to their lands within the limits of the • State of - Michigan it is deemed the duty of the Department to enter upon the negotiation.
There are valuable minerals on the land that the Chippewas are possessed of (and they are the only Indians that hold any land in Michigan) which extend westward, however, of that State and cover, out of its limits, mines of copper etc. The law making the appropriation refers only to Michigan but taking- care to obey the direction of the Act there can be no objection that I perceive to extending the purchase beyond the State. It is important, it strikes me, that we should have the uninterrupted control of the whole Southern Shore of Lake Superior for commercial and other purposes, as well as for mining.
*502 * * * it is contemplated to extend the purchase West of the State of Michigan, and I think as far as the station of the American Fur Company * * * South West of Fond-du-Lac, and thence * * * to the cession made by the Chippewas of the Mississippi on the 29 July 1837. * * *
(c) The treaty was made in October, following. The purpose of the Government in making the treaty was to extinguish Indian title to the lands described in the treaty.
20. The Treaty of October 4, 1842, 7 Stat. 591, was made at La Pointe, “between Robert Stuart,[7] commissioner on the part of the United States, and the Chippewa Indians of the Mississippi, and Lake Superior * * It provided, in part, as follows-:[8]
The Chippewa Indians of the Mississippi and Lake Superior, cede to .the United States all the country within the following bounderies [sic]: * * * it being the intention of the parties to this treaty, to include in this cession, all the Chippewa lands eastwardly of. the * * * line * * * from the * * * trading post on the Fond du Lac river to the intersection of the line of the treaty made with the Chippewas of the Mississippi July 29th 1837. * * *
The Indians stipulate for the right of hunting on the ceded territory, with the other usual privileges of occupancy, until required to remove by the President of the United States, and that the laws of the United States shall be continued in force, in respect to their trade and intercourse with the whites, until otherwise ordered by Congress.
* *.* whenever the Indians shall be required to remove from the ceded district, all the unceded lands belonging to the Indians of Fond du Lac, Sandy Lake, and Mississippi bands, shall be the common property and home of all the Indians, party to this treaty.
In consideration of the foregoing cession, the United States, engage to pay to the' Chippewa Indians of the Mississippi, and Lake Superior, annually, for twenty-five years * * *.
Whereas the whole country between Lake Superior and-. the Mississippi, has always been understood as belonging in common to the Chippewas, party to this treaty;, and whereas the bands bordering on Lake *503 Superior, have not been allowed to participate in the annuity payments of the treaty made with the Chippewas of the Mississippi * * * July 29th 1837, and whereas all the unceded lands belonging to the aforesaid Indians, are hereafter to be held in common, therefore, to remove all occasion for jealousy and discontent, it is agreed that all the annuity due by the said treaty, as also the annuity due by,the present treaty, shall henceforth be equally divided among the Chippewas of the Mississippi and Lake Superior, party to this treaty, so that every person shall receive an equal share.
The Indians residing on the Mineral district, shall be subject to removal therefrom at the pleasure of the President of the United States. * * *
21. (a) The Indian bands who were parties to the foregoing treaty, as indicated by the signatures thereto, came from 18 localities, including ten (identifiable) locations represented by signatories of the Treaty of July 29, 1837. Among the ten localities represented at both councils were Lac du Flambeau, Lac Court Oreilles, and La Pointe.
(b) In negotiating and signing the Treaty of October 4, 1842, the United States commissioner intended to buy and the Indians intended to sell the Indians’ original right of occupancy of the lands.
(c) The provision in the treaty for the retention of the trade and intercourse laws of the United States in the ceded area was a matter of expediency resulting from the disruptive influence of the sale of liquor to the Indians[9] and the ineffectiveness of territorial laws in coping with the situation.[10]
(d) The Wisconsin lands so ceded were north and (in part) east of the cession of 1837, and comprised all the remaining lands occupied by the Chippewas in Wisconsin, except for *504 a small strip omitted by reason of the inability of the parties to give a precise location to the American Fur Company’s trading post on the Wisconsin-Minnesota boundary.
This cession included the lands subsequently set aside as the Lac du Flambeau and Bad Liver Leservations, which, in turn, included some of the lands here in controversy.
22. (a) The Act of August 6, 1846, 9 Stat. 56, authorized the people of the Territory of Wisconsin to form a constitution and State government, for the purpose of being admitted into the Union.[11] The act further provided that:
* * * section numbered sixteen, in every township of the public lands in said State, and, where such section has been sold or otherwise disposed of, other lands equivalent thereto, and as contiguous as may be, shall be granted to said State for the use of schools. * * *
(b) The Act of March 3, 1847, 9 Stat. 179, provided, in part, as follows:
* * * all that portion of the public lands lying within the Territory of Wisconsin, north and west of the following boundary, to wit: commencing at the Mississippi Liver on the line between townships twenty-two and twenty-three north, running thence east along said line to the fourth principal meridian, thence north along said meridian line to the line dividing townships twenty-nine and thirty, thence east along said township line to the Wisconsin Liver, thence up the main channel of said river to the boundary line between the State of Michigan and the Territory of Wisconsin, shall form a land district, to be called the Chippewa Land District; and, for the sale of the lands in said district, a land office shall be established * * *.
* * * a geological examination and survey of the lands * * * in said district [shall] be made * * *. * * * such of said lands as may contain copper, lead, or other valuable ores, [shall] be exposed to sale * * *. And all the lands * * * in said district, not reported as aforesaid, shall be sold in the same manner as other lands under the laws now in force for the sale of the public lands, excepting and reserving from such sales section sixteen in each township for the use of schools, and such reservations as the President shall deem necessary for public uses. * * *
*505 (c) The lands subsequently set aside as reservations for the three plaintiff bands were within the Chippewa Land District as above defined.*[12]
(d) The Act of May 29, 1848, 9 Stat. 233, formally admitted the State of Wisconsin into the Union.[13]
23. (a) The Act of March 3, 1849, 9 Stat. 403, established the Territory of Minnesota.
(b) Meanwhile, the Office of Indian Affairs had obtained from the Chippewas of the Mississippi and Lake Superior extensive cessions of land in Minnesota east of the Mississippi River.[14]
(c) Among the early (1849) actions of the legislative assembly of the new territory of Minnesota was a resolution urging the removal of the Chippewas living on ceded lands east of the Mississippi to unceded lands west of the river. .This resolution received the favorable consideration and ultimate endorsement of the Territorial Governor (who was ex officio Superintendent of Indian Affairs for Minnesota), the Commissioner of Indian Affairs, and the Secretary of the Interior.
24. On February 6,1850, the President (Zachary Taylor) issued the following Executive order
The privileges granted temporarily to the Chippewa Indians of the Mississippi, by the fifth article of the treaty made with them on the 29th of July 1837, “of hunting, fishing and gathering the wild rice, upon the lands, the rivers and the lakes included in the territory ceded” by that treaty to the United States; and the right granted to the Chippewa Indians of the Mississippi and Lake Superior, by the second article of the treaty with them of October 4, 1842, of hunting on the territory which they ceded by that treaty, “with the other usual privileges of occupancy until required to remove by the President of the United States,” are hereby revoked; and all of the said Indians remaining on the lands ceded as aforesaid, are required to remove to their unceded lands.
*506 25. The issuance of the foregoing Executive order precipitated a public discussion in which expression was given to many differences of opinion concerning the removal.
Opposition to removal was widespread among the Chippewa Indians living on the ceded land. Their reasons were •many and varied, with a common denominator based on reluctance to leave the vicinity of the white settlements.
Separation from the whites was, on the other hand, the central theme of the advocacy of removal by Indian agents and subagents. These officials had observed that the intrusions of the white men had resulted in depletion of the supply of game and fish, had made it possible for the Indians to obtain intoxicants readily, had introduced communicable diseases among the Indians, and seemed generally to precipitate a retrogression of Indian economy, health, and character. Therefore, the agents reasoned, send the Indians west, away from the white settlements, to new and better hunting grounds, and let them regain their former way of life. Frequent recommendations had been made by the agents for the payment of annuities in the western, unceded lands, as a means of inducing the Indians to remove to those lands.
Removal was opposed by many of the missionaries and teachers and other well-meaning people.[15] Their argument was that the white man had never given the Indian a real chance to adopt the white man’s way of life, and that, instead of banishing the red man to the western lands, he should be given a chance to own and cultivate the soil where he had always lived. Some of these persons apparently realized that the western lands were not unlimited, and that provision for the Indians to continue a nomadic life over vast areas would ultimately prove impossible.
As so often happens in such matters of divided opinion on public affairs, the Government temporized and then compromised. Within the next decade, both policies were adopted and given expression in substantial form. Neither succeeded as its advocates had hoped.
*507 26. The Swamp Land Act (of September 28,1850, 9 Stat. 519) provided as follows:[16]
* * * to enable the State of Arkansas to construct the necessary levees and drains to reclaim the swamp and overflowed lands therein, the whole of those swamp and overflowed lands, made unfit thereby for cultivation, which shall remain unsold, at the passage of this. act, shall be, and the same are hereby, granted to said State.
Sec. 2. * * * it shall be the duty of the Secretary of the Interior, as soon as may be practicable after the passage of this act, to make out an accurate list and plats of the lands described as aforesaid, and transmit, the same to the governor of the State of Arkansas, and, at the request of said governor, cause a patent .to be' issued to the State therefor; and on that patent, the fee simple to said lands shall vest in the said State of Arkansas, subject to the disposal of the legislature thereof: Provided, however, That the proceeds of said lands, whether from sale or by direct appropriation in kind, shall be applied, exclusively, as far as necessary, to the ..purpose of reclaiming said lands by means of the levees and drains aforesaid.
Sec. 3. * * * in making out a list and plats of the land aforesaid, all legal subdivisions, the greater part of which is “wet and unfit for cultivation,” shall, be included in said list and plats; but when the greater part of a subdivision is not of that character, the whole of it shall be excluded therefrom.
Sec. 4. * * * the provisions of this act be extended to, and their benefits be conferred upon, each of the other States of the Union in which such swamp and overflowed lands, known and designated as aforesaid, may be situated. * * *
27. (a) The Act of September 30, 1850, 9 Stat. 544 (making appropriations for the Indian Department), appropriated $25,000 “for expenses of removal and subsistence of the Chippewas of Lake Superior and Mississippi from the lands ceded under the treaty of” October 4,1842.
(b) The Act of February 27, 1851, 9 Stat. 570 (supplying deficiencies in appropriations), appropriated $25,00.0 “for expenses of removal and subsistence of the Chippewas of Lake Superior and the Mississippi from the lands ceded *508 under the treaties of” July 29,1837, and October 4,1842, “in addition to the appropriation of” September 30, 1850. The same act. appropriated $3,000 “for expenses of the removal of the subagency for the Chippewas of Lake Superior and the Mississippi from the old site at Lapointe, to the new one * * *.”
(c) The Territorial Governor of Minnesota {ex officio Superintendent of Indian Affairs for the territory) was placed in .charge of the removal. He made an intensive effort-to effect the removal of all the Chippewas from ceded lands in Wisconsin, and succeeded in removing some 2,000 of them over a period of three years. Some of the' obstacles he .encountered proved insurmountable, however, as to some of the. bands, and by 1854 the Commissioner of Indian Affairs was recommending exceptions to the policy of removal.
28. On November 21, 1850, rules for the administration of the Swamp Land Act were initiated by the Commissioner of the General Land Office in a letter to the surveyor general of each of the States affected.[17] Among the instructions were the following:
(1) That all lands which, though dry part of the year, are subject to inundation at the planting, growing, or harvesting season, so as to be unfit for cultivation taking the average of the seasons over a reasonable number of years, should be considered swamplands.
(2) That a list should be made, from the -field notes of surveys then on file, of the lands so granted to the State, designating those which had been sold or otherwise disposed of since the passage of the law and the price paid for them when purchased.- If the State should be willing to adopt such lists, the General Land Office would regard them as controlling. Otherwise the office would accept satisfactory evidence furnished by the State of lands embraced by the grant.
(3). That in making up the lists on the basis of the surveyors’ field notes, intersections of survey lines with swamp or overflow should be connected by straight lines, and all legal subdivisions the greater part of which were thus shown to be swamp or overflow should be so certified to the State.;
*509 (4) That if the State preferred to have surveys.made, only the boundaries of the swamp or overflowed lands should he surveyed, and connections taken with the nearest section or township corner; or
(5) That lakes and streams should be meandered and ordinates surveyed at suitable intervals from the borders of the lake or. stream to the margin of bordering swamp land. Connection of the ends of the ordinates would, give the boundaries of the swamp land with sufficient accuracy.'
(6) That determinations of swamp lands should be made in terms of quarter-quarter (40-acre) sections.
. The surveyor general was further instructed to make out lists of the swamp-lands as early as practicable and,' after the selections were approved by the Secretary of the Interior, to have the register enter all the lands so' selected as granted ■to the State.
■29. (a) ‘ The surveyor general did not transmit to the'Governor of Wisconsin lists of the swamp lands shown by the field notes, as he had been instructed to do in keeping, with the mandate of the Act to the Secretary of the Interior.[18]*? No such lists'have yet b¿en transmitted to the Governor of Wisconsin by the Secretary of ;the Interior.??' [19] \. ‘
■ (b) When the regulations for the administration, of the Swamp'Land Act were issued by the General Land/ Office, extensive portions of Wisconsin had not been Surveyed,[20] and many of the plats and field notes of surveys that had'been completed (and some of those made thereafter) were rough *510 and inexact in their designations of swamp and overflowed lands.[1]
30* (a) On March 15, 1851, the Wisconsin legislature authorized the Governor “* * * to appoint * * * persons * * * to act under his direction, in selecting ‘swamp lands’ * * * [and] * * * to obtain from the * * * surveyor general, copies of all the township plats of this State on file at that office. * * *”
(b) On June 3,1851, the Governor of Wisconsin (Nelson Dewey) wrote to the surveyor general:
* * * As the decision of your Office, under these instructions, is, that the State * * * must adopt one or the other of * * * two bases * * * and cannot rely upon both combined, I have to advise you that this State is willing to adopt the field notes of the Surveys on file in your office as the basis * * *.
. (c) On April 19,1852, the Wisconsin legislature authorized and “required” the Governor (Leonard J. Farwell) “* * * to employ * * * surveyors * * * to make an actual * * * Survey and report of all overflowed lands granted to this State by act of Congress * * *; [and] * * * to ascertain the amount of swamp * * * lands granted * * * which may *■ * * have been or hereafter may be disposed of by the United States since the passage of said act, and to draw * *. * such * * * money as may be * * * due * * * on account of the disposal * * *; [and] * * * to ascertain and select all * * * swamp * * * lands granted * * * surveyed * * * or [to be] surveyed * * * and cause entries to be made * * * and to cause to be recorded therein descriptive lists * * *.” [2]
(d) Governor Alex. W. Randall, of Wisconsin, in 1860, protested the insistence by the Secretary of the Interior that the State was bound by Governor Dewey’s election, saying that “Gov. Dewey never had any authority to make any *511 such arrangement * * * [and] the Secretary of the Interior had no authority * * * to * * * conclude any of the rights of the state * * Other Governors of Wisconsin made similar protests over the years. The Secretary of the Interior nevertheless recorded Wisconsin as late as 1896 as being one of four states that had elected to be bound by the field notes of survey.[3]
(e) The Wisconsin legislature has never authorized, recognized, or ratified the action of Governor Dewey in making the election to be bound by the field notes of survey. On the contrary, it has consistently authorized and directed the determination of swamp lands by examination of the ground. The Secretary of the Interior has never recognized officially the will of the Wisconsin legislature in this matter, although he has, by regulations issued in 1931, and by . administrative procedures obtaining as early as 1897, permitted a showing by third parties that lands indicated as swamp by the field notes were not swampy in physical fact.
31. The Treaty of September 30, 1854,10 Stat. 1109, was made at La Pointe with “the Chippewa Indians of Lake Superior and the Mississippi.” By its terms (1) the Indians ceded land in Minnesota which had been owned in common by the Chippewas of Lake Superior and the Chippewas of the Mississippi, and (2) adjustments were made in the annuities to cover the severance of the common property. In addition the treaty provided: .
* * * The United States agree to set apart and with- • hold from sale * * * the following described tracts of land * * *:
* * * For the La Pointe band, and such other Indians as may see fit to settle with them, a tract of land bounded as follows: Beginning on the south shore of Lake Superior, a few miles west of Montreal River, at the mouth of a creek called by the Indians Ke-che-se-be-we-she, running thence south to a line drawn east and west through *512 the center of township forty-seven north, thence west to the west line of said township, thence south to the southeast corner of township forty-six north, range thirty-two west, thence west the width of two townships, thence north the width of two townships, thence west one mile, thence north to the lake shore, and thence along the lake shore, crossing Shag-waw-me-quon Point, to the place of beginning. Also two hundred acres on the northern extremity of Madeline Island, for a fishing ground.
* * * For the other Wisconsin bands, a tract of land lying about Lac De Flambeau, and another tract on Lac Court Orielles, each equal in extent to three townships, the boundaries of which shall be hereafter agreed upon or fixed under the direction of the President. * * *
* * * The United States will define the boundaries of the reserved tracts, whenever it may be necessary, by actual survey, and the President may, from time to time, at his discretion, cause the whole to be surveyed, and may assign to each head of a family or single person over twenty-one years of age, eighty acres of land for his or - their separate use; and he may, at his discretion, as fast as the occupants become capable of transacting their own affairs, issue patents therefor to such occupants, with such restrictions of the power of alienation as he may see fit to impose. * * * And he may also make such changes in the boundaries of such reserved tracts or otherwise, as shall be necessary to prevent interference with any vested rights. * * *
* * * the Indians shall not be required to remove from the homes hereby set apart for them. * * *
32. (a) The La Pointe (Bad Fiver) Reservation, as finally surveyed,[4] comprised 124,333 acres in nine townships, as follows:
All of township 46 north, range 2 west.
All of township 46 north, range 3 west.
That part of township 41 north, range 1 west, contained in fractional sections 4,5, and 6, and in all of sections 7,8, 9,16, 17, and 18.
All of township 47 north, range 2 west.
All of township 47 north, range 3 west.
*513 All of fractional township 48 north, range 1 west.
All of fractional township 48 north, range 2 west.
All of fractional township 48 north, range 3 west.
That part of township 48 north, range 4 west, contained in fractional section 24, and in all of sections 25 and 36.
(b) On September 28,1850, when the Swamp Land Act was. approved, there were, within the lands described in the preceding subparagraph, some “swamp and overflowed lands,, made unfit thereby for cultivation, which * * * remain [ed], unsold * *
(c) The field notes of survey of the lands described in sub-paragraph (a), above, in existence when the governing regulations were issued by the General Land Office on November-21,1850, and some.field notes thereafter made, indicated that in some legal subdivisions (as small as quarter-quarter sections) the greater part was wet and unfit for cultivation within the terms of the statute and the regulations.
(d) Some legal subdivisions, within the lands described in subparagraph (a), above, which were indicated on the field notes as swamp, as described in subparagraph (c), above,., were not, in physical fact, on September 28, 1850, wet and unfit for cultivation over the greater part, within the meaning of the statute and the regulations.
(e) Some legal subdivisions, within the lands described in subparagraph (a), above, which were not indicated on the field notes as wet and unfit for cultivation over the greater part within the meaning of the statute and the regulations, were, in physical fact, on September 28, 1850, so wet and unfit.
(f) The Bad River Reservation contained six sections 16. One or more of these sections 16 contained lands falling within each of the categories described in subparagraphs (b), (c), (d),and (e), above.
33. (a) The Lac du Flambeau Reservation, as finally surveyed [5] and set apart,[6] contained 69,824 acres in seven townships, as follows:
*514 In township 39 north, range 6 east, sections 5 and 6.
In township 40 north, range 4 east, sections 1-3, 10-15, 22-27, and 34-36.
All of township 40 north, range 5 east.
In township 40 north, range 6 east, sections 5-8,17-20, and 29-32.
In township 41 north, range 4 east, sections 1-4, 10-16, 21-28, and 33-36.
All of township 41 north, range 5 east.
In township 41 north, range 6 east, sections 5-8,17-20, and 29-32.
(b) Subject only to modification in respect to dates of survey, the statements contained in subparagraphs (b), (c), (d), and (e) of finding 32, relating to the Bad River Reservation are applicable to the lands contained in the Lac du Flambeau Reservation, including the three sections 16 which were incorporated therein.
34. (a) The Lac Court Oreilles Reservation, as finally surveyed [7] and set apart,[8] contained 69,136 acres in eight townships, as follows:
In township 38 north, range 8 west. All of sections 4-8; in section 9, Sy>, NEy, E%NWí4, and SW^NWy 5 and all' of sections 17 and 18.
In township 38 north, range 9 west. All of sections 1,12, and 13.
In township 39 north, range 7 west. All of sections 1 and 2; in section 3, NyNEy, SySEy, and NEySEy; all of sections 4 and 5; in section 6, Ey, EiySWy, and NWy (Lots 2 and . 3); all of section 7; in section 8, Wy, SWySEy, and Lots 1, 2, and 3; in section 9, NEyNEy, SE14SE14, and Lots 1-6; in section 10, Sy, NEy, SyNWy, and NEyNWy; all of sections 11-15; in section 17, Wy2, SE14, W%NE%, and SEyNEy; all of sections 18-21, 28 and 29; in section 30, Ny, NEy SWy, NySEy, and SE1/4SE14; in section 31, Ey2, SW%, W%NWy, and SE14NW14; and all of sections 32 and 33.
In township 39 north, range 8 west. All of sections 1-15, and 17; in section 18, NWy, NySWy, NySEy, and *515 SEy^SEy; in section 19, S%, NE14, SE%NW^4, and WyNWy; all of sections 20-30; in section 31, S14, NW%, Sl/2NEy4, and NWy4NEi/4; and all of sections 32-36.
In township 39 north, range 9 west. In section 1, Lot 2; and all of sections 24, 25, and 36.
In township 40 north, range 6 west. In section 3, SE}4 and NEy; in section 8, EySEy; in section 9, NWySWy, SyNEy, SyNWy; in section 10, NW^jind NWyNEy; in section 17, E^NE^, EiySEy, SEySW^ (or Lot 1); in section 18, SEy; in section 19, NE%; all of section 20; in section 21, NW%NW% j in section 27, Lot 1; in section 28, Lots 2 and 3, SWySEy (Lot 5), and SWy (Lots 1,6, and 7) ; all of section 29; in section 30, Sy>; all of section 31; in section 32, NW}4 (Lots 1,2, and 3) and N^NEy; all of sections 33 and 34; in section 35, SWySW^ (Lots 1 and 2).
In township 40 north, range 7 west. In section 26, (Lots 1-5); in section 27, SE14 (Lots 1 and 2); in section 34, Ey; all of section 35; in section 36, part of SE14 (Lots 2 and 3), and SE%SW% (Lot 4).
In township 40 north, range 8 west. All of sections 1-15 and 17-23; in section 24, S%, NWy, S^NEy, and NW14NE14; and all of sections 25-36.
(b) On September 28, 1850 (when the Swamp Land Act was approved), there were, within the lands described in the preceding subparagraph, some “swamp and overflowed lands, made unfit thereby for cultivation, which * * * remain[ed] unsold *•*
(c) By the time the Lac Court Oreilles Reservation was set apart (1873), the Office of Indian Affairs and the General Land Office had been made aware of the complications arising from the claims of Wisconsin to the school and swamp lands within the Indian reservations. All school lands were eliminated from the Lac Court Oreilles Reservation.[9] There is'evidence to indicate that efforts were also made to eliminate the swamp lands. The plat of the Lac Court Oreilles Reservation reveals unmistakable checkerboarding of swamp and reservation lands.
• ;(d) The effort to eliminate swamp lands from the Lac Court Oreilles Reservation was not wholly successful. There *516 remained within it some legal subdivisions, as small as quar-. ter-quarter sections, the greater part of which were, on September 28, 1850, wet and unfit for cultivation, in physical fact, within the meaning of the statute and the regulations.
Some such legal subdivisions were not indicated as swamp lands on the field notes of survey.
At least one 40-acre tract which the field notes indicated as swamp land was included in the reservation. Whether or not this tract was, in physical fact, on September 28, 1850, wet and unfit for cultivation within the meaning of the-statute and the regulations, has been questioned by defendant.[10] Ultimately, other legal subdivisions within the Lac Court Oreilles Reservation containing 1,200 acres, more or less, were indicated as swamp by the field notes of survey.
(e) The contradictions in the evidence concerning the existence or non-existence within the Lac Court Oreilles Reservation of lands having the physical attributes defined by the Swamp Land Act of 1850[11] demonstrate this fact: that before this century-old controversy between the State of Wisconsin and the Department of the Interior had reached the halfway mark in time, the' term “swamp lands” had ceased to have definitive meaning[12] and was useful only as a generic term.[13] • ...
35. (a) During the years intervening between the Executive Order of February 6,1850 (finding 24), and the Treaty *517 of September 30,1854, the policy of removal of the Indians to unceded lands had been implemented and carried out in .a substantial degree (finding 27). The payment of annuities was transferred to new locations in the western land as one ■of the inducements. The Chippewas who remained in Wisconsin at the time of the 1854 treaty represented a minority ■of the Chippewa population of Wisconsin in 1850.
(b) The Act of December 19,1854,10 Stat. 598, authorized rthe President—
* * * to cause negotiations to be entered into with the Chippewa Indians, for the extinguishment of their title to all the lands owned and claimed by them in the Territory of Minnesota and State of Wisconsin * * *.[14]
The act directed that the treaties should contain provisions •(1) “Granting to each head, of a family, in fee simple, a reservation of eighty acres of land, to be selected in the territory ceded, so soon as surveys shall be completed * * * which * * * shall be patented * * (2) for the equal distribution of annuities, to be paid at their villages “* * * within the limits of the ceded territory * * *(3) for the extension of all benefits to the mixed bloods .«* * * * * * reside on the ceded lands * * *” and (4) for the lifting of the trade and intercourse laws from the •ceded territory, “except the twentieth section, which prohibits the introduction and sale of spirituous liquors to Indians.”
(c) The Treaty of February 22, 1855, 10 Stat. 1165, with ■“the Mississippi bands of Chippewa Indians,” provided:
* * * The Mississippi, Pillager, and Lake Winnibi-goshish bands of Chippewa Indians hereby cede, sell, and convey to the United States all their right, title, and interest in, and to, the lands now owned and claimed by them, in the Territory of Minnesota, and included within the following boundaries, viz: * * *. And the said Indians do further fully and entirely relinquish and convey to the United States, any and all right, title, and interest, of whatsoever nature the same may be, which they may now have in, and to any other lands in the Territory of Minnesota or elsewhere. * * *
*518 .(d) The statute cited in subparagraph (b), above, and the treaty cited in the preceding subparagraph, together with the Treaty of September 80, 1854 (finding 31), summarize the evolution during this period of the policy relating to the resettlement of the Chippewa Indians in Wisconsin and Minnesota. ¡
(e) Indians belonging to the three bands who are plaintiffs in this case did not leave Wisconsin in substantial numbers. Although the Executive order of February .6, 1850 (finding 24), was never revoked, and although no formal extensions were issued with respect to them (as was done for the Menominees), these three bands were among the Indians who were permitted to remain in Wisconsin and for whom permanent homes in that State were ultimately provided. . >.
36. (a) At the time of the Treaty of September 30, 1854, the La Pointe Band was well concentrated in the area set aside for it by the treaty. It has continued to live there since that time. Inasmuch as the treaty described the boundaries of the Bad Biver (La Pointe) Beservation, the only formalities remaining with respect to it after the ratification of the treaty on January 10, 1855, were (1) the withdrawal of the lands from entry or sale, which was ordered by the President on March 7, 1855, and (2) the completion of the detailed survey, which was accomplished in 1873.
(b) At the time of the Treaty of September 30,1854, the Lac du Flambeau and the Lac Court Oreilles Bands were roaming over more extensive areas than were promised them as reservations. They continued their nomadic life for 15 years or more after the treaty, becoming at times almost forgotten.[15]
(c) In the meantime, Congress made appropriations for surveying the reservations,[16] orders were issued for the with *519 drawal from entry or sale of the reserved tracts,[17] surveys were made,[18] conferences were held with the Indians, and selections finally made and confirmed, on Lac du Flambeau in 1866, and on Lac Court Oreilles in 1873. When boundaries were finally fixed, lands not included therein which had been theretofore withdrawn pending selection of the reserves were returned to the market as public lands.
37. The century-old controversy between Wisconsin and the Department of the Interior over the administration of the Swamp Land Act of 1850, as related to swamp lands in general and swamp lands lying within Indian reservations in particular, divides naturally into four periods: (1) 31 years, being from 1850 through 1881; (2) 41 years, 1882 through 1922; (3) 13 years, 1923 through 1935; and (4) 15 years, 1936 through 1950.
Misunderstanding arose shortly after the Swamp Land Act was passed on September 28, 1850. In 1881, Wisconsin and the Department of the Interior accepted the report of a joint commission which both parties believed at the time would end their differences. The narrative of these years is set forth in findings 38 through 56.
After it became evident that the controversy had not been ended, each party again saved its rights until the decision of the Supreme Court in Wisconsin v. Lane, 245 U. S. 437, in 1918 settled the issue of the school lands within the Indian reservations adversely to the State’s contentions. For a time it appeared that Wisconsin would accept the school lands decision as determinative of its rights to the swamp lands in the reservations. After many gestures and some commitments in this direction, Wisconsin reconsidered its position and withdrew from the concessions previously made. By 1923, the show was back on the road. The narrative of this period is contained in findings 57 through 92.
In 1926, the Supreme Court decided the issue of the swamp lands within the Indian reservations in the States’ favor, in United States v. Minnesota, 273 U. S. 769. The Department of the Interior admitted it had lost a battle, but refused to concede the war. In 1935, the Secretary of the Interior and *520 the Governor of Wisconsin agreed upon terms of settlement ■of the long standing dispute. The settlement failed to gain the approval of the President and was not implemented by Congress. The narrative of this period is contained in findings 93 through 113.
Wisconsin bided her time after it became apparent that Congress would not implement the settlement agreement by -an appropriation of funds. The opportunity afforded the State to intervene in this case was the beginning of the current denouement of the controversy. The narrative of these final years is set forth in findings 114 through 117.
38. (a) The Act of March 2, 1855, 10 Stat. 634, directed the President to cause patents to be issued, as soon as practicable, to purchasers who had made entries of public lands •claimed as swamp lands prior to the issue of patents to the State; and provided that where the State had sold such a tract of land prior to the entry, no patent should be issued by the President until the State had released its claim. Each State was to return to the General Land Office, within 90 days from the passage of the Act, a list of the lands so sold: otherwise, patents were to issue from the United States, and the purchase money was to be paid to the State upon due proof by it that the lands purchased were swamp lands.[19]
(b) On March 9, 1855, the Commissioner of the General Land Office wrote to the Governor of Wisconsin directing his attention to the Act of March 2,1855, above, and requesting the Governor to “* * * cause to be prepared * * * a statement of all the lands selected or enuring to the State under the Swamp land law, which have been sold by the State * *
(c) On May 14, 1855, the Governor of Wisconsin forwarded to the Commissioner of the General Land Office a request for “* * * permission * * * to select from the unsold lands of the Government * * * [a] quantity equal * * *” to 40,000 acres of swamp lands believed to have been sold by the United States.
*521 (d) On August 26,1856, the Acting Commissioner of tlie General Land Office wrote to tlie Governor of Wisconsin:
* * * Tbe quantity, to which the State will be entitled under the provisions of the act of 2nd March, 1855, for the relief of purchasers and locators of swamp * * * lands in lieu of the quantity of swamp land estimated to have been located * * * after the passage of the [Swamp Land Act] * * * is 35,683.46 acres, as corrected to this date. * * *[20]
(e) Thereafter, and from time to time, the Governor of Wisconsin executed releases to the United States of tracts which had been (1) reported as swamp lands by the surveyor general; (2) sold to individuals by the United States Land Office after the passage of the Swamp Land Act; (3) certified, after such sale, to the State of Wisconsin as swamp land inuring to the State; and (4) patented to the State after the certification.[1]
39. (a) On November 21, 1857, Wisconsin selected as swamp lands the following tracts, all-of which lie within the boundaries of the Lac Court Oreilles [Reservation as set forth in finding 34 (a):
In township 38 north, range 8 west. In section 8, NE34NE14.
In township 39 north, range 8 west. In section 12, NE14 NE14; in section 17, NW%NW%; and in section 30, SEi/4SEi/4.
These four tracts contained 160 acres. None was approved as a swamp land selection at the time of the submission.
(b) It is not established by the evidence that any tract described in the preceding subparagraph was patented to Wisconsin by the United States prior to 1895, when a patent issued for the SE14SE14, section 30, township 39 north, range 8 west.
40. On November 10, 1858, the Attorney General of the United States forwarded to the Secretary of the Interior an *522 •opinion relating to the effect of the Swamp Land Act in relation to lands in Arkansas. An excerpt from the opinion -follows:
* * * a grant by Congress does of itself propiro vigore pass to the grantee all the estate which the United States had in the subject matter of the grant, except what is expressly excepted * * * It is not necessary that the patent should issue before the title vests in the State under the Act of 1850. This Act of Congress was of itself a present grant, wanting nothing but a definition of boundaries to make it perfect, and to attain that object, the Secretary of the Interior was directed to make out an accurate list and plat of the lands, and cause a patent to be issued therefor. But when a party is authorized to demand a patent for land, his title is vested as much as if he had the patent itself, which is but evidence of his title. * * * [2]
41. (a) On April 30, 1860, the Commissioner of the General Land Office wrote to the Governor of Wisconsin (Alex. W. Band all) acknowledging receipt of certain lists of lands claimed to be swamp:
* * * It appears from * * * these papers that the State * * *. has made selection of these lands from an examination and survey in the field, and that * * * the * * * Surveyor General * * * has declined [to certify them to the General Land Office] * * *.
* * * The point * * * js # * * whether the State * * * will be permitted to introduce proof that any lands other than those shown by the field notes of the * * * surveys are swamp within the meaning of the Act. * * * A careful consideration * * * [has] resulted in the transmission * * * to the * * * Secretary of the Interior * * * [of] an opinion adverse to a change in the mode of selection adopted and agreed upon *523 between the Governor [Dewey] and the Department. The Secretary * * * concurred in the views of this office. * * *
* * * the lists presented by you cannot be regarded as selections made in accordance with the arrangement entered into in 1851, and which has been the basis of all our official action so far as your State is concerned.
(b) In the meantime, the Act of March 12,1860,12 Stat. 3, had extended the grant of the Swamp Land Act to Minnesota and Oregon, and provided:
* * * the selection to be made from lands already surveyed in each of the States including Minnesota and Oregon * * * shall be made within two years from the adjournment of the legislature of each State at its next session after the date of this act; and, as to all lands hereafter to be surveyed, within two years from such adjournment, at the next session, after notice by the Secretary of the Interior to the governor of the State, that the surveys have been completed and confirmed.
(c) On May 21, 1860, the Commissioner of the General Land Office forwarded to the Governor of Wisconsin a copy of the foregoing Act, called his attention to the time limitation contained therein, and said:
* * * As the selections in your State are made by the * * * Surveyor General from the field notes of the surveys according to the terms agreed upon by Governor Dewey * * *, that officer has * * * been advised of the limitation and directed to proceed with the completion of the selections in accordance with the requirements of the Act.
* * * inform me when the next session of the Legislature * * * will commence; and * * * advise me of the day of adjournment.
(d) On June 14, 1860, the Governor of Wisconsin (Mr. Randall) replied to the foregoing letter:
* * * Your instructions to the Surveyor Geni. * * * places the State in a very awkward predicament. * * * Gov. Dewey never had any authority to make any such arrangement as that suggested in your letter. * * * The Secretary of the Interior had no authority * * * to make any such arrangement as would conclude any of the rights of the State, and the Secretary * * * even up to the present time, has neglected to “make out an accurate list and plats of the lands * * * and trans *524 mit the same” to the Gov. of this State, as required by law. * * * this State * * * has just cause of complaint * * *.
(e) In the subsequent course of dealings between Wisconsin and the Department of the Interior, the latter’s application of the limitation provisions of the Act of March 12, 1860 (subparagraph (b), abové), was never more than sporadic. Within a few years it became desultory, and after the report of the joint commission in 1881, no further reference was made to the statute.
42. (a) On November 13, 1865, the United States issued to Wisconsin a swamp land patent (No. 8, Menasha Series) covering 16,249 acres [3] in the Menominee Indian Reservation in Wisconsin.[4]
(b) On April 15, 1866, the Commissioner of the General Land Office informed the Secretary of the Interior that the patent had been inadvertently issued, as far as concerned lands in the reservation. A call was thereafter made by the Department of the Interior upon the Governor of Wisconsin to surrender the patent for cancellation. The Governor refused to do so, on advice from the State’s Attorney General that the lands properly inured to the State under the swamp land grant.[5]
*525 43. On August 2, 1866, the surveyor general’s office at Dubuque delivered to an agent of the State of Wisconsin the original field notes and plats of the public surveys of that State.[6]
44. On August 21,1866, the General Land Office authorized the further selection of swamp lands, by Wisconsin in two land districts. The method of selection was specified by the General Land Office as follows:
* * * The Governor can appoint two agents to examine the plats and field notes * * * whoshall * * * list * * * all tracts shown thereby to be swamp lands.
* * * the Agents must append their certificate under oath, that * * * the tracts * * *_ are * * * shown to be swamp in the smallest legal subdivision.
* * * The selections must be confined to townships wherein swamp selections have not been heretofore made, as * * * the returns [by the surveyor general] of swamp selections in a given township * * * [are] regarded as concluding the selection in any such township.
* * * the selections must embrace no lands to which adverse rights may have attached * * *.[7]
45. (a) On October 22, 1866, two commissioners appointed by the Governor of Wisconsin made affidavit that they had examined the field notes and plats and had found therefrom that the tracts listed by them, containing 524,545 acres, were swamp and overflowed lands. The lists were duly submitted to the General Land Office as swamp land selections in List No. 3, Stevens Point Series.
(b) Included in the selections described in the preceding subparagraph were the tracts listed below containing more than 20,000 acres which were within the boundaries of the Lac du Flambeau Reservation as set forth in finding 33 (a) :
*526 In township 40 north, range 4 east. In section 3, SWySWy; in section 10, W^NW1^; in section 11, SEyNEy, and SEy; and in section 12, SWyNWy, NE1/4SW14, WySWy, and Lots 1, 2, 3, 5, and 6.
In township 40 north, range 5 east. In section 24, Sy SEy; in section 25,- NEy, EyNWy, NySEy, SW14SE14, SE14SWI/4, and Lot 2; and in section 31, Lot 1.
In township 40 north, range 6 east. In section 17, EyNEy and Ey2SE%; in section 29, SyNEy, SyNWy, SWy4, and Wi/2SEy4; in section 30, NEy SEy and Sy2SEy4; in section 31, NEy, NWyNWy, SyNWy, NySEy, SEySEy, and EySWy; and in section 32, NWy and NWySWy*
In township 41 north, range 4 east. In section 1, NEy, E%NW%, and S%; in section 2, Ny, NySEy, and SWySWy; all of section 3; in section 4, NEy, EyNWy, SEy, and EySWy; in section 10, NyNEy; in section 11, Ny; in section 12, Ny, EySWy, and SEy; in section 13, Ny2NWy4; in section 15, WyNEy, FW%, NWySEy, SySE% and SWy; all of section 21; in section 22, NWyNWy and SWySWy; in section 23, NEy SEy and Sy-SEy.; in section 24, SWyNWy, NySEy, SWy, and Lots 3 and 4; in section 25, Ny and SEy; in section 26, NyNEy; in section 27, Ny, NWySEy, SWy, and SEySEy; in section 28, NEy, NyNWy, SEyNWy, WySWy, and NEy SEy; in section 33, Sy, NyNEy, SEyNEy, NyNWy, and SWyNWy; in section 34, syNEy, NEyNwy, SyNWy, NEysEy, wySEy,, SWy, and Lot 1; in section 35, Ey, SEyNWy, NyNWy, NySWy, and Lot 1; and in section 36, NEy, NEyNWy, syNwy, SEy, Nyswy, and SEyswy.
In township 41 north, range 5 east. In section 1, NWy, Sy, and Lot 2; all of section 2; in section 3, Lots 1-4; all of section 4; all of section 5; all of section 6; in section 7, Ny, WySWy, NEySWy, and NySEy; in section 8, Ny, • NySWy, SEy, and Lot 2; in section 9, NyNEy, SWyNEy, Wy, and NWySEy; in section 10, WyNEy,-SEyNEy, NyNWy, SEyNWy, NEySWy, and Lots 1-3; all of section 11; all of section 12; in section 13, Lot 1; in section 14, NyNEy and Lot 1; in section 17, EyNEy; *527 in section 29, NWyNE1^ and Lot 1; in section 30,. SW^SW1/^ and Lot 4; and in section 31, NWyNWyt,. SW1/4SW1/4, SE1/4NE1/4, and Ei/2SEi/4.
In township 41 north, range 6 east. All of section 7; in. section 8, W^SWy,; in section 17, NWyNWyj, SV2NW14, Ny2SW%, SE14SW14, and SW^SE^; in section 18,.. E14NEI4, NE14SE34, and Lots 1-4; in section 20, NE14,. NEy4NWy4, Sy2NWi/4, SE14, NE1/4SW14, and Sy2SWy4;. and in section 29, Lot 8.
46. (a) On May 6,1867, the Commissioner of the General. Land Office wrote to the Governor (Mr. Fairchild) of.' Wisconsin:[8]
* * * the preliminary work of comparing * * * selections [in the Stevens Point and Menasha districts] with, the field notes, to test the swampy character of the tracts-selected * * * has been completed, and * * * all tracts. shown to be swamp and not otherwise interfered with, will be * * * certified to the State. * * *
(b) None of the tracts listed in finding 45 (b) was certified to the State.
47. On May 11, 1867, patents were issued by the United' States to Indian allottees on the Bad River Reservation for-several tracts containing more than 2,800 acres, some of which, were later (1870: see finding 49) selected by Wisconsin as swamp lands. The issuance of patents was given as the-reason for the rejection (in 1876) of these selections.
48. (a) On April 22, 1869, the Commissioner of the General Land Office wrote to the Governor of Wisconsin review- ■ ing lists which the Governor had filed for approval as swamp, lands. The letter contained the following:
* * * List No. 6. Embraces lands selected as swamp-but reserved for Indian purposes in accordance with the-stipulations of a treaty approved Sept. 30,1854. These tracts were withdrawn from market June 27,1866, prior, to the selection as swamp, and are now under control of" the Indian Bureau. * * *
*528 (b) Except for the State’s refusal in 1866 to surrender the Menasha patent (finding 42 (b)), selections by Wisconsin of swamp lands lying within areas set aside for Indian reservations (Menominee, Stockbridge, Munsee, and Chippewa) first entered the discussion as such in 1869, as indicated in the preceding subparagraph. The initial claim of Wisconsin to such lands was on a modified basis. A part of one of the reservations had been withdrawn from use as a reservation.[9] Wisconsin made claim to the swamp lands within the part so withdrawn, on the ground that the end of Indian occupancy meant the end of the only impediment to final transfer under the grant.[10]
49. (a) On July 30, 1870, Wisconsin selected as swamp the following tracts containing approximately 1,300 acres, which were within the boundaries of the Bad River Reservation as described in finding 32 (a) :
In township 48 north, range 3 west. All of section 9; in section 17, Lots 1 and 2; in section 22, N%, N^SEi^, SE14SE14, NE14SW14, and S14SW14; in section 23, Lots 2-9; and in section 30, N%NE*4.
The foregoing selections were not approved.
(b) On April 24, 1871, the General Land Office approved selections by Wisconsin of the tracts listed below, containing 10,000 acres more or less, which had been submitted as being swamp' and which are within the boundaries of the Bad River Reservation as set forth in finding 32 (a):
In township 47 north, range 3 west. In section 7, SWfr.%SW; in section 22, SW^SW^; in section 30, SWfr.i4SW%; and in section 31, WI/2NE14 and Wfr.14.
*529 In township 48 north, range 2 west. In section 7, Lots 1-3; all of sections 17-21; in section 27, Lots 3-5; in section 28, NW%NEi4, Ni/2NWy4, and Lot 1; in section 29, N%NE%, SW1/4NW1/4, and N[1]/2N¥[1]/4; and in section 30, N^NE^ and NW%NW14.
In township 48 north, range 3 west. In section 1, Lots 1 and 2; in section 2, SW^SW^ and Lots 1 and 7; in section 3, S^SW[1]^, S14SE34, and Lot 1; all of fractional sections 4 and 5; in section 8, Lot 1; all of fractional sections 10-12; all of section 13; all of fractional sections 14 and 15; in section 18, Lot 1; in section 20, NE% and NW^SE^; in section 21, Ni/2; in section 23, NE%, SW%NW%, W%SW%, and SE14SW14; in section 24, N%NW%, E%SE%, and Lots 4,' 5, 6, 8, and 9; in section 25, NE^NE^; in section 26, Ny^NWyC in section 27, NW%NW%; and in section 29, NIV1/4NW1/4.
(c) No patents were issued to Wisconsin by the United States covering any of the tracts described in the preceding subparagraph on the basis of the approval of the selections as swamp lands.
50. (a) On July 14, 1871, the Attorney General of Wisconsin wrote to the Governor:
* * * There are * * * certain reservations to Indian tribes in the State, some of which have lately been extinguished, and the lands * * * are being * * * brought into market. * * *
* * * I claim that the State is entitled under the * * * [Swamp Land Act] to the * * * Swamp * * * lands therein as soon as the Indian title or claim is extinguished * * *.
* * * The necessity for immediate action is* * * confined to * * * the Menominee and Stockbridge reserve. * * *
(b) On July 21,1871, the Governor of Wisconsin (Lucius Fairchild) wrote to the Commissioner of the General Land Office demanding for the State the swamp lands in such parts of former Indian reservations as were'returned to the market as public lands.
(c) On January 3, 1872, it was reported to the Attorney General of Wisconsin that the Commissioner of the General Land Office took the position that the treaties providing for *530 the reservation, (from which the lands had been withdrawn) did not extinguish Indian title, wherefore the lands had never become public lands.[11]
(d) On January 16, 1873, the Office of the Governor of Wisconsin forwarded to the General Land Office the claim of the State to lands shown to be swamp by the field notes, though presently within the limits of Indian reservations* and asked for the issuance of patents to the State upon the-extinguishment of the Indian title. The letter continued:
*' * * We- ask -for authority * * * to select * * * all swamp * * * lands * * * shown to be such- by the maps and field notes * * * not heretofore selected * * *.
We ask * * * for indemnity, either in money or other-lands, for all lands sold by the United States, which enured to the State under the * * * [Swamp Land Act and the School Land Act], * * *
(e) On May 20,1874, the Acting Commissioner of the General Land Office advised a member of the House of Representatives that he felt obliged, because of (1) previous actions, by the Commissioner of Indian Affairs (who, he said, regarded the treaty stipulations for Indian reservations as withdrawals of the lands from the swamp grant) and .(2) the tacit approval thereof by the Secretary of the Interior* to “decline to issue patents for any swamp lands which maybe selected in any of the townships withdrawn under the treaty” of'September 30,1854.
(f) On April 28,1875, the Acting Secretary of the Interior wrote the Commissioner of the General Land Office:
I have examined the appeal of the State of Wisconsin from your decision * * * refusing * ■* * the claim of the State, to the swamp lands included in the Indian reservations created, by the * *' * Treaty of September 30* 1854. * * •
* * * the lands included in said reservations were the property in fee simple of the United States, on * * * the date of the swamp land grant. * * *
*531 The grant * * * was a present grant, and the State * * * acquired title to all the swamp lands in said tracts at that date. * * * that title could hot be and was not divested by subsequent treaty of 1854.
I reverse your decision * * *. ,
(g) On August 11,1875, the Governor of Wisconsin (W. R. Taylor) wrote to the State’s School Land Commissioners citing the decision of the Secretary of the Interior recognizing the claim of the State to swamp lands within the Indian reservations created by the Treaty of September 30, 1854. He quoted the reply he had received from the Secretary of the Interior to his inquiry as to the application of the Act of March 12,1860, to such selections, wherein the Secretary had said (1) that no new selections could be made of lands which were surveyed before March 12, 1860, and (2) that lands surveyed since that date in townships wherein selections had not already been made, could be selected by persons appointed by the Governor for that purpose. The Governor’s letter to the Commissioners added:
* * * I am not aware that the State has ever made any selections from townships within the Indian reservations. * * *
* * * the Interior Department, prior to the decision * * * has constantly held that the State was not entitled to make selections within the Indian reservations: * * *
(h) On October 13,1875, the Acting Commissioner of Indian Affairs wrote to the Secretary of the Interior acknowledging receipt of the decision by the Acting Secretary recognizing the validity of Wisconsin’s claim to swamp lands within the Indian reservations. The letter continued:
* * * The treaty * * * makes provision for. * * * allotment * * * in severalty to * * * Indians' * * *.
An allotment has already been made to members'of the LaPointe band * * *. • •
* * * in. some * * * cases * * * such allotments are composed of * * * lands designated as .Swamp lands * * *.
These lands comprise the very choicest tracts upon the reservation * * *. The Indians gather the major part of their wild rice and cranberries from a portion of same and have their gardens.upon the remainder.. .* * * houses and * * * other improvements are located upon them. * * * ‘
*532 X * * * recommend that the Commissioner of the General Land Office be directed * * * not to certify to * * * Wisconsin as Swamp lands any of the tracts * * * within * * * any of the reservations * * * and that legislation be asked * * * giving * * * the State * * * lands in lieu * * *.
The foregoing recommendation was approved by the Secretary of the Interior. Legislation to support it was proposed in 1879 or 1880, but failed of adoption.
. (i) On May 4, 1876, the Governor of Wisconsin (Harrison.Ludington) transmitted to the Commissioner of the General Land Office for approval as swamp lands two lists, one containing tracts which the General Land Office had previously “omitted” from approval in a previous submission because the tracts were in the Lac du Flambeau Reservation.
. (j) On July 11, 1876, the Commissioner of the General Land Office wrote the Governor of Wisconsin relative to the general list submitted with the Governor’s letter of May 4 for approval and patent as swamp lands:
* * * all [were] selected as swamp July 30th, 1870. * * *
A number of tracts have been sold or located * * * and patented to the purchasers and locators * * *.
* * * tracts in T 48. N. E. 3. W. * * * have been selected by Indians under the * * * treaty * * * of September 30, 1854. And with the exception of * * * two * * * were patented May 11,1867 * * *.
* * * An examination of the field notes * * * shows that the following tracts * * * are not Swamp * * *, and the claim of the State thereto is rejected. * * *
The tracts in township 48 north, range 3 west, were in the Bad River Reservation.
■ The tracts rejected because shown by the field notes not to be swamp contained approximately 5,500 acres. They were not within the reservations of plaintiff bands. Concerning the rejection, the Commissioner’s letter noted that the State might appeal the ruling within 60 days.
... (k) On August 24,1876, the Commissioner of the General Land Office wrote to the Commissioner of Indian Affairs:
' * * * The Governor of Wisconsin has * * * made * * * application ■ for the _ approval and patenting of the ■ swamp * * * lands within'the Reservations made under *533 * * * [the treaty of September 30,1854] * * * and * * * this Office will * * * submit to the Secretary of the Interior * * * a list embracing 19,778.33 acres of such lands within the * * * Lac de Flambeau Reservation,. with a recommendation that the same be approved to the State.
Should said list be * * * approved, similar lists of lands in other reservations under the treaty * * * will be submitted, and such as have * * * been approved will be carried into patent.
(l) On May 15,1878, the Commissioner of Indian Affairs, wrote the Secretary of the Interior:
* * * By [the Swamp Land Act] Wisconsin was granted all * * * Swamp * * * lands * * * unsold at date of the Act. The * * * Indian reservations were made subsequent to the Swamp grant * * *, and hence it is apparent that all the swamp lands within * * * these reservations belong to the State; * * * the State should in some way he reimbursed for the lands * * *. (Italics supplied.)
(m) On November 23,1878, the Commissioner of Indian Affairs wrote the Secretary of the Interior:
* * * I * * * submit * * * a list of lands, allotted in severalty, to 44 * * * Chippewas, on Bad River reservation * * * aggregating 2,995.29 acres. * * * patents issued for [these] lands * * * May 11, 1867 * * *
* * * No allottments * * * have been. made * * * on the Lac de Flambeau reservation. * * * allott-ments * * * have * * * been made * * * on the Lac Court Orielle reservation, none of which have been approved * * *.
* * * Special Agent * * * Brooks * * * has made allottments on the * * * Lac Court Orielle and Bad River reservations, which have not * * * been prepared for submission to the Department.
The lands allotted by Mr. Brooks * * * do not conflict with lands * * * claimed by the State of Wisconsin as “Swamp * * * lands” * * *.
The larger proportion of the lands claimed by the State, within these reservations, are wild rice fields, which are of great value to the Indians * * *.
51. (a) During the years 1850 through 1880, no patents covering swamp lands within any of the reservations of plaintiff bands were issued to Wisconsin by the United States. *534 Following the discovery in 1866 of tlie situation resulting from the issuance of the Menasha patent covering swamp lands in the Menominee Reservation, the Department of Interior deliberately withheld the issuance of similar patents. The withholding was done for the protection of the Indians.
(b) By the end of 1880 Wisconsin had expanded its claim for swamp lands within the reservations to include all such lands because of their swampy character and without regard to the earlier qualification that selections be approved only in- areas where Indian claims had been extinguished. The Governor of Wisconsin was nevertheless aware of “* * * the difficulties which- might arise from permitting the sale and occupancy of these lands * * *” and had therefore not pressed the State’s claims. To this extent, Wisconsin acquiesced in the withholding policy of Interior.
(c) During the period of 1850 through 1880, the Department of the Interior consistently maintained its position[12] that the swampy nature of any lands for selection by Wisconsin under the grant should be detérmined from the field notes of survey.[13]
(d) Wisconsin’s acquiescence in this method of selection was more apparent than real.[14] After the rebuff administered to it in 1860 (finding 41), the State did hot again, *535 prior to 1880, make an issue with Interior of the method of selection. It did have on hand, however, the results of the ■examination made by its own agents at its own expense in 1859; and the nature of some of the selection lists thereafter submitted by Wisconsin compels the inference that some of such lists included not only lands indicated as swamp by the field notes of survey, but other lands as well, presumably ■tracts found to be swampy by physical examination.[15]
52. (a) Logging operations in Wisconsin had reached the ureas of the plaintiffs’ reservations by 1810, but the cutting of timber on the reservations soon ran into complications which were not overcome for several years.[16]
(b) In 1872, the Indian Agent in charge entered into a contract with a local lumberman whereby the contractor was licensed to. cut some of the pine on the unallotted lands of the Lac Court Oreilles Reservation in return for stipulated annual payments. The contractor made two of the annual payments, and cut some timber. The license was revoked in 1874, after the decision by the Supreme Court in the case of United States v. Cook. The headnotes of the report[17] of that decision follow:
1. Timber standing on lands occupied by the Indians cannot be cut by them for the purposes of sale alone; though when it is in their possession having been cut for the purpose of improving the land — that is to say, better adapting it to convenient occupation — in other words, when the timber has been cut incidentally to the improvement, and not cut for the purpose of getting and selling it — there is no restriction on the sale of it.
2. The Indians having only a right of occupancy in the lands, the presumption is against their authority to cut and sell the timber. Every purchaser from them is charged with notice of this presumption. To maintain his title it is incumbent on him to show that the timber was rightfully severed from the land.
3. The United States may maintain an action for unlawfully cutting and carrying away timber from the public lands.
*536 The Cook decision put an end to the efforts of the Office of Indian Affairs to obtain general revenue for the benefit of the plaintiff bands (and all other Indians living on tribal lands in Wisconsin) through the sale of green timber growing on tribal lands.[18]
After the Cook decision, the cutting of live timber on the unallotted lands of the reservations of the plaintiff bands was regarded as a trespass, and the trespasser was required to respond accordingly.[19]
(c) Allotments were made to individual Indians living on the Bad River Reservation at-an early date, and patents were issued to some of the allottees as early as 1867. Ten years later some allotments had been made (but no patents had been issued therefor) on the Lac Court Oreilles Reservation. No allotments were made on the Lac du Flambeau Reservation until some time later.
(d) The question as to whether or not the Indian owner of an allotment (which had been patented to him) could sell the timber thereon was first raised in 1876, with respect to lands in the Bad River Reservation. The Secretary of the Interior ruled that the Indian owner could sell the timber, but proceeded immediately to hedge the ruling with so many qualifications (all of which were intended to protect and benefit the Indians) that no appreciable volume of allottees’ timber was cut for several years. During this evolutionary process, the doctrine of trespass was applied to the cutting of timber on lands in the course of being patented to an allottee. Details of the story belong to and are reported in the next time period of the swamp lands controversy. At the close of the first period (1881), the complications thereafter to arise over the proceeds of timber cut from the disputed lands were barely discernible.
53. (a) In May 1880, the Governor of Wisconsin and the Secretary of the Interior composed their differences over the *537 method of selection of swamp lands in general. Commissioners were appointed to examine the plats and field notes ■of survey to determine what lands were swamp for which patents had not been but should be issued to the State.
(b) On October 10,1880, the Commissioners of the Public Lands of Wisconsin reported (in their third Annual Report) to the Governor:
* * * About 57,000 acres of tíie selections under the swamp land grant * * * lie within Indian reservations. While it is conceded that the title to the lands was vested in the State by the acts of Congress granting them, it is yet held that such title is subject to the occupancy of the lands by the Indians in such reservations as were established prior to the admission of the State into the Union. * * * [20]
* * * in our last report, we * * * referred to the preparation * * * of a statement * * * of all the lands received by the State under * * * [the Swamp Land Act] * * * together with * * * the claim of the State for such lands under the system of selections which had previously obtained. * * * in April last, it appeared that the State would be entitled to more than half a million acres in addition to the lands already received under this grant * * *.
* * * the Governor * * * was able to obtain from the Department of the Interior conditions which were made the basis for a final adjudication and settlement of this long deferred and vexed difference between the state and the United States. * * *
54. (a) The joint commissioners reported on August-13, 1881. Their report was accepted by the Secretary of the Interior and the Governor of Wisconsin without formal approval or endorsement thereof by either official.[1]
(b)' The report of the joint commissioners listed as swamp (as being so indicated on the field notes of survey) the tracts ■described below, containing approximately 1,720 acres, which are within the boundaries of the Bad River Reservation as set forth in finding 32 (a) :
*538 In township 46 north, range 2 west. In section 25, NEy NEy, SyNEy, SEyNWy, NEySWy, and SWy swy4 ;• and in section 36, SEy..
In township 46 north, range 3 west. In section 14, Wy SWy and SEySWy; in section 15, NEySWy and SEy; in. section 19, NEy SEy; in section 20, NWySWy; in section 23, NyNWy; in section 28, NyNWy, SWyNWy, and NWySWy; in section 29, SyNEy, NySEy, and SEy SEy; in section 32, SEy NEy; in section 33, SWy NWy and NWySWy; and in section 34, EyNEy.
In township 47 north, range 3 west. In section 18, NEy NWy; in section 19, NWyNWy.
In township 48 north, range 2 west. In section 31, NWy swy.
In township 48 north, range 3 west. In section 2, SEy SWy; in section 8, Lot 2; in section 23, Lot 10; and in section 28, swyswy.
(c) None of the tracts described in the preceding sub-paragraph was included in the lists of Bad River selections (i) submitted on July 30, 1870, but not approved or (ii) approved April 24,1871.[2]
• (d) As of August 1881, Wisconsin had submitted swamp land selections in the Bad River Reservation (including the acreage listed in the report of the joint commissioners) totaling approximately 13,020 acres.[3]
(e) The report of the joint commissioners listed as swamp (as being so indicated on the field notes of survey) the tracts described below, containing approximately 960 acres, which, are within the boundaries of the Lac du Flambeau Reservation as set forth in finding 33 (a) :
In township 40 north, range 4 east. In section 1, Lot 6; in section 3, EyNWy and SEySWy; in section 11, Lot 5; in section 12, SEySWy; and in section 27, NWyNWy.
In township 40 north, range 5 east. In section 24, NEy SEy.
In township 41 north, range 4 east. In section 10, Ey NWy; in section 13, NWyNEy, SEyNWy, and SWy NWy; in section 14, SEyNEy; in section 22, NEyNWy *539 and SEi/^SW^ j and in section 23, SE^NEi^, NW^SE^, and SE%SW%.
In township 41 north, range 5 east. In section 35, NE%. SE14; and in section 36, NW^SW^.
In township 41 north, range 6 east. In section 8, SW^NWi/i; in section 31, NW^NW^; and in section 32, NW%NE%.
(f) None of the tracts described in the preceding sub-paragraph was included in the list of Lac du Flambeau selections submitted on October 22, 1866 (finding 45).
(g) As of August 1881, Wisconsin had submitted swamp land selections in the Lac du Flambeau Eeservation (including the acreage listed in the report of the joint commissioners) totaling approximately 20,960 acres.[4]
(h) The report of the joint commissioners listed as swamp (as being so indicated on the field notes of survey) the'tracts described below, containing approximately 1,160 acres, which (except for the SW^SE^ 30-39-7) are within the boundaries of the Lac Court Oreilles Eeservation as set forth in finding 34 (a) :
In township 38 north, range 8 west. In section 8, NE*4 NE14.
In township 39 north, range 7 west. In section 6, Ei^SW^; in section 17, W^NW^, NW^NE1^, and SE14NE14; in section 30, S%SE%; and in section 31, W%NW%.
In township 39 north, range 8 west. In section 8, SW14SW14; in section 12, NE14NE14; in section' 13, NE14NE14; in section 17, W^NW^; and section 36, NW^NW1^.
In township 40 north, range 6 west. In section 29, Lot 11; and in section 33, Lot 2.
In township 40 north, range 7 west. In section 26, Lot 1.
In township 40 north, range 8 west. In section 11, W^SW1^; in section 13, SW^SE^; in section 15, SE14SW14; in section 22, NW^NW1^; in section 23, SE14SW14; in section 24, NW^4NE% and SW%SE% ; and in section 36, NW^NW1^.
*540 (i) None of tbe tracts described in the preceding subpara-graph was included in the list of Lac Court Oreilles selections submitted on November 21, 1857 (finding 89), except the NE14NE14 of section 8, township 38 north, range 8 west.
(]') As of August 1881, Wisconsin had submitted swamp land selections in the Lac Court Oreilles Reservation (including the acreage listed in the report of the joint commissioners) totaling approximately 1,240 acres.[5]
■ (k) The combined total of acreage approximated in sub-paragraphs (d), (g), and (j), above, is 35,140, representing the swamp land submissions by Wisconsin, as of August 1881, for selections within the reservations of the three plaintiff bands.
55. (a) On October 13, 1881, the Governor of Wisconsin requested that patent be issued to the State by the United States covering certain selections of lands indicated as swamp by the field notes of survey.
(b) ■ On November 14, 1881, in .response to the foregoing request, the United States issued to Wisconsin a patent covering 31,059.56 acres of such lands, located in 12 townships spread over five ranges.
(c) The patent included the SE^NE^, section 36, township 48 north, range 4 west, containing 40 acres, and lying within the boundaries of the Bad River Reservation. This township was the only one of the 12 which contained lands in any of the reservations of plaintiff bands. Only three sections (24, 25, and 36) of this township were in the Bad River Reservation. The 40-acre tract herein described was the only one patented in 36-48-4. It had not been included in any of the lists hereinabove described.[6]
(d) On November 21, 1881, the United States paid Wisconsin cash indemnity as required by the Act of March 2, 1855,[7] for the prior sale (1856) of Lot 10, section 23, township 48 north, range 3 west. This lot was in the Bad River Reservation. It had been listed in the report of the joint commission.
*541 56. On December 31, 1881, the Governor of Wisconsin (William E. Smith) reported (in his Annual Message) "to the Assembly:
* * * Progress has been made in the adjustment of the claims of the state for additional swamp lands * * *. * * * A careful revision of former selections of swamp lands showed the state entitled to 536,000 acres more than had been received. * * *
* * * In making the revision, it was found that the United States had sold since March 3, 1857,[8] 435,081.33 acres * * * now determined to be swamp, and also that of the lands previously patented to the state as swamp 319,900 were not of that character * * * [making] * * * a difference in favor of the state of 115,181.33 acres. * * *[9]
There is no existing law under which the state can be indemnified for this * * * item, but its' claim being established * * *, there can be no doubt of obtaining the congressional legislation necessary to provide * * * indemnification. * * *
* * * Authority having been received to select government lands in lieu of those sold prior to March 3d, 1857, such selections may be made by an examination ox the field notes and plats, or by an agent who shall personally examine the lands. * * *[10]
* * * If the present policy of selling’ school and swamp lands at $1.25 per acre[11] be continued, the expenditure incident to a selection by personal examination would not be expedient, but if it should.be deemed advisable to have the lands appraised and sold at their value, it probably would be. * * * [12]
* * * The right of the state to school and swamp lands in Indian reservations, for many years denied at *542 the department of the interior, is now admitted; but the difficulties which might arise from permitting the sale and occupancy of these lands are considered to be so great that a formal approval of them is withheld.
When Wisconsin’s claim to these lands was presented * * * in 1879, the Secretary of the Interior and the Commissioner of Indian affairs proposed to seek ..legislation * * * authorizing the selection of lands * * * in lieu * * * and addressed a communication to congress on the subject.
. A bill * * * was introduced * * * but failed to become a law, although favorably reported * * *.
* * * .Within the Indian reservations there are 5,153.94 acres of school land's and about 55,000 acres of swamp lands; * * *.[13] .
* * * this work * * * has proved to be an undertaking of far greater magnitude than was anticipated, involving as it did a revision of all swamp selections in the state. This required the careful reading of the field notes of survey and. an examination of the plats in regard to each forty-acre tract.
-It * * * [was] understood that the revision should be a final adjustment of the claim of the state * * *.
' 57. (a) On October 10, 1882, the Commissioners of the Public Lands of Wisconsin, in their fifth annual report to the Governor (J. M. Rusk) , again reviewed the State’s problem in obtaining patents covering swamp lands under the 1850 grant. With respect to swamp lands in general (i. e., swamp lands not within Indian reservations), the report said:
* * * The delay, in selecting and patenting to the state gave time and invitation to individuals to locate and enter large tracts of swamp and overflowed lands which otherwise would incoñtestibly [sic] have become the property of the state under the grant.[14] As this delay was through no fault of the state, * * * the state should not suffer for the delay or neglect of the general government.
' * * * this * * * is admitted by the. general land office, * * * but there exists no law authorizing indemnity for the lands * * * lost * * *, and additional *543 legislation is necessary that justice may be done the state. * * *
■ No indemnity was made to Wisconsin for the swamp lands “* * * lost through no fault of her own * * *.” The controversy between the State and the Department of the Interior slowly revived.
(b) Upward of 40 years passed before the limited phase of the controversy which is at issue in this case (relating to swamp lands lying within the reservations of plaintiff bands) again appeared to be near resolution.
Three facets of the course of dealings during this 40-year period warrant consideration: (1) transactions, rulings, and policies concerned with land; (2) transactions, rulings,' and policies concerned with timber and the proceeds of timber; and (3) the impact of court decisions on the controversy, and the actions of Wisconsin and Interior flowing therefrom. Matters relating to land are set forth in findings 58 through €6; the timber matter is covered in findings 67 through 84; and the litigation phase is described in findings 85 through 92.
58. A Wisconsin statute, approved on March 29, 1882, authorized five named individuals to construct a canal and booms in Ashland County and “* * * to use or acquire certain [swamp] lands of the State' * * * necessary therefor.” On July 20, 1882, the Commissioners of the Public Lands of Wisconsin sold to the individuals named in the statute all of the State’s right, title, and interest in and to certain swamp lands in townships 48 north, ranges 2 and 3 west. Included were parcels aggregating 3,080 acres in the Bad River Reservation. These parcels have never been included in any patent issued to Wisconsin by the United States. It does not appear that the Commissioners, in making this sale, were specifically apprised that some of the lands sold were within an Indian reservation.
59. (a) On March 9, 1894, the General Land Office approved a schedule of swamp land selections submitted by Wisconsin. The schedule is not in evidence.
(b) On April 17,1894, the General Land Office “held for rejection” (meaning the rejection was subject to appeal) the claim of Wisconsin under the swamp land grant to eight *544 tracts (comprising approximately 860 acres) in the Lac du Flambeau Reservation. On September 1,1894, the Assistant Commissioner of the General Land Office advised the Wausau Register that, after due notice to the State and no appeal having been filed, the rejection of the claim was final.[15] On September 12,1894, the Commissioner of Indian Affairs was advised by the General Land Office that “ * * * Said selections were for lands, allotted to * * * Indians * * * on the Lac du Flambeau reservation * * * and embraced in schedule approved on March 9,1894.” On October 31,1894, the Commissioner of Indian Affairs advised the Indian Agent of the rejection.
(c) On December 19, 1894, the Secretary of the Interior wrote to the Commissioner of the General Land Office “relative to certain selections made by the State of Wisconsin under the swamp land grant * * * of lands within the Lac du Flambeau * * * Reservation.” Reference was made “ * * * to a schedule of 101 selections made by members of the * * * band * * * which was approved by the President, except where they were in conflict with selections * * * claimed by * * * Wisconsin under the swamp land grant * * The letter continued:
* * * The grant of swamp lands to the State having been made * * * four years prior to the treaty, and being a grant in presentí, the question arises: Did the State get title to the swamp lands falling within the Indian reservation ?
* * * the Indians prior to the treaty of 1854 had the right of occupancy to the land in the reservation, together with the country surrounding it. By the treaty * * * the Indians stipulated for the right of occupancy of the lands ceded, until required by the President to remove.
* * * the title to the lands * * * was in the United States * * * in 1850. It therefore passed by said grant, but subject to the right of Indian occupation * * *. The * * * State could take only the naked fee, and could not disturb the occupancy of the Indians. That occupancy could only.be * * * determined by the United States. Beecher v. Wetherby, 95 U. S. 517 (525).
*545 In United States v. Thomas, 151 U. S. 577 (583), the-Supreme Court * * * said that the right of Indian occupancy [of school lands] “gave them the enjoyment of the-land until they were required to surrender it by the President * * *, which requirement was never made. So * * * the title never vested in the State, except as. subordinate to that right of occupation of the Indians.”
* * * the reasoning of those cases applies to * * * [swamp lands]. * * * by the grant of 1850 the State * * * acquired the title to the swamp lands in the Lac de Flambeau reservation, subject to the right of Indian occupation — the mere naked fee, without the right to. occupy until the Indian right shall have been extinguished. * * *
* * * so long as the Indian reservation remains intact,, patent should not issue to the State for the swamp lands, within said reservation. * * *
60. On October 8, 1895, the United States issued to Wisconsin a patent covering swamp lands to the extent of 397.57' acres, described in two half-quarter and six quarter-quarter-tracts. One of the 40-acre tracts was the SE^4SE% of section 30, township 39 north, range 8 west, which was within the boundaries of the Lac Court Oreilles Reservation as set forth in finding 34(a). A plat of the patent shows that, with, the exception of this one 40-acre tract, all of the lands covered by it were in legal subdivisions which had been checker-boarded out of the reservation.[16]
61. (a) In December 1895, and in December 1896, Wisconsin released to the United States tracts containing 400 acres (not in any of the reservations of plaintiff bands) which had theretofore been claimed as swamp. The releases were made because of the existence of prior patents or because the selections had been rejected “as not being swamp by the-report of * * * 1881.”
(b) On March 17, 1896, the General Land Office issued a circular containing the swamp land laws and regulations. The circular is not in evidence. Deference to it is contained in a note following “Part 271 — Swamp Land Grants” in the Code of Federal Regulations, 1949 edition, title 43, page 605. *546 This note summarizes the office circular of November 21, 1850, and contains the following:
* * * A State having elected to take swamp land by field notes and plats of survey is bound by them, as is also the Government. See Secretary’s decisions, October 4, 1855 (1 Lester’s L. L. 558), August 1, 1859 (id. 571), December 4, 1877 (4 Copp’s L. O. 149), and September 19, 1879. * * *
(c) In 1897, Wisconsin again provided by statute for physical examination of lands to determine their swampy character. The examination was completed in due course, and reports showing the results thereof were filed with the State land office. Six years after the adoption of the statute, the results[1] of the examination had not been tabulated.
(d) On April 19, 1898, the Chief Clerk of the Commissioners of the Public Lands requested the Governor of Wisconsin (Edward Scofield) to relinquish the claim of the State to a tract of 80 acres, theretofore claimed as swamp, on the ground that physical examination of the land revealed it as non-swamp.
(e) On August 30, 1898, the Secretary of the Interior, at the instance of the Commissioner of Indian Affairs, directed the Commissioner of the General Land Office to send a special agent into the field to make a physical examination of certain lands in the Lac du Flambeau Reservation which were indicated as swamp on the field notes, and to determine by such examination whether the lands were or were not swamp. The examination was begun in September. Wisconsin obj ected to the making of the examination, and it was suspended on orders from the General Land Office.
(f) On June 8,1899, the Governor of Wisconsin (Edward Scofield), in a letter to the Commissioners of the Public Lands, expressed the opinion that “* * * the State should not waive its right to any alleged swamp lands heretofore selected, until it has been determined by an examination in the field whether the claim * :1: * is valid * * The Governor’s letter also said:
* * * It has been the policy * * * for nearly all of the two years last past, to examine in the field and ascertain from such examinations whether or no any tract of land included in any list or selection heretofore filed in the *547 General Land Office, are in fact swamp lands within the meaning of the Act * * *, and this without reference to what is shown by the plats and field notes of government survey. * * *
' (g) References to “so-called” swamp lands and to “swamp lands” entered the correspondence between Wisconsin and Interior and their respective interoffice communications before 1900.
62. (a) The Act of February 11,1901, 31 Stat. 766, provided that—
* * * with the consent of the * * * Indians * * * on the Bad River Reservation * * * the President may allot to each Indian now living * * * on said reservation * * * and who has not heretofore received an allotment, not exceeding eighty acres of land * * *.[17]
(b) The Act of February 3, 1903, 32 Stat. 795, provided that-7-
* * * with the consent of the * * * Indians * * * on the Lac Courte Oreille Reservation * * * the President may allot to each Indian now living * * * on said reservation * * * and who has not heretofore received an allotment not exceeding eighty acres of land * * *.[18]
* * * the provisions of * * * this Act shall also * * * apply to the * * * Indians * * * on the Lac du Flam-beau Reservation * * *.
63. (a) On May 16, 1903, a member of the Wisconsin legislature forwarded to the Governor (Robert M. La Follette) a statement pertaining to a bill then before the Governor for Executive approval. The bill related to the sale of certain of the public lands of Wisconsin (primarily swamp lands) and provided for the establishment of certain State forestry services. Following are excerpts from the statement pertaining to swamp lands:
* * * The report of the Commissioners of Public Lands shows that on June 30, 1902, the state owned * * * a *548 total of 812,152 acres so-called swamp lands * * *.
* * * the so-called swamp lands * * * are held by the state subject only to the provision * * * in the act of 1850 * * * “that the proceeds of said lands * * * shall be applied * * * to the * * * reclaiming [of] said lands * * *.”
Our statutes provide that the proceeds of all sales of swamp lands shall be divided into two equal parts, one of which shall be paid back to the * * * counties and by them distributed to the towns * * *. The other half goes into the Normal School Fund. * * *
The various reports and other documents relating to the public lands show that a large part of the so-called swamp lands were not such in fact and as near as could be ascertained such is the case as to the lands at present held by the state. The examination of the lands provided for by the act of 1897 has been made and the original reports of such examination are on file in the state land office, but * * * information can [not] now be derived therefrom as to what proportion of so-called swamp lands are such in fact. * * *
* * * a * * * considerable part of the public lands is situated within Indian reservations where the state can give no possessory title. * * *
* * * The substitute bill [which was the one before the Governor] provides * * * [for] * * * the following lands * * * to be sold: “all lands that are in fact swamp lands * * * .” * * * it is obvious [that] the state ought not to sell [lands within Indian reservations] as they would only be bought for speculative purposes. * * *
* * * While the substitute bill provides for the sale of * * * lands it is believed that the several restrictive provisions will * * * limit the sale * * *. The restrictive provisions [include] * * * The absolute withdrawal from sale of all lands within Indian reservations. * * *
(b) On January 2,1905, an “Agent of the Governor” transmitted to the Governor of Wisconsin (Mr. La Follette) a report of his work “for the past two years.” The report contained the following:
* * * In addition to the works on [Civil] War Claims I have done what could be done towards securing an adjustment of the Swamp Land Indemnity Claim.
Because of the * * * opposition of [the] Congressman * * * of the 11th Wisconsin District, it has been *549 impossible to secure legislation granting to the state other public lands in lieu of lands due the state under the Swamp Land Act which have been otherwise disposed of by the Federal Government. All that could be done was to cooperate with the other public land states in an attempt to secure the passage of legislation providing for the payment of a cash indemnity. Such a measure has been introduced * * *.
' (c) On January 12, 1905, the Message of Governor La Follette to the Wisconsin Legislature contained the following :
* * * * Wisconsin is entitled to reimbursement from the federal government for 312,000 acres[19] of swamp lands .* * * granted * * * under the Swamp Land Act ,* * * but * * * since * * * disposed of otherwise by the United States * * *. .The state should receive indemnity * * * at the rate of $1.25 an acre * * *. * * * it is the duty of the legislature to memorialize •the representatives of Wisconsin in the national congress to do all in their power to secure the payment of this just claim of the state. * * *
. (d) On August 15, 1905, the Acting Commissioner of Indian Affairs forwarded to the Superintendent of Forests of Wisconsin a reply to the latter’s proposal that Wisconsin and the United States agree upon an exchange of lands whereby lands within the Lac du Flambeau Beservation which the State claimed would be taken out of the reservation and turned over to the State. The Acting Commissioner’s letter said:
* * * the plan * * * does not seem to be feasible * * * because the State * * * only owns the fee to the lands * * * subject to the possessory right of the Indians * * *. Although the lands cannot be allotted * * * _ in severalty * * *, all the unallotted members of the tribe have a right to the use of these State lands in common * * *, and * * * there is no law that will permit this Department to make an exchange * * *.
64. On March 3, 1909, the Secretary of the Interior forwarded to Senator Bobert M. La Follette, of Wisconsin, a detailed recitation of the “* * * facts respecting the rights *550 of the State * * * under her school and swamp grants, to lands in the several Indian Reservations * * * in said State, together with the conclusions suggested by a review of the laws, and decisions appertaining thereto.” The Secretary concluded with a suggestion that Congress consent to a suit by Wisconsin against the United States before the Supreme Court to quiet the title to lands under both grants.[20]
■ 65. (a) On May 23, 1917, the Assistant Commissioner of the General Land Office advised the Wausau Register and Receiver of the rejection of Wisconsin’s swamp land claim to two lots in the Lac du Flambeau Reservation, because both lots had been allotted and patented. The letter continued:
* * * notice * * * was served on the State and no action taken within the time allowed. * * * the * * * claim * * * is * * * rejected. * * * This closes the case.
(b) On May 28, 1917, the Wausau Register advised the Governor of Wisconsin:
* * * thirty days were allowed to show cause why .the claim should not be rejected and the State * * * failed to take * * * action * * * within the time allowed * * *
* * * May 23, 1917, the * * * General Land Office rejected the * * * claim, which action closes the case. H* í* í*
(c) On July 6,1917, the Chief Clerk of the Commissioners of the Public Lands of Wisconsin advised the Governor, in relation to the rejection of the State’s claims by the General Land Office that—
* * * it seems superfluous to ask the State to show cause * * * . In advance we are told that such showing can have no effect * * *. * * * the state should receive indemnity in cash * * *.
66. (a) By the time (January 1918) the Supreme Court ruled adversely on Wisconsin’s claim to the school lands in the Menominee and Bad River Reservations,[1] the only patents which had been issued by the United States to Wisconsin covering swamp lands within plaintiffs’ reservations were *551 (1) the 1881 patent which included a 40-acre tract in the Bad River Reservation [2] and (2) the 1895 patent which included a 40-acre tract in the Lac Court Oreilles Reservation.3 In each instance the circumstances were such as to indicate that the inclusion of reservation lands was an oversight. [3]
(b) By the end of 1917, the unallotted lands remaining within the Bad River and Lac Court Oreilles Reservations comprised less total acreage than the selections theretofore made by Wisconsin of swamp lands within such reservations.
(c) In each of the three reservations substantial portions of the total acreage which were swamp (either by indication on the field notes of survey, or in physical fact, or both) had been allotted. Portions of the acreage so allotted had been patented to the allottees. Certificates of competence had been issued to some of such owners. Some of these owners had sold their lands, thereby sending the lands and the titles thereto into the stream of commerce. The various towns[4] had taken cognizance of such land ownership and transfers in their tax structures.
67. (a) Logging operations on lands within the reservations of plaintiff bands progressed uncertainly from 1876 to 1892.[5] After the latter year, substantial volumes of timber were taken from such lands regularly for a period of 20 years or more.
(b) The proceeds of timber cut from lands within the reservations of plaintiff bands, irrespective of when cut, are in controversy in this case if the land from which the timber was cut was swamp land.
(c) Within each of the three reservations some timber has been cut from lands which were, in physical fact, wet and unfit for cultivation within the meaning of the Swamp Land Act,[6] although not so indicated on the field notes of survey.
*552 (d) Within each of the three reservations some timber has been cut from lands which were indicated on the field notes mf survey as swamp.
(e) Within one or more of the sections 16 in the Bad Biver and Lac du Flambeau Beservations some timber has been cut from lands falling within the categories defined in the two preceding subparagraphs.
(f) It is seldom possible to determine from the evidence, in relation to any specific portion of the proceeds of timber, or in relation to any specific tract or tracts from which timber was cut to contribute to such proceeds, which standard was used to determine the swampy character of the land, i. e., reference to the field notes of survey or physical examination. The relation of the distinction to the State’s claim to such proceeds does not appear to have entered the discussion prior to 1929.[7]
68. The proceeds that are at issue[8] in this case were derived from timber cut (1) from tribal lands under circumstances whereby (a) the operator was required to make restitution as for a trespass [9] or (b) the intervenor contends that defendant should make restitution[10] and (2) from allotted lands under circumstances whereby (a) the operator was required to make restitution as for a trespass [11] or (b) the allottee-owner retained the money, thereby depriving the intervenor of the value.[12]
69. During 1886, 1887, and 1888, logging operators paid to defendant, as for trespass, the value of timber they had cut within the boundaries of the Lac Court Oreilles Beservation as described in finding 34(a) from 11 separate 80-acre *553 tracts.[13] Parts or all of nine of the 11 tracts had been described in the selections of swamp lands[14] made by Wisconsin [15] in 1857 and 1881.
■ 70. (a) The Act of February 16, 1889, 25 Stat. 673, provided:
* * * the President * * * may * * * under such regulations as he may prescribe authorize the Indians residing on reservations or allotments, the fee to which remains in the United States, to fell, cut, remove, sell or otherwise dispose of the dead timber standing or fallen, on such reservation or allotment for the sole benefit of such Indian or Indians. * * *
(b) On October 1,1890, the Secretary of the Interior wrote the President:
* * * the rules * * * [herewith submitted] * * * apply only to the unallotted lands of the Bad River, Lac Court Oreilles, and Lac de Flambeau Reservations, and I * * * request * * * your approval * * *.
. The report which contained the proposed rules was approved by the President on October 4, 1890.
(c) On September 27,1892, the Secretary of the Interior submitted to the President, with his recommendation for approval, a proposal by J. H. Cushway and Company for the purchase of timber on the Lac du Flambeau Reservation. The letter said in part:
* * * The timber to be cut under this authority is all the merchantable standing and dead and down on the allotted lands, and the merchantable dead and down only, on the common lands. * * *
The President approved the proposal on September 28, 1892. The cutting of timber was begun before the year ended. Mills were built on the reservation by Cushway in 1893, and *554 the arrangement was continued on a basis mutually satisfactory to Cushway and the Indians for more than 20 years.
(d) On November 27, 1893, the Secretary of the Interior •submitted to the President, with his recommendation for approval, a proposal by J. S. Stearns to purchase the timber ■on the Bad River Reservation under an arrangement similar to the Cushway program on the Lac du Flambeau Reservation. The proposal was approved, the Stearns mills were ■built, and the arrangement resulted in mutually satisfactory relationships for upward of 20 years.
(e) Logging operations had been virtually at a standstill on all three of the reservations of plaintiff bands from 1889 to 1892. • After cutting was resumed, as described in the two preceding subparagraphs, on the Lac du Flambeau and Bad River Reservations, further cutting was also done on the Lac Court Oreilles Reservation, but the arrangements therefor are not described in the evidence.[16]
71. (a) On October 1, 1896, the Commissioner of Indian Affairs, acting with departmental approval, instructed the Lac du Flambeau Indian Agent to proceed with a plan he had submitted to construct certain buildings on the reservation with timber and the proceeds of timber to be cut from unallotted lands. The Agent was directed to take the timber from unallotted swamp and school lands.[17]
Within a year thereafter five or more specific authorizations were issued to the Agent to proceed with such cutting. Pursuant to his instructions and the authorizations, the Agent arranged with the Flambeau Lumber Company (formerly J. H. Cushway & Co.) to cut and manufacture the lumber and erect the buildings, payment to be made in timber taken from swamp lands. As these projects proceeded the Agent announced his intention to cut all of the timber from the school and swamp lands as rapidly as the work could be accomplished.
(b) On August 30,1897, the Attorney General of Wisconsin wrote to the Commissioner of Indian Affairs protesting the cutting on the school and swamp lands of the Lac du *555 Flambeau Reservation, inquiring why such cutting was considered proper, and requesting that further cutting be delayed.
(c) The Commissioner of Indian Affairs replied that .«* * * r}girá 0f the Indians * * * is not limited * * * to * * * improvement * * * for agricultural purposes * * * they also have the right to cut timber for the erection of necessary buildings * *
,(d) On October 27,1897, Wisconsin’s Secretary of State, acting in behalf of the State’s Commissioners of Public Lands, wrote to the Commissioner of Indian Affairs (1) reviewing the foregoing exchange of correspondence between the Commissioner and the State Attorney General; (2) citing the authorizations to the Indian Agent for the cutting; (3) listing 34 specific tracts within the Lac du Flambeau Reservation which were claimed by the State as swamp lands (all of which had been allotted; and 15 of which had been patented to the allottees) on which contracts for cutting had been approved; (4) challenging the Commissioner’s authority to permit the cutting, for improvement or otherwise; and (5) requesting that all cutting from school or swamp lands be suspended until the State should have a reasonable opportunity to investigate and protect its rights.
(e) On October 29, 1897, the Commissioner of Indian Affairs wrote to the Indian Agent, reviewing the foregoing letter and instructing the Agent:
* * * no authority now exists for the cutting of any timber on any of these swamp lands or school lands, * * * and you will suspend any cutting of timber on the school and swamp lands claimed by the State within the reservation * * * until further notice from this office. * * *
* * * Contracts have been made by the allottees of the tracts- * * * [listed above] * * * and they have been approved. No timber should be cut on these allotments * * * until further notice * * *.
The Commissioner’s instructions to the Indian Agent, to stop the cutting related to all swamp lands within the Lac du Flambeau Reservation, whether unallotted (and therefore h¿ld as tribal lands), allotted (but not patented), or allotted and patented. The Agent was further instructed to report *556 to the Office of Indian Affairs the amount, if any, of timber that had been cut from the allotted tracts. The Agent’s reply' is not in evidence.
(f) All such cutting was forthwith stopped. Meanwhile, some of the buildings had been erected at a cost of $23,934.39, which was paid initially by the Flambeau Lumber Company; The sum of $11,895.04 was paid to the Flambeau Lumber Company in swamp land timber. The balance of $12,039.35 was ultimately paid to the lumber company by Congressional appropriation. The act specifically recognized the debt due-the lumber company and confirmed the authority of the Secretary of the Interior to enter into the arrangement.[18]
After the erection of certain school buildings which were a part of the improvement program on the reservation, the Flambeau Lumber Company installed an electric lighting system in the school buildings and furnished the current for its operation for five years, without settlement being made for either installation or current. Years later (1914), the sum of $1,913.08 was determined to represent the value of the installation and current, and this amount was allowed as an offset against a larger amount claimed to be due from the lumber company because of its failure to cut certain dead timber from swamp lands within the Lac du Flambeau Reservation.[19]
(g) In June 1897, the sum of $14,766.82 was received by defendant from J. S. Stearns for timber cut from unallotted lands in the Bad River Reservation. How much of these lands were swamp is not established by the evidence. It must be inferred that most of the tracts were either swamp (in fact or by field note indication) or school lands.
*557 72. On October 29, 1898, the Department of the Interior authorized payment to Wisconsin of $9,548.10 in settlement for timber cut from State lands within the Menominee [Reservation.[20]
73. On June 29, 1900, the Commissioner of the General Land Office wrote to the Commissioner of Indian Affairs:
* * * the * * * Indian Agent * * * requests authority to disburse certain funds collected on the Lac-Court Oreilles * * * [Reservation on account of timber depredations.[1]
This matter involves the payment of * * * $950 by Mr. * * * Hoffman * * * in settlement for * * * timber cut * * * from SE14NE14 Sec. 11, T. 40 N., R. 8 W., * * * covered at the time of the trespass by an application filed in the name of Sarah Gordon (Indian) to select said tract as an * * * Allotment.
This proposition was accepted by the Secretary of the Interior November 15, 1897, and * * * the money was covered into the Treasury * * * as “Miscellaneous receipts * * * proceeds * * * not the result of Indian labor.” * * *
There was * * * a further liability * * * by Mr. Hoffman for the cutting of * * * timber from SW%NW% Sec. 3 and SE%NE% of Section 4, Tp. 39 N., R. 8 W., * * * covered by Charles La Bush’s application for allotment. * * * Mr. Hoffman’s offer to settle * * * was accepted * * *.
The tracts in question are in two * * * townships set aside by the * * * Treaty of September 30,1854 * * * for the * * * Lac Court Oreilles band * *
* * * the * * * townships set aside * * * were not vested in the Indians in fee simple, but were * * * set apart and withdrawn from sale from the mass of the public domain until the * * * allotment of * * * tracts in severalty * * *. * * * title to any tracts * * * un-allotted is still in the United States, and not burdened by any Indian title whatever.
*558 When the allotment * * * is completed, any tracts remaining * * * unallotted will * * * again become .a portion of the public domain * * *.
The application of Sarah Gordon for the * * * tract in Section 11, was never allowed * * * but * * * she was given another tract in another township * * *.
* * * the trespass was committed on all of the * *•* lands during * * * 1888 and 1889, and * * * La Bush’s allotment was approved October 1,1894.
* * * since the tracts * * * were at the time of the trespass lands of the United States, the moneys * * * [belong] to the United States * * * for the reason that the timber was taken from the land at the time it was withdrawn from the public domain for Indian purposes.
74. (a) On September 10, 1902, the Commissioner of Indian Affairs wrote the Secretary of the Interior acknowledging receipt from him of five reports submitted by the Acting Commissioner of the General Land Office relating to timber trespasses committed on unallotted lands of the Lac du Flambeau Beservation by Cushway & Company. The letter summarized the reports by listing the various amounts of timber cut from the several tracts (all specifically described) and the value of the timber which, in each instance, Cushway had. offered to pay. The letter continued:
* * * The Actg. Commissioner * * * states * * * that the lands * * * unallotted * * *. In some instances the lands are given as unapproved swamp selections.[2]
a: * * Some of the tracts are marked on the tract books of this office in pencil “swamp.” * * *
* * * The Actg. Commissioner * * * states * * * that in his opinion Cushway & Company is not a wilful trespasser; that * * * said company * * * cut timber
* * * with the consent and knowledge of the * * * Indian Agent * * *.
Part of this apparent trespass was committed * * * in 1896. The * * * Indian Agent * * * was instructed to permit Cushway * * * to cut timber from unapproved swamp and school lands for * * * Agency purposes, said company to take its pay in timber cut from swamp and school lands. * * *
The total trespass * * * amounts to $18,923.94. This money * * * has been paid to * * * [the] Indian Agent * * *, who * * * has deposited it in a bank * * *.
*559 * * * this money * * * should * * * [be turned] over to the Receiver of Public Moneys at Wausau * * *..
(b) On September 17, 1902, the Acting Secretary of the-Interior, replying to the foregoing letter, approved the recommendation and said that the Commissioner of the General Land Office was being directed to instruct the Receiver of Public Moneys at Wausau to deposit the money “in the-Treasury of the United States for the benefit of the Chippewas of Lake Superior, under the provisions of the Act of-' March 3, 1883 * * [3]
75. (a) In 1905, Wisconsin filed a bill in equity to enjoin the Secretary of the Interior from interfering with the-State’s use, possession, and enjoyment of lands within the-sections 16 in the Bad River Reservation. On April 2,1906*. the bill was dismissed by the Supreme Court,[4] with these-words: ...
Without repeating all that was said in previous decisions, we hold, on the authority of those decisions, that. the State is not entitled to the relief asked nor to any order that would interfere, at this time, with the administration by the Interior Department, of the lands in-question for the benefit of the Indians for whom the Bad River * * * and the Flambeau Reservations were-established. * * *[5]
(b) It is not established by the evidence that, prior to-the foregoing decision, Wisconsin claimed the proceeds of' timber cut from the swamp lands within plaintiffs’ reservations, or that the Department of the Interior was aware that, such a claim might be made.
After the decision, both the intervenor and defendant were • aware of the question of the State’s ultimate right to the-proceeds of timber cut from either school lands or swamplands within the reservations.
(c) On July 19, 1906, the Indian Agent at La Pointe-wrote to the Commissioner of Indian Affairs:
I have * * * your [letter] * * * in reference to the-trespass made by * * * Cushway * * * on the SE% *560 of the NE34, Section BO, T. 40, E. 6,[6] in which you directed me to settle * * * by haying the company pay * * * [for] stumpage * * * a total of $2343.75. I have collected * * * and, after deducting * * * expenses, I have deposited * * * $2307.40, in the * * * bank * * *. * * * it can be drawn out at any time it is demanded by the State, should the State require the same * * *.
(d) On August 1, 1906, the Acting Secretary of the Interior, writing to the Commissioner of Indian Affairs, reviewed in detail the latter’s report of two timber trespasses by Cush way on the Lac du Flambeau Eeservation (one on the NE14NW14, section 25, T. 40, K. 5[7] “which is unallotted * * * swamp land * * and one reported by the State Forester of Wisconsin on “unallotted Indian land” not further described); and approved the Commissioner’s recommendation for settlement upon payment of double the market value (for willful trespasses) in both instances. It appears from the letter that the Indian Agent, in reporting the first instance of trespass, expressed the opinion that Cushway “knew at the time that it was on ‘state lands’.” The Acting Secretary further directed that—
* * * the receipts from the lands reported on by * * * [the State Forester] * * * be deposited to the credit of the Lac du Flambeau Indians as “Miscellaneous Ee-ceipts, Class 3,” and the proceeds from the other lands, “swamp lands,” to be retained by the agent to his official credit, until the controversy between the Government and * * * Wisconsin as to which has title to the swamp lands has been finally settled.
(e) On October 18, 1906, the Acting Commissioner of Indian Affairs wrote to the State Forester of Wisconsin, advising him that the Cushway trespass on the Lac du Flam-beau Eeservation which the Forester had reported had been settled in accordance with his recommendation, and that the Indian Agent had been instructed to retain the money on deposit “until the controversy concerning the ownership of the land has been finally settled.”
*561 76. (a) On November 3, 1908, the President authorized the Secretary of the Interior to sell the timber on the Bad Liver Reservation which had been killed by forest fires during the previous summer. The authority provided that the proceeds from the sale of the burnt timber on the unallotted lands should be deposited in the Treasury and expended for the benefit of the Indians on the reservation.
(b) On December 5, 1908, the Secretary of the Interior advised the President that forest fires had burned much timber on the Lac du Flambeau and Lac Court Oreilles Reservations, as well as on the Bad River Reservation, and recommended that authority be granted to the Secretary to sell the burnt timber on the unallotted lands of the Lac dii Flambeau and Lac Court Oreilles Reservations. The letter continued:
* * * As the title to the lands on which this timber is located is in controversy (the lands being claimed by the State as school or swamp lands)[8] it is recommended * * * that * * * the proceeds * * * [be] placed in escrow until it shall have been decided to whom the lands belong. ? * *
A similar recommendation was made with respect to the unallotted lands on the Bad River Reservation where the title thereto was in controversy.
The President approved the recommendations on December 5,1908.
(c) On February 23,1909, the Superintendent (of Lac du Flambeau, then located at La Pointe) was directed by the Office of Indian Affairs “to account for the proceeds of this burnt timber under ‘Miscellaneous Receipts, Class III,’ * * and to keep “a separate scale for each quarter section, that the proceeds may be properly credited when it shall have been determined whether the title to the lands is in * * * Wisconsin or the Indian tribe.”
(d) Some if not all of the timber on the Lac du Flambeau Reservation that had been killed or damaged by fire in 1908 and 1910 was cut under these arrangements and the proceeds placed in a separate account in the nature of escrow.[9] Simi *562 lar action was authorized with reference to burned timber on the Bad River and Lac Court Oreilles Reservations. The extent, if any, to which such action was taken is not established by the evidence.
77. (a) On January 7, 1914, the Supervisor of Forests (of the Office of Indian Affairs) wrote to the Commissioner of Indian Affairs concerning a settlement with Cushway & Company “* * * for the timber that has been left standing on allotments, and the dead timber left upon unallotted lands” of the Lac du Flambeau Reservation. In connection with'the proposed settlement a timber cruise had been made during the summer of 1913 of the lands affected. On the basis of estimates made from the results of the cruise, the Supervisor of Forests enclosed a series of schedules, among which were the following:
* * * 3. All dead timber on lands which are claimed by the State as “swamp” or “school” lands. * * *
* * * 5. All living timber on lands claimed by the State as “swamp” or “school” lands. * * *
(b) On January 14, 1914, the Supervisor of Forests reported to the Commissioner of Indian Affairs that the records of the Superintendent (of the school) of the Lac du Flambeau Reservation showed that, as of December 1913, receipts for timber cut from lands within the reservation which the State claimed as swamp lands totaled $134,960.07. He further stated that:
* * * My understanding was that all moneys which had been received for timber sold from lands claimed by the State had been deposited to the credit of the separate descriptions from which it was cut. It appeared from certain entries * * * that the total * * * included timber * * * cut from tribal lands * * * not claimed by the State. * * *
(c) On January 22, 1914, the Assistant Commissioner of Indian Affairs asked the Superintendent of the Lac du Flambeau School to ascertain and forward to the Office of Indian Affairs “* * * the exact amount of funds heretofore deposited in the Treasury * * * [under the title ‘Indian Moneys, Proceeds of Labor, Lac du Flambeau Indians’] derived from the sale of timber * * *” cut from lands *563 claimed by Wisconsin as swamp lands “* * * in order that such, funds may be set aside and retained pending a final disposition of the matter * *
(d) On February 10, 1914, the Superintendent replied with advice that he could identify $100,151.91 as representiiig proceeds from the sale of timber on swamp lands claimed by the State.
(e) On May 27,1914, the Superintendent and Special Disbursing Agent at La Pointe identified some further moneys as belonging to the Flambeau swamp land fund.
(f) On June 29, 1915, the Superintendent, Lac du Flam-beau School and Agency, forwarded to the Commissioner of Indian Affairs a supplemental statement of “state swamp” moneys, 1913-15, totaling $6,422.81.
(g) As a result of this examination into the proceeds of timber cut from the Lac du Flambeau Reservation, and by methods which are not fully explained by the evidence, there was ultimately posted (April 25,1918) to an account labeled “Indian Moneys, Proceeds of Labor, Lac du Flambeau swamplands,” the sum of $119,450.50, all of which represented proceeds of timber cut from 1907-1908 through 1914-1915.[10]
78. The Act of August 1, 1914, 38 Stat. 582, making appropriations for the Bureau of Indian Affairs, contained the following provisions:
* * * a complete roll of the unallotted members of the * * * Bad River Band * * * entitled to allotments under existing laws on the Bad River Reservation, shall be made * * *. * * * allotments of land (exclusive of the merchantable timber thereon) within said reservation shall be made in conformity with the provisions of the treaty of September [30,1854] * * * and subsequent Acts of Congress * * * to all persons so enrolled who may be alive at the time of the approval of this Act. Patents * * * shall issue * * * without delay, and such patents shall contain a clause reserving to the United States the right to cut and market merchantable timber on the lands so allotted * * *. When the merchantable timber has been cut * * *, the title to *564 such timber as remains * * * shall * * * pass to the * * * allottees: * * *.
* * * the Secretary of the Interior * * * is authorized to sell the merchantable timber * * * under such rules and regulations as he may prescribe; the net proceeds * * * therefrom, together with any undistributed proceeds derived from the sale of timber heretofore cut * * * from such lands, shall be distributed per capita * * * to the members of the band * * * adjudged * * * competent; and in cases where members have not been adjudged competent * * * their shares shall be deposited to their individual credit * * * or used for their benefit * * *.
* * * of the amount now on hand derived from the sale of tribal timber, at least $500,000 shall be distributed * * * within sixty days from the date of the approval of the roll * * *.
* * * the Secretary of the Interior * * * is * * * authorized * * * to set apart lots [10, 11, and 12, section 25, township 48 north, range 3 west] [11] on the La Pointe Reservation * * * for an Indian town site * * *.
* * * the [NE14NE14 34-48-3 [12] is] set aside * * * as a burial ground * * *.
* * * the Secretary of the Interior * * * js * * * authorized to reserve, within said town site of Odanah, not exceeding ten acres for use of the * * * Indians for fair grounds, parks, and other public purposes. * * *
79. (a) On August 8, 1914, the Superintendent of the La Pointe school forwarded to the Commissioner of Indian Affairs “* * * a list * * * showing the net amount deposited to the credit of * * * swamp lands, Bad River Reservation, for timber cut thereon * * The list set forth 36 parcels of land, and showed that timber cut from five of them had yielded proceeds of $4,834.73.
(b) On January 30,1915, the State Forester of Wisconsin, in response to a suggestion made to him by the Commissioner of Indian Affairs, agreed that the Department of the Interior might proceed with the cutting of dead timber on school and swamp lands in the Bad River Reservation, the proceeds to be held in escrow “until the claim of Wisconsin to these * * * lands * * * is finally settled.”
*565 ' 80. (a) Sometime during 1915, the United States filed in the district court for the western district of Wisconsin a bill in equity to cancel patents that had been issued by Wisconsin covering certain lands in the sections 16 in the Bad River Reservation under which the J. S. Stearns Lumber Company claimed title. The district court dismissed the bill for want of equity. The United States appealed.
(b) On February 24, 1915, the Supreme Court of Wisconsin in State ex rel. Owen, Atty. Gen., v. Donald, Secretary of State, 160 Wis. 21, 151 N. W. 331, set forth a comprehensive review of the status of swamp lands and of the authority of the State and of its agencies in dealing with them within the framework of the State’s constitution and statutes. While the controversy arose out of questions relating to the administration of the State’s forestry program, the issues ranged over a wide area of local tax powers and the authority of the State’s Commissoners of Public Lands.
81. The Act of May 18, 1916, 39 Stat. 123, making appropriations for the Bureau of Indian Affairs, contained the following provisions (p. 157) :
* * * without bias or prejudice to the rights * * * of any party to the litigation now pending,[13] the Secretary of the Interior * * * is authorized to sell the timber on the so-called “school lands” and “swamp lands” within the * * * Bad River and Lac du Flambeau * * * Reservations * * *, and to which the State of Wisconsin has asserted a claim; to keep a separate account of the proceeds of such sale with each legal subdivision of such land and to deposit the said proceeds at interest * * * to be paid over, * * * with the interest * * *, to the party or parties who shall finally be adjudged to be entitled to such fund: Provided, That the consent of the State or parties claiming title therefrom be obtained before any such sale shall be made.
With the consent of the Indians of the Lac Court Oreilles Tribe, * * flowage rights on the unallotted tribal lands, and, with the consent of the allottee or * * * heirs * * *, flowage rights on any allotted lands in the Lac Court Oreilles Reservation * * * may be leased or granted for storage-reservoir purposes. * * *[14]
*566 82. (a) On June 29, 1916, the Assistant Secretary of the Interior wrote to the Governor (E. L. Philipp) of Wisconsin, enclosing lists of “* * * lands within the Bad Eiver and Lac du Flambeau * * * Eeservations which have been claimed by * * * Wisconsin as ‘swamp’ and ‘school’ lands * * The lists were forwarded in response to the Governor’s request,[15]* The letter said:
* * * The * * * lists * * * purport to show all lands that have been claimed by * * * Wisconsin as “swamp” lands.
There are sis sections * * * 16 * * * within the * * * Bad Eiver * * * and three sections * * * 16 * * * within the * * * Lac du Flambeau *** Eeservation.
The Indian Office has an estimate of 80,425,800 feet of timber on the * * * sections 16 * * * and an estimate of 1,724,000 feet on the so-called “swamp” lands in * * * [the Bad Eiver] reservation.
* * * The amount of live timber * * * on sections 16 on the Lac du Flambeau Eeservation was found to be 551,430 feet, and the amount on “swamp” lands was found to be 3,126,150 feet [by an estimate made in 1913].
This letter must not be interpreted as conceding any rights to * * * Wisconsin in any of the lands * * * or of the timber * * * thereon. These lists are furnished merely as showing the aggregate area that might * * * inure to * * * Wisconsin if the claims of that State should be sustained in the courts. * * *
All * * * the Department desires at this time is * * * the consent of * * * Wisconsin to the removal of such timber as it is found advisable to cut and the deposit of the proceeds in escrow pending a final determination of * * * title * * *.
(b) On April 10, 1917, the Superintendent of the Lac du Flambeau Agency wrote the Commissioner of Indian Affairs:
We have on hand here $885.75 under * * * “Timber Sales, State Swamp Land.” We are in urgent need * * *.
As this money is lying here idle, * * * kindly advise * * what it could be used for.
(c) On April 27,1917, the Acting Assistant Commissioner replied:
*567 * * * the title of the * * * lands * * * is involved in a case now pending * * * entitled United States vs., the J. S. Stearns Lumber Company * * *. Until * * * the title * * * has been determined, the Office would not be justified in authorizing the use of any of this money,
83. (a) On June 12, 1917, the Secretary of the Interior approved a recommendation submitted by the Commissioner of Indian Affairs for the sale of the timber on those school and swamp lands in the Bad River Reservation as to which the State had transferred whatever title it may have had.[16] The Department had theretofore twice disapproved a similar recommendation. In this instance the Commissioner emphasized the danger of wind and fire damage, because of the cutting of timber on all sides.
(b) On July 18,1917, the Chicago attorney for the J. S. Stearns Lumber Company forwarded to the Commissioner of Indian Affairs “* * * the consents required by the Act of * * * May 18,1916, for * * * sale of timber on Section 16 and swamp lands within the Bad River * * * Reservation” covering “* * * practically all of the lands not claimed by the State * * [17]
These “consents” covered all of sections 16[18] in (1) township 46 north, range 2 west; (2) township 46 north, range 3 west (except two 80-acre tracts, being the W%SE% and the E%SWi4); (3) township 47 north, range 1 west; and (4) township 47 north, range 2 west. Also included were 320 acres in section 16 of township 47 north, range 3 west, being the NEi/4, W%NW%, and W%SE%.
The documents also included the “joint consent of Ashland Boom and Canal Co. and the Wausau Title Company as to” the following tracts not in sections 16:[19]
*568 In township 48 north, range 2 west. In section 17, lots 1 to 9; in section 18, lots 1 to 8; and in section 20, lots 2 to 4.
In township 48 north, range 3 west. In section 4, lots 2, 3, 5, and 6; in section 8, lots 1 and 2; in section 9, lots 1 to 9; in section 10, lots 1 to 15; in section 11, lots 1 to 14; in section 13, SE14; in section 14, lots 1 to 13; in section 15, lots 1 to 12; in section 17, lot 1; in section 22, lots 1 to 3; in section 23, lots 2 to 9; and in section 24, lots 4, 5, 6, and. 9.
(c) On August 10,1917, approval was given by the Secretary of the Interior to regulations submitted by the Commissioner of Indian Affairs for the sale of the timber on the school and swamp lands in the Bad Biver Reservation as to which “consents” had been submitted. The regulations provided:
* * * The proceeds derived from the timber cut from each legal subdivision shall be credited to said description, deposited in a * * * Bank at interest, and held in escrow, pending a final determination of the title to the land in accordance with the provisions of the Act of May 18, 1916. * * *
Thereafter, advertisement was duly made, and contracts were awarded in October 1917, for the cutting of 5,880 acres, of which 2,840 acres were in sections 16, and 3,040 acres were the swamp lands which Wisconsin had conveyed without having patents thereto.
84. (a) The total of the proceeds of timber cut from school and swamp lands on the Bad River and Lac du Flam-beau Reservations (plus minor amounts from timber taken from swamp lands on the Lac Court Oreilles Reservation), which had been received by defendant, comprised a substantial amount of money by the time (January 1918) the Supreme Court ruled adversely on Wisconsin’s claim to the school lands.
The exact amount of such proceeds is not established by the evidence.[20] Neither does the evidence contain accounts from which to determine how much of the proceeds were *569 derived from school lands as distinguished from swamp lands.[1]
' (b) The Department of the Interior first took steps in 1906 to make possible an accounting of the proceeds, if Wisconsin’s right thereto should ultimately be established in the courts.[2] These arrangements related only to the proceeds thereafter to be received. A substantial portion of such proceeds had been derived prior to 1906.
(c) By the end of 1908, the unallotted lands in the reservations of plaintiff bands were largely comprised of school and swamp lands.[3] Such unallotted lands did not include all of the swamp lands in the reservations from which timber had been cut, with proceeds paid either to defendant or to allottee-owners.[4]
85. (a) Sometime during 1917 Wisconsin filed in the Supreme Court an original suit against the Secretary of the Interior claiming title under the school land grant to sections 16 in the Menominee Beservation.
On January 7, 1918, the Supreme Court entered a decree for defendant, holding that the lands in controversy did not pass to the State under the school lands grant.[5]
On the same day, and on the authority of the foregoing decision, the Supreme Court reversed the judgment of the district court[6] in United States v. Stearns Lumber Company,[7] and remanded the cause for further proceedings in conformity with the opinion.
(b) On February 25, 1918, the Assistant Secretary of the Interior wrote to the Governor (E. L. Philipp) of Wisconsin:
I enclose copies of two decisions of the Supreme Court * * * rendered on January 7,1918, one in * * * Wisconsin * * * vs. * * * Lane * * * and the other * * * United States * * * vs. * * * Stearns Lumber Company.
*570 The first * * * involved the * * * title to Sections 16 within the Menominee * * * Reservation * * *. The second * * * involved the * * * title to Sections 16 within the Bad River * * * Reservation * * *. In both * * * the Supreme Court held that * * * Wisconsin had acquired no title to Sections 16 within the * * * Reservations * * *.
The timber on Sections 16 of the Bad River Reservation * * * claimed by certain parties through mesne conveyances from * * * Wisconsin was sold * * * and is now being removed. The decision in * * * Stearns * * * makes it unnecessary that * * * consent * * * be obtained as to any future sales of timber from Sections 16 within that Reservation.
* * * timber * * * upon swamp lands within the Bad River Reservation * * * should be cut * * * to save * * * loss through depreciation * * *. The status of the swamp lands is very similar to that of the Sections 16, but before any action is taken toward the disposal of the timber from swamp lands, I would like to be advised whether * * * Wisconsin concedes that the decision in the school land case determines the right of the Indians to the swamp lands also. * * *
(c) On April 12, 1918, the Governor of Wisconsin forwarded to the Assistant Secretary of the Interior “* * * a copy of resolution as passed by the Commissioners of Public Lands * * * of Wisconsin * * The resolution said:
* * * the Commissioners of the Public Lands of * * * Wisconsin, and the State of Wisconsin, make no claim to the swamp lands embraced within the Bad River * * * Reservation, * * * because of or under the Swamp Land Grant, and make no claim to any timber thereon, and authorize the Governor * * * to notify the Interior Department of the United States * * * to that effect.
(d) On April 27, 1918, the Assistant Commissioner of Indian Affairs advised the Superintendent of the Lac du Flambeau School that funds deposited under the title “Indian Moneys, Proceeds of Labor, Lac du Flambeau Indians” totaled $119,450.50. He authorized the disbursement therefrom “for the benefit of the Lac du Flambeau Indians” of $35,155.76, and said that “* * * such amount as you may require * * * to June 30, may be allotted upon * * * justi *571 fication.” For reasons not explained by the evidence, no disbursement was made from the specified fund.
(e) On May 6,1918, the Assistant Commissioner of Indian Affairs forwarded to the Commissioner of the General Land Office a copy of the resolution of the Commissioners of Public Lands of Wisconsin and said:
* * * The 545 members of the La Pointe band who were allotted under the provisions of the Act of August 1, 1914 * * *, were entitled to 80 acres each, but as there was not sufficient land, exclusive of the swamp lands and the sections * * * 16 * * *, they were allotted * * * 60 acres each. * * * if * * * patents * * * have not yet been issued * * *, it is suggested that the matter be held in abeyance * * *.
* * * furnish * * * the status of the so-called swamp lands in the sections * * * 16 * * *. If any lands of the Bad River Reservation have been patented to * * * Wisconsin for any purpose, please * * * advise * * % giving * * * description * * *.
(f) On May 18, 1918, the Assistant Secretary of the Interior forwarded to the Superintendent of the La Pointe School a copy of the resolution of the Commissioners of Public Lands of Wisconsin and instructed him:
* * * In view of this resolution, the timber on swamp lands on the Bad River Reservation may be sold under authority of the Act of May 18,1916 * * *. * * * prepare a contract, similar to the one * * * of October 18, 1917, to cover the sale of all timber on swamp lands of the Bad River Reservation, not included in the contract of October 18,1917. * * *
The main contract was made with Stearns, was dated June 26, 1918, and was approved July 27, 1918. It covered 9,521.68 acres. The regulations were those previously approved, and contained the escrow clause.[8]
*572 . (g) On May 15, 1918, the Assistant Secretary of the Interior wrote to the Governor of Wisconsin, asking to be advised whether the State had any further claim to the swamp lands within the Lac Court Oreilles, Lac du Flambeau, and other reservations.
When the Governor failed to reply, follow-up letters were .sent on June 7,1918, August 19,1918, and February 11,1919. The correspondence was resumed by the Attorney General of Wisconsin.[9]
(h) On June 21, 1918, the Commissioner of the General Land Office advised the Wausau Register and Receiver of the resolution of Wisconsin’s Commissioners of Public Lands, and said:
* * * As that resolution constitutes a relinquishment of all claim under the grant * * * to the swamp * * * lands in the * * * Bad River * * * Reservation, the State’s swamp land selection-list No. 1 and * * * list No. 4 * * * are hereby rejected as to the following tracts of land: * * * So note on your records and advise the State * * *. This closes the case.
86. (a) On February 14, 1919, the Attorney General of Wisconsin (John J. Blaine) wrote to the Governor (E. L. Philipp):
* * * Since the Supreme Court * * * has decided that the state has no title to the * * * [sections 16 and swamp lands in Indian reservations], I doubt very much the necessity of any formal relinquishment * * *.
However, I assume that the Department of the Interior desires some formal recognition of our relinquishment.
Permit me to suggest that final determination * * * be held in abeyance until all these matters * * * have been passed on by me.
* * * final decision will be made within * * * ten days.
(b) On March 15,1919, the Attorney General of Wisconsin, replying to a request from the Superintendent of the Lac du Flambeau Agency as to whether or not the State had relinquished its claim to the swamp lands in that reservation, said:
*573 * * * This matter has come before me from several angles, and as yet I have not determined what action should be taken. * * *
* * * I assume that the state has nothing to relinquish, though I am not now determining in what manner this fact may be recognized. * * * if you will advise me just in what respect a settlement of the matter means a great deal to the Indians, I will try and work out a solution that may be practical. * * *
(c) On April 2, 1919, the Governor of Wisconsin (Mr. Philipp) wrote to Senator Lenroot of that State concerning a call made upon him by Indians from the La Pointe Agency complaining of the failure of the Indian Agent to complete their allotments from school and swamp lands. In his letter the Governor said:
* * * You will recall that for years the state maintained that it had a claim upon these lands * * *.
I have had no faith in these claims for the reason that the land was not surveyed when the grant was made * * *, and I felt that * * * the lands * * * within * * * the reservation actually belonged to the Indians * * * irrespective of the * * * grant.
The Supreme Court has recently cleared up this matter and * * * Wisconsin has no further claim.
* * * will you * * * call * * * the Indian Commissioner * * * and prevail upon him to hurry the adjustment. * * * I * * * wish it * * * settled because the Indians are very restless * * ®.
(d) On April 7,1919, the Commissioner of Indian Affairs (to whom the Superintendent of the Lac du Flambeau Agency had forwarded the letter of March 15, 1919, addressed to him by the Attorney General of Wisconsin) wrote the State’s Attorney General. The letter referred to the resolution of the Commissioners of the Public Lands of Wisconsin relinquishing claims to swamp lands in the Bad River Reservation, and to the failure of the Governor to respond to requests for advice as to the State’s claim to swamp lands in the Lac du Flambeau Reservation. It then continued :
* * * this Office knows of no reason why the State should not take the same action with reference to * * * [the other reservations] that it has with reference to * * * Bad River * * *; namely, by proper resolution to sur *574 render whatever claim * * * it has heretofore maintained to the swamp and school lands * * *.
The claim of the State to the swamp and school lands within the several reservations, has materially affected the rights of the Indians * * *. Since the surrender of the claim of the State to the swamp lands within * * * Bad River * * *, the Office is proposing to allot these lands to such of the Indians * * * as have not received the full amount of land to which they are entitled * * *. * * * advise the Office * * * what action the State proposes to take * * *.
(e) On April 9,1919, the Attorney General of Wisconsin replied to the foregoing letter:
* * * As I view this situation, Congress undertook to grant certain lands to * * * Wisconsin; * * * these lands were subject to treaties between the United States and the Indians; * * * the * * * Supreme Court has held that the lands * * * were not unconditionally granted in prae-senti; * * * the grant contemplated that Congress might make other disposition of the lands; * * * the rights of * * * Wisconsin * * * are to be subordinate to such disposition, in which event the State should seek indemnity in other lands for the loss of school sections. * * *
* * * I am at a loss to find wherein there is an authority for the Commissioners of the Public Lands of Wisconsin to relinquish any title the state may have to any lands.
The relinquishing * * * without legislative authority * * * must be invalid * * *.
* * * the Commissioners * * * cannot convey away the title to any of the state lands, except as provided by the statutes:[10]
* * * if the state has no right * * * to those lands, a relinquishment is unnecessary * * *.
* * * my sympathies are entirely with the Indians. * * * this whole proposition is now under consideration by a committee of the legislature, * * *, and it is hoped that we can work out a solution whereby a relinquishment, if necessary, can validly be made * * *.
87. On May 28, 1919, the Assistant Commissioner of Indian Affairs'wrote to the Superintendent of the Lac du Flambeau School with reference to a request by the band’s council that legislation be sought from Congress authorizing the allotment of the swamp and school lands on the *575 reservation. The letter referred to the decision by th'e Secretary of the Interior in 1894- (19 L. D. 518) to the effect that Wisconsin acquired the naked fee to the swamp lands by the statutory grant of 1850, subject to the right of Indian occupancy. The letter then continued:
* * * thus * * * the claim of the State to the swamp lands within the Lac du Flambeau Beservation, subject, to the right of occupancy by the Indians, has been sustained by the Department. If * * * the State has a vested right in the swamp lands of the reservation * * * it cannot be divested * * * by Congressional enactment ; the * * * remedy * * * lies either in the courts or by surrender of its rights by the State. * * *
* * * the matter should not be presented to Congress at this time. * * *
88. (a) On July 21, 1919, the Acting Assistant Commissioner of Indian Affairs wrote to the Attorney General of Wisconsin with further reference to the swamp lands within the Lac du Flambeau Beservation. The letter said:
* * * The Indians are insistent that the lands be allotted to members of the band who have not received allotments, and that the timber money credited to these tracts be distributed to them. * * * The attitude * * * [of] the Indians * * * makes it desirable that early action should be taken * * * by the proper State officials.
(b) On July 24,1919, the Attorney General of Wisconsin replied to the foregoing letter:[11]
* * * it is now the desire of the commissioner to make an allotment of the lands in the Lac du Flambeau reservation, and * * * any claim to these lands on the part of * * * Wisconsin having been effectually disposed of by the * * * Supreme Court, I know of no reason why the allotment cannot proceed.
It is * * * my opinion that, under the decisions * * * Wisconsin has no right * * * to the swamp and school lands within the Lac du Flambeau reservation and can make no claim thereto.
* * * by chapter 322 of the laws of 1919, provision has been made to reimburse purchasers of lands in those cases where the state had no title or its title has failed, *576 and * * * the land commissioners * * * may revoke * * * the certificate or patent * * *.[12]
* * * this is the only valid act that the legislature could enact * * *. * * * with respect to these * * * lands, for the purpose of reimbursement * * * and * * * cancellation * * *, the state had no title * * *. * * * the state has no right * * * to these lands and the members of the tribe are entitled to * * * allotment * * * under the federal statutes, without any * * * further act upon the part of * * * Wisconsin * * *.
(c) On July 29,1919, the Commissioner of Indian Affairs forwarded the foregoing letter to the Secretary of the Interior and recommended—
* * * that the Commissioner of the General Land Office be requested to clear list all the swamp and school lands on the Lac du Flambeau Reservation * * * to the end that appropriate action may be taken to allot the lands to the Indians.
The recommendation was approved by the Secretary on July 30, 1919, and referred to the General Land Office for appropriate action.[13]
(d) On September 9,1919, the Commissioner of the General Land Office forwarded to the Wausau Register and Receiver the descriptions of lands within the Lac du Flam-beau Reservation included in “Swamp-land selection-list *577 No. 3, Stevens Point series, made up in 1866, and the list made up in 1881, by the Commission * * *,” and advised that “* * * the swamp-land claim to the * * * described •tracts is * * * held for rejection.” The letter continued:
* * * Of this action advise the State. Notify it, moreover, that, unless it files appeal * * * within thirty days * * * the * * * claim will be finally rejected without further notice * * *.
(e) On September 16,1919, the Register at Wausau wrote to the Governor of Wisconsin:
Although the Attorney General of * * * Wisconsin wrote to the Commissioner of Indian Affairs * * * that the State * * * has no right * * * to the swamp and school lands within the Lac du Flambeau reservation the regular course of business requires that the swamp land claim in question must be rejected.
* * * September 9, 1919, the Acting Assistant Commissioner of the General Land Office held said swamp land claim for rejection.
Thirty days from this notice you are allowed to * * * appeal * * *; and upon your failure to take action within the time allowed, the * * * claim will be finally rejected * * *.
(f) On September 23,1919, the Chief Clerk of the General Land Office forwarded to the Secretary of the Interior “* * * correspondence from the Superintendent of the Lac du Flambeau School, * * * relative to the issuance of a patent to * * * Joe Corn, for certain land on the * * * Reservation.” The letter further advised that Corn’s name appeared on a schedule of allotments approved on November 9, 1886; that he was allotted 80 acres, being the W%SW%, 2-41-4; that he had never received a patent; that the SW%SW}4 was classified as swamp, which “* * * explains why no patent was ever issued to the allottee”; and that the claim of the State to the SW^SW^ was rejected on September 9, 1919. The letter continued:
The * * * [rejection of] * * * the claim of the State to the swamp and school lands within the * * * Reservation removes all objections to the issuance of a patent to this allottee. * * * recommended that * * * a patent * * * [be issued] * * *.
*578 The recommendation was approved on November 12,1919, and referred to the General Land Office for appropriate action.
(g) On September 24, 1919, the Chief Clerk of the Commissioners of the Public Lands of Wisconsin returned to the Executive Secretary the letter from the Wausau Eegister rejecting the State’s claim to lands in the Lac du Flambeau Eeservation. The letter continued:
* * * It is apparent that by recent decision of the Supreme Court, the state has no valid claim to the land * * *, and the cancellation of record of the claims on file in this office must follow. * * * Proper entries will be made on the records * * *.[14]
(h) On October 3, 1919, the Eegister at Wausau advised the Commissioner of the General Land Office that the State had been notified, on September 16, 1919, of the Commissioner’s decision of September 9,1919, and that—
* * * this office was notified by the State that the records in the state department are corrected to conform with the * * * rejection and that no appeal will be taken * * * and no further claim will be made by the State to the land. * * *
(i) On October 27,1919, the Commissioner of the General Land Office wrote the Eegister at Wausau—
* * * the swamp-land claim to the tracts described in the letter of September 9,1919, is hereby finally rejected. So note on your records and advise the State * * *. This closes the case.
89. (a) On January 14,1921, the Secretary of the Interior transmitted to the Chairmen of the Committees on Indian Affairs of the Senate and House of Eepresentatives the draft of a proposed bill “* * * for the enrollment and allotment of members of the Lac du Flambeau Band * * The bill would have authorized and directed the Secretary of the Interior “* * * to prepare a final roll of all the unallotted members of the Lac du Flambeau Band * * * [and to] * * * cause allotments to be made * * * (exclusive of the mer *579 chantable timber ***)** Patents were to be issued “* * * after the merchantable timber has been removed * * The bill would have further authorized the Secretary of the Interior “* * * to sell the merchantable timber on the lands allotted * * and directed that “* * * the net proceeds derived therefrom, together with any undistributed proceeds derived from the sale of timber heretofore cut and sold from such lands, shall be distributed per capita * *
(b) The letters of transmittal of the proposed bill advised the Chairmen of the Committees:
* * * after many years of controversy, * * * Wisconsin has surrendered its claim to the swamp and school lands within the * * * Lac du Flambeau * * * Reservation, and on October 27, 1919, the Commissioner of the General Land Office instructed the Register * * * at Wausau * * * that the claims of the State * * * had been rejected. This action removed all obstacles to allotment and patenting of these lands to the individual members of the band. The records of the Indian Office show that there are approximately 20,421 acres of swamp land * * * within the reservation. * * *
90. On August 8, 1921, the Federal Power Commission issued a license to the Wisconsin-Minnesota Light and Power Company to construct a project which included a reservoir on the Chippewa River and which involved certain tribal lands within the Lac Court Oreilles Reservation.[15] Promotion of the project, including the acquisition of all necessary lands, had been supported by the Railroad Commission of Wisconsin.
On May 25, 1923, the United States District Court at Superior ordered the taking of the specified lands for the power project.
The necessary lands were acquired in due course, and the project was built. Indian allottees received compensation *580 for such of their lands as were taken, and the band received compensation for the tribal lands taken. Some of the lands so taken were flooded by the reservoir. Some of the lands so flooded were lands that were overflowed within the meaning of the Swamp Land Act.[16]
91. (a) On December 9, 1921, the Assistant Secretary of the Interior wrote to the Superintendent of the La Points School:
Authority is * * * granted * * * to make a per capita payment of $1216.87 to the 545 Indians * * * enrolled * * *, in the total sum of $663,194.15, of which * * * $271,781.72 represents the proceeds of timber sales on allotted land within the Bad River Reservation under authority of the Act * * * [of August 1,1914] * * * and $391,412.43 * * * receipts from the sale of timber on swamp and school land under the Act of May 18,1916 * * *.
(b) On February 16, 1923, the Superintendent of the La Points Agency advised the Commissioner of Indian Affairs that all of the reservation timber had been cut and that he proposed to make a fourth and final per capita payment to the enrollees. The Superintendent further advised that, under the authority of the Acts of August 1,1914, and May 18, 1916, he had made one per capita payment in 1915, one in 1917-18, and one in 1922. On March 8,1923, the Assistant Secretary of the Interior confirmed the Superintendent’s authority to make the final payment.
92. (a) Within five years after the resolution in 1918 of the school lands issue, the following actions were taken with respect to the swamp lands in the Bad River Reservation:
(1) By Wisconsin: The Commissioners of the Public Lands adopted a formal resolution relinquishing the State’s claim. This resolution was forwarded by the Governor to the Assistant Secretary of the Interior.
(2) By the United States: After Wisconsin had notified Interior of the relinquishment of its claim, Interior authorized the sale of the swamp land timber on the reservation under the Act of May 18, .1916, retaining the escrow clause in *581 the contracts. A month later the General Land Office formally rejected Wisconsin’s claims to the swamp lands, thereby “closing the case” as a matter of administrative procedure within the department. Less than two years after the State gave notice of relinquishment of claim, the Indian Agent (Superintendent at La Pointe), with departmental authority, made final per capita payments to Indian enrollees on the reservation from the proceeds of timber cut from swamp and school lands, thereby exhausting such proceeds.
(b) Within five years after the resolution of the school lands issue in 1918, the following actions were taken with respect to the swamp lands in the Lac du Flambeau Reservation :
(1) By Wisconsin: The Attorney General advised Interior that in his opinion the State had no right or claim to the lands, and that he saw no reason why allotments should not be made of the lands to the Indians. In the course of administrative procedures formally rejecting the State’s claim on the basis of the Attorney General’s opinion, the State waived its right to appeal and notified Interior to that effect before the appeal period had expired.
(2) By the United States, before the Office of Indian Affairs received the disclaimer of interest in the reservation by the Attorney General of Wisconsin:
(i) The Commissioner of Indian Affairs authorized the Indian Agent at Lac du Flambeau to make disbursements for the Indians from a fund containing proceeds of swamp land timber that had accrued before passage of the Act of May 18, 1916.
(ii) The Indian Agent did not make disbursements from the specified fund (containing $119,450.50). The reasons for the withholding of such disbursements are not explained by the evidence.
(iii) The Commissioner of Indian Affairs expressed the opinion that the lands could not be allotted until the rights of the State were surrendered or otherwise removed.
(3) By the United States, after the Office of Indian Affairs received from the Attorney General of Wisconsin his letter of disclaimer:
*582 (i) The Secretary of the Interior directed the General Land Office to clear list the reservation, and this was done in regular administrative procedure, ending with formal advice to the State of final rejection “closing the case.”
(ii) The issuance of a patent to an Indian allottee was authorized on the ground that surrender of the State’s claim had removed the only obstacle to the patent.
(iii) The Secretary of the Interior asked for authority from Congress to make additional allotments on the reservation in keeping with the authority for similar action on the Bad River Reservation based on the Act of August 1, 1914, 88 Stat. 582 (finding 78). This request was predicated on the Secretary’s understanding and assertion that the claims of Wisconsin to the swamp lands in the Lac du Flambeau Reservation had been abandoned-or withdrawn.
(c) If any action was taken, within five years after the 1918 resolution of the school lands issue, by either inter-venor or defendant, respecting the swamp lands in the Lac Court Oreilles Reservation, such action is not in evidence.[17]
93. (a) On May 7,1923, the United States filed in the Supreme Court a bill of complaint against the State of Minnesota, seeking (1) the cancellation of patents covering swamp lands in Chippewa Reservations in that State and (2) recovery of the value of such of the lands as had been sold by the State, leaving the patents thereto uncanceled.
(b) On May 26, 1923, the Secretary of the Interior wrote to the Governor (John J. Blaine) of Wisconsin concerning the patents which had been issued to the State covering swamp lands within the Menominee[18] and Lac Court Oreilles[19] Reservations:
* * * The Interior Department * * * contends that the patents * * * were issued * * * by inadvertence
*583 * * *, and that they conveyed no title * * *.
* * * it is * * * requested that * * * appropriate action to remove the cloud from the record title * * * be taken by the State Legislature. * * *
(c) On July 9,1923, the Deputy Attorney General of Wisconsin replied to the letter which the Secretary of the Interior had addressed to the Governor[20] on May 26,1923:
* * * Wisconsin has consistently claimed that the right to a return of * * * [the Menominee] patent * * * could not be sustained on the ground of inadvertence * * *; and that * * * the departments of this state * * * were without authority to surrender * * * without a consent of the legislature * * *. This consent has never been obtained * * *.
* * * there is only one way of getting this matter disposed of, and that is by * * * litigation * * * which the courts of last resort can determine * * *.[1]
(d) On July 19,1923, the Acting Secretary of the Interior replied that he considered a court test to be a good idea.
94. (a) On August 3, 1923, the Acting Secretary of the Interior transmitted to the Attorney General of the United States a letter which the Commissioner of Indian Affairs had addressed to the Secretary on August 2,1923, relating to a proposed suit against Wisconsin in the Supreme Court to determine the rights of the Indians of the Menominee and Lac Court Oreilles [Reservations to the swamp lands. The letter recommended the action.
(b) On April 24, 1924, a bill of complaint in the case of United States v. Wisconsin was filed in the Supreme Court. The bill pertained largely to the swamp lands in the Menom *584 inee Reservation which had been patented to Wisconsin in 1885.1 It further recited that on October 8, 1895, a patent had been issued to Wisconsin covering the SE14SE14 30-39-8, in the Lac Court Oreilles Reservation; alleged that all such patents were issued by inadvertence; and asked that they be canceled.
95. (a) The Act of May 19,1924, 43 Stat. 132, authorized and directed the Secretary of the Interior—
* * * to add to the existing rolls of the Lac du Flambeau Band * * * persons * * * entitled * * * born prior to * * * this Act * * *. * * * [to] cause allotments * * * to be made to the members * * * on said additional roll (exclusive of the merchantable timber on such land) * * *. * * * patents * * * shall issue * * * after the merchantable timber * * * has been removed * * *.
* * * to sell the merchantable timber * * *, the net proceeds * * *, together with any undistributed proceeds * * * from * * * timber heretofore cut * * * from such lands, shall be distributed per capita * * * to * * * members * * * competent * * *.
What action, if any, was taken by the Bureau of Indian Affairs pursuant to this statute is not established by the evidence.
(b) On August 14, 1924, the Commissioner of Indian Affairs was advised by a Special Supervisor as to the results of an investigation of a proposed suit against Wisconsin and others in behalf of Bad River Indians for trespasses alleged to have been committed in 1893 or thereabout in the cutting of timber from school lands and the swamp lands contained within the 3080 acres which Wisconsin had sold (by patent) in 1882 to five named individuals. The Special Supervisor was particularly concerned over the means to be used to determine what timber had been cut, and concluded with a recommendation that the Forestry Service be asked (1) to determine the quantity, kinds, and value of the timber cut and removed or (2) to state that the evidence thereof had been destroyed by the lapse of time.[2]
(c) On September 3, 1924, the Chief Supervisor of Forests (of the Indian Field Service) reported to the Com *585 missioner of Indian Affairs the results of a careful and thorough examination of the Bad River Reservation, to which he attached “* * * a list showing the amount of timber that had been removed from Sections 16 and the so-called ‘Swamp lands’ so far as the records of that agency showed.” The Supervisor thought an effort to determine kind, quantity, and value of timber cut many years before would yield poor results.[3]
96. (a) On October 25, 1924, the Acting Assistant Commissioner of the General Land Office advised the Attorney General of Wisconsin that Wisconsin’s “* * * appeal * * * from the decision of this office, dated September 15, 1924, in the matter of the State’s swamp-land claim to the NE}4 NE]4 Sec 12, T. 39 N., R. 8 W., 4th P. M., within the Lac Courtes Oreilles * * * Reservation, has * * * been transmitted to the Secretary of the Interior.” [4]
(b) On February 16, 1925, the First Assistant Secretary of the Interior wrote to the Attorney General of Wisconsin stating that “* * * Action * * * on the appeal * * * [mentioned in the preceding subparagraph] * * * will be deferred pending the outcome of the case * * * in the Supreme Court.” [5]
97. (a) On March 1, 1926, the Supreme Court dismissed the Government’s bill of complaint in United. States v. Minnesota,[6] subject to certain exceptions set forth in the opinion.[7] As stated in one of the head-notes of the decision, the Court held that the Swamp Land Act * * * granted those States an immediate inchoate title to the public swamp land in their confines, to become perfect as of the date of the Act when the lands were identified and patented * *
(b) On October 4, 1926, the Solicitor General of the United States, acting with the concurrence of the Solicitor of the Department of the Interior and the Secretary, moved *586 for dismissal of United States v. Wisconsin, and the case was accordingly dismissed.[8]
98. On December 30, 1927, tbe Assistant Commissioner of Indian Affairs wrote to the Superintendent of the Keshena (Menominee) Agency concerning $9,548.10 that had been paid to Wisconsin by a Chicago firm for timber cut from swamp lands in the Menominee Reservation in 1897-1898:
* * * the swamp lands * * * were patented to * * * Wisconsin in * * * 1865. * * * [In] 1923 * * * the United States * * * [sued] * * * Wisconsin to cancel the. * * * patents ***.*** [In] 1925 * * * the United States * * * [sued] * * * Minnesota to cancel patents * * *. On March 1, 1926, the Supreme Court decided * * * in favor of Minnesota.
* * * the Office is of the opinion that the $9,548.10 * * * belongs to * * * Wisconsin. * * *
99. On January 2,1929, the General Land Office ruled, in an unreported decision:[9]
There has been considerable correspondence between the officials of * * * Wisconsin and the * * * Department as to the selecting of swamp lands, but there has teen no formal agreement, ratified by the legislatv/re of the State, as to the method which should control. It follows that, while the field notes of the survey may indicate that the land is swamp, the returns of the surveys may be com-batted by an interested party, and the State may, in -proper manner, select as swamp a tract not shown to be such by the field notes, and, if the showing made by the State is not overcome, receive patent for the tract. * * * (italic supplied.)
100. On April 16, 1929, the First Assistant Secretary of the Interior reversed the decision by the Commissioner of the General Land Office rejecting Wisconsin’s claim to the NE]4NE]4 12-39-8, in the Lac Court Oreilles Reservation. The reversal overruled the opinion by the Solicitor for the Department, rendered June 29,1922, that swamp lands in the reservation did not pass to the State under the grant, and restored the Secretary’s 1894 ruling that the State took title *587 to the swamp lands in the reservations, subject to the Indian right of occupancy.[10]
101. (a) On November 16, 1929, the Chief Supervisor of Forests (of the Indian Service) wrote to the Commissioner of Indian Affairs concerning the claims of Wisconsin to swamp lands in the Menominee and Chippewa Reservations:
* * * the * * * Chief Clerk of the Board of Land Commissioners [of Wisconsin] is asserting the claim of the State to all * * * [swamp] lands * * * [within the Bad River and Lac du Flambeau Reservations] and apparently proposes to examine all of them in 1930. There is no doubt as to the swampy character of very large areas * * * but some of the lands claimed by the State are not actually swamp. If the State is disposed to assert its claim, it will be advisable that all lands be examined by the Indian Service. * * *
(b) On December 26,1929, the Acting Assistant Commissioner of the General Land Office wrote to the Commissioners of the Public Lands of Wisconsin in reply to the request theretofore submitted by the Chief Clerk of the State Land Department “* * * that all objections to the patent * * * [in Menominee] * * * issued November 13, 1865 * * * be withdrawn and the title * * * fully conceded to * * * Wisconsin.” The letter reviewed the history of the Menominee, Stockbridge, and Munsee Reservations and the rulings of the Supreme Court and the Secretary of the Interior and concluded that the Department could no longer object to the patent. It was further pointed out that some of the land had also been made the subject of other patents, some of them dated in 1872 and 1873. As to these tracts, the letter suggested that the issue of title, based on adverse possession (good even against the State, by a Wisconsin statute, after 40 years) be tested in the courts.
(c) On February 25,1930, the Chief Clerk of the Commissioners of the Public Lands of Wisconsin wrote to the Commissioner of the General Land Office:
I am enclosing * * * a list of descriptions in the Lac du Flambeau * * * Reservation which combines the *588 list prepared by Wisconsin * * * in 1866 and one prepared by joint commission * * * in 1881 * * *.
* * * I * * * request patent * * *.
• The total set forth at the bottom of the list was 22,358.54 acres.
(d) On February 26,1930, a similar request based on a list combining “descriptions approved by the General Land Office on April 27,1871 and * * * by the. joint commission in 1881 * * *” was submitted with respect to the Bad River Reservation. The acreage total was 11,565.93.
(e) On March 18,1930, the United States issued a patent to Wisconsin covering the NE14NE14 12-39-8, being the 40-acre tract in the Lac Court Oreilles Reservation which had recently been involved in administrative proceedings.[11]
102. (a) On April 1, 1930, the Chief Supervisor of Forests of the Indian Service advised his office by memorandum:
* * * Wisconsin has arranged for an examination not only of the lands [in the Bad River, Lac du Flambeau, and Menominee Reservations] that were reported by field notes as being swamp but of all lands within these reservations that * * * were swamp * * * [in] 1850 * * *, and * * * asserts that under Departmental decision of January 2, 1929,[12] the State * * * is entitled to * * * lands that may have been swamp even though the field notes did not show them to be so.
* * * there are * * * tracts in all of these reservations that were * * * swamp * * * [in] 1850 * * *. On the other hand, I * * * have visited tracts on * * * Lac du Flambeau that were shown on the field notes * * * as * * * swamp that are * * * not properly classifiable as swamp * * *.
* * * Wisconsin should be * * * held * * * to one rule or the other * * *.
* * * the Indian Office should oppose the issuance of a patent * * * for any lands until they are found by physical examination to be swamp, unless her representatives will bind * * * the State to claim only those lands * * * shown by the field notes to be swamps * * *
(b) On May 27,1930, the Acting Assistant Commissioner of the General Land Office wrote to the Commissioner of *589 Indian Affairs relative to swamp land claims asserted by Wisconsin for lands within the Lac du Flambeau, Bad Fiver, and Menominee Reservations:
* * * The * * * applications were filed in * * * 1930.[13] * * * there was * * * a request * * * that * * * patents be issued to the State * * *.
The field notes * * * indicate that the major portion of the lands were of the character contemplated by the grant of swamp and overflowed .lands * * *. The * * * minor portion was not, according to the field notes % QTjpli pllf! T*51
* *’* there are allotments, * * * and * * * patents * * * to Indians covering some of the lands * * *.
In general the claim of * * * Wisconsin * * * is adjusted on the basis of the showing made by the field notes of * * * survey * * *. But this plan of adjustment is not exclusive, as appears from the unreported departmental decision of January 2,1929 * * * in * * * Wisconsin y. * * * Hines * * *.
It is * * * the character of land on September £8, 1850, that controls in the adjustment of swamp-lard claims. Evidence as to the present character of the land is, of course, relevant as tending to establish its character in [sic] September 28, 1850. No adjudication of the lands covered by the three swamp-land applications has been made [14] (Italics supplied.)
Normally this would now be in order. Those tracts shown by the field notes * * * to be of the character * * * to inure to the State * * * would be described in a swampland clear list * * *, and * * * there would inure to the State * * * a swamp-land patent * * *. Adjudication would be had also of those tracts which are not indicated by the field notes * * * to have been * * * [swamp]. Those tracts embraced in * * * patents * * * to Indians, would be the subject of decisions.
* * * this office has been * * * advised that your office has the desire, acting for the Indians and with a view of protecting * * * allotments * * * to make field investigations * * * of said lands for the purpose of contesting the swamp-land claims of the State. This proposed action is contingent upon an appropriation * * * for expenses. * * *
* * * Suggestion is * * * made that * * * protests * * * be filed * * * against the [State’s] swamp-land appli *590 cations. This office could then * * * suspend the applications pending disposition of the protests. * * *
(c) On June 5, 1930, the Commissioner of Indian Affairs wrote to the Commissioner of the General Land Office asking that Wisconsin’s applications for swamp lands in the Lac du Flambeau, Bad River, and Menominee Reservations be held in abeyance until the Office of Indian Affairs could make field investigations, for which it hoped to obtain appropriations “during the present session of Congress.”
103. (a) The Act of June 13,1930, 46 Stat. 584, amended the Act of February 12,1929, 45 Stat. 1164, to read:
* * * all funds with account balances exceeding $500 held in trust by the United States and carried in principal accounts on the books of the Treasury Department to the credit of Indian tribes, upon which interest is not otherwise authorized by law, shall bear simple interest at the rate of 4 per centum per annum.
(b) The Act further provided:
* * * All tribal funds arising under the Act of March 3, 1883 * * * as amended * * * now included in the fund “Indian Money, Proceeds of Labor,” shall, on and after July 1, 1930, be carried on the books of the Treasury Department in separate accounts for the respective tribes, and all such funds with account balances exceeding $500 shall bear simple interest at the rate of 4 per centum * * *.
(c) On July 1, 1930, the Office of Indian Affairs posted as an interest-bearing account, under the terms of the statute set forth in the preceding subparagraph, the funds carried as “Indian Moneys, Proceeds of Labor, Lac du Flam-beau swamp lands,” in the amount of $119,450.50. The account has been so carried and has earned interest since that time.
104. (a) On July 31, 1930, an Examiner for the General Land Office wrote the Chief Clerk of Wisconsin’s Commissioners of Public Lands that he had been instructed to make an examination of specified tracts[15] in the Lac du Flambeau Reservation to determine “* * * that the lands * * * are not swamp and belong to the * * * Indians, or *591 that they are swamp and are, therefore, subject to patenting to the State.” He said he would let the Chief Clerk know when the examination would be made, so that Wisconsin “* * * may, if it so desires, have * * * thereat a representative.”
(b) On August 12, 1930, the Commissioner of Indian Affairs wrote the Chief Clerk of Wisconsin’s Commissioners of Public Lands that the Indian Office would cooperate in securing legislation authorizing payment by the United States to Wisconsin for the swamp lands in the Indian reservations, but felt that a physical examination of all of the lands should be made first. The letter said :
* * * We feel, and you admit, that the old surveys and classification are quite erroneous * * *.
The Commissioner of Indian Affairs further said that the request for an appropriation to cover the cost of the examination had not been successful, but that the department would try again.[16]
(c) On December 23, 1930, the Assistant Commissioner of the General Land Office wrote to Wisconsin’s Commissioners of Public Lands rejecting the State’s claim to lots 2 and 3 of 10-41-5 on the ground that examination showed them to be non-swamp.[17] The letter said that lot 2,11-41-5, had been found by examination to be swamp and would be included in a list for approval by the Secretary.[18] With respect to the rejection, Wisconsin was given 30 days to appeal.
No appeal was taken, and on May 27, 1931, the rejection was made final.
(d) On January 2, 1931, the Assistant Commissioner of Indian Affairs advised a correspondent on the Lac du Flambeau Reservation:
* * * the right of the state to the swamp lands within the reservation cannot well be denied, and it is entitled to patents for the lands actually found to be swamp. * * * [19]
*592 105. (a) On January 21, 1931, the United States issued a patent to Wisconsin for the NW^SW1/^ of 18-39-8 (37.49 acres). This tract was in the Lac Court Oreilles Reservation. It had not been selected by Wisconsin as swamp in 1857 or 1881. When, how, and why it was selected are facts not established by the evidence.
(b) On March 3,1931, the United States issued to Wisconsin a patent for the NW*4NW% of 17-39-8. This was a 40-acre tract in the Lac Court Oreilles Reservation which had been selected by Wisconsin as swamp in 1857 and again in 1881.
(c) No further patents covering swamp lands in the Lac Court Oreilles Reservation have been issued to Wisconsin by the United States. The four tracts for which such patents were issued were (1) the SE14SE14, 30-39-8, mentioned in finding 60, conveyed in 1895; (2) the NE14NE14, 12-39-8, mentioned in finding 101 (e), conveyed in 1930; (3) the NW^SW^, 18-39-8, mentioned in subparagraph (a), above, conveyed in 1931; and (4) the NW%NW}4, 17-39-8 mentioned in the preceding subparagraph, also conveyed in 1931. Three of the tracts had been selected as swamp in 1857 and 1881; the fourth had not been so selected.
(d) The Lac Court Oreilles Reservation was contained within eight townships in four ranges. They were: 2 townships 38 north, in ranges 8 and 9 west; 3 townships 39 north, in ranges 7, 8, and 9 west; and 3 townships 40 north, in ranges 6, 7, and 8 west. The perimeter of the townships containing the reservation therefore included 18 townships in six ranges, being 4 townships 37 north, in ranges 7, 8, 9, and 10 west; 3 townships 38 north, in ranges 6, 7, and 10 west; 3 townships 39 north, in ranges 5, 6, and 10 west; 3 townships 40 north, in ranges 5, 9, and 10 west; and 5 townships 41 north, in ranges 5, 6, 7, 8, and 9 west.
Prior to the establishment of the reservation in 1873, the United States had issued to Wisconsin, in 1856, 1861, and 1862, patents covering 24 tracts lying within the townships from which the reservation was ultimately drawn, and 17 tracts lying within the perimeter townships.
After the reservation was established, the United States issued to Wisconsin, in 1881, 1886,1887,1890, and 1895, pat *593 ents covering 26 tracts lying within the townships which encompassed the reservation, and 13 tracts lying within the perimeter townships.
None of the 80 tracts exceeded 40 acres in size. Subject to a few exceptions, most of the tracts were quarter-quarter subdivisions.
(e) No further patents covering swamp lands in the Bad River Reservation have been issued to Wisconsin by the United States. The only tract for which such a patent was issued was the SE14NE14, 36^48-4, mentioned in finding 55 (c), conveyed in 1881.
(f) The Bad River Reservation was contained within nine townships in four ranges, being 2 townships 46 north, in ranges 2 and 3 west; 3 townships 47 north, in ranges 1,2, and 3 west; and 4 townships 48 north, in ranges 1,2, 3, and 4 west. The perimeter townships numbered 11, being 2 townships 48 north, 1 in range 5 west and 1 in range 1 east; 3 townships 47north, in ranges 4 and 5 west and range 1 east; 2 townships 46 north, 1 in range 4 west and 1 in range 1 east; and 4 townships 45 north, in ranges 1,2,3, and 4 west.
By swamp land patents issued in 1872,1881,1886, and 1897, the United States conveyed to Wisconsin 93 separate 40-acre tracts lying within the perimeter townships.
(g) No patent covering swamp lands in the Lac du Flam-beau Reservation has been issued to Wisconsin by the United States.
This reservation was contained within seven townships in three ranges, being 1 township 39 north, in range 6 east; 3 townships 40 north, in ranges 4, 5, and 6 east; and 3 townships 41 north, in ranges 4, 5, and 6 east. There were 16 perimeter townships, being 3 townships 38 north, in ranges 5, 6, and 7 east; 4 townships 39 north, in ranges 3, 4, 5, and 7 east; 2 townships 40 north, in ranges 3 and 7 east; 2 townships 41 north, in ranges 3 and 7 east; and 5 townships 42 north, in ranges 3, 4, 5, 6, and 7 east.
By swamp land patents issued in 1868, 1881, and 1886, the United States conveyed to Wisconsin 39 separate 40-acre tracts in four of the townships which encompassed the reservation and 42 separate 40-acre tracts in five of the perimeter townships.
*594 (h) Between August 14,1931, and December 11,1952, the United States issued to Wisconsin 22 patents covering swamp lands, none of which lands were in any of the reservations of plaintiff bands.[20] Two of the 140 tracts were in townships bordering the Lac du Flambeau Reservation.
106. (a) On March 5, 1931, the Commissioner of Indian Affairs wrote to Wisconsin’s Commissioners of Public Lands regarding the swamp lands in the Menominee Reservation:
* * * The Office feels that possibly the people of * * * Wisconsin do not wish to take a strictly legalistic view of this matter and that with a full understanding of the, swamp land case the State legislature might be willing to abandon its claim * * *.
The letter indicated that if the lands had to be purchased, the money would probably have to come out of the Menominee funds.
(b) On March 13, 1931, the Chief Clerk of Wisconsin’s Commissioners of Public Lands replied to the foregoing letter:
* * * You offer nothing * * *. If, after being directed on September 28, 1850, to make * * * determination [of the swamp lands] as soon as may be practicable, with eighty years * * * now passed, one is led to wonder when the practicable time will come.
* * * if an agreement with the state in 1881, means nothing in 1931, what hope is there for an ultimate closing of this matter ?
* * * these lands are part of the constitutional fund and are beyond the power of this commission or the legislature to * * * dispose of otherwise than to get money for the school fund, * * *.[1]
(c) On March 27, 1931, the Commissioner of- Indian Affairs replied:
* * * It had been our thought that in the long run the citizens of Wisconsin in the interests of their Indian people might well consider suggesting to their Legisla *595 ture the relinquishing of all claims to swamp lands in the Indian Reservations.
107. On April 20, 1931, the General Land Office issued the following regulations:[2]
Selection and patenting of swamp lands, (a) All lands properly selected and reported to the Bureau of Land Management as swamp will be compared with the records of the said office, and lists of such lands as are shown to be swamp or overflowed, within the meaning of the acts of March 2, 1849, and September 28, 1850 (9 Stat. 852, 519), and that are otherwise free from conflict will be made out by such office and approved.
(b) When the lists have been approved a copy of each list will be transmitted to the governor of the State, with the statement that on receipt of his request patent will issue to the State for the lands. A copy of each list also will be transmitted to the manager of the land office for the district in which the lands are situated, and he will' be requested to examine the same with the records of his office and report any conflicts found.
(c) Upon receipt of a request from the governor for patent, and a report from the manager as to status, patents will issue to the State for all the lands embraced in said lists so far as they are free from conflict.
Applications in conflict with swamp-land claims. Ap-Ídications adverse to the State, in conflict with swamp-/ and claims, will be governed by the following rules:,
(a) In those States where the adjudication of swampland claims is based on the evidence contained in the survey returns, applications adverse to the State for lands returned as swamp will be rejected unless accompanied by a showing that the land is non-swamp in character. \
(b) In such case, the claim adverse to the State mustr be supported by a statement of the applicant under oath, corroborated by two witnesses, setting forth the basis of the claim and that at the date of the swamp-land grant the land was not swamp and overflowed and not rendered thereby unfit for cultivation.- In the absence of such’ affidavit the application will be rejected. If properly supported, the application will be received and suspended subject to a hearing to determine the swamp or non-swamp character of the land, the burden of proof being upon the non-swamp claimant.
*596 (c) In those States where the survey returns are not made the basis for adjudication of the swamp-land selections, junior applications for lands covered by swampland selections may be received and suspended, if supported by non-swamp affidavits corroborated by two witnesses, subject to hearing to determine the character of the land, whether swamp or non-swamp, and the burden of proof will be upon the junior applicant. Likewise, the State, if a junior applicant, may be heard upon furnishing an affidavit corroborated by two witnesses alleging that the land is swamp in character within the meaning of the swamp-land grant, in which case the burden of proof at the hearing will be upon the State.
(d) Where hearings are ordered in any such cases, the Buies of Practice governing contests will be applied, except as herein otherwise provided.
108. (a) On May 23, 1931, an act of the Wisconsin legislature became effective[3] authorizing the Attorney General of the State to investigate and prosecute, on behalf of Wisconsin, the claims of Indians residing in the State against the United States.
(b) On June 30, 1931, the Assistant Attorney General asked the Office of Indian Affairs for a review of such claims. The Commissioner of Indian Affairs replied on July 21,1931, with a review of the records of his office covering more than a dozen separate Indian claims, among them being claims for accounting of proceeds of timber cut from the Bad Biver and Lac du Flambeau Beservations.
109. (a) Sometime during the latter half of 1931, the Chief Clerk of Wisconsin’s Commissioners of Public Lands requested the Superintendent of the Lac ' du Flambeau Agency to inform him regarding the amount of money received for timber cut on the Bad Biver and Lac du Flambeau Beservations, by legal descriptions, from swamp and school lands. The Superintendent referred the request to the Office of Indian Affairs.
(b) On November 23, 1931, the Commissioner of Indian Affairs directed the Logging Engineer (of the Indian Service) to proceed, not later than January 15, 1932, to Lac du Flambeau and Ashland “for the purpose of preparing from the records at those points data as to the volume and value *597 of the timber removed from the lands on Bad Biver and Lao du Flambeau Reservation now claimed by * * * Wisconsin.”
(c) On February 1,1932, the Logging Engineer submitted to the Commissioner of Indian Affairs his report “on the volume and value of the timber removed from the lands on the Bad River Reservation that is now claimed by * * * Wisconsin under the swamp land act * * *.” The report said:
* * * a record was prepared for every description which appeared on any of the lists in order that another search of the records would not be necessary. * * *
* * * our search covered the reports from the autumn of 1886 to 1923 * * *.
* * * the timber was reported by legal descriptions or in the name of the Indian to whom it was allotted. It was, therefore, possible to secure the volume and value that was removed from each description * * *.
The tabulations with the report accounted for 9,232.57 acres in the “area approved by Secretary April 24, 1871,” and showed a total of $46,034.83 as the value of the timber taken therefrom.[4]
(d) On February 12,1932, the Assistant Commissioner of Indian Affairs wrote to the Superintendent of the Lac du Flambeau Agency concerning the accounting for timber proceeds:
* * * the Office is unwilling to expend any time in securing information as to the volume of timber cut from Sections 16, as they are Indian property. * * *
* * * During 1917 and 1918 * * * all merchantable timber was removed from the swamp land on Bad River Reservation, the proceeds being distributed to the Indians adjudged to be entitled to same, and as all land except less than 2,000 acres on Bad River Reservation has been allotted * * *, it will be impossible * * * to patent to the State the 11,569.54 acres they now request patent for. * * *
* * * the State is entitled to such land within Indian reservations * * * as is subject to the swamp-land act * * *.
The timber records at La Pointe Agency are believed * * * to have been kept in an accurate manner, *598 and it will probably be possible to secure the data requested * * * by making a careful search of these records. * * *
* * * Office records show that $119,450.50 is on deposit to the credit of the Lac du Flambeau Indians which was derived from sale of timber on “swamp land.” * * * This money has been deposited at interest in the Treasury since July 1,1930, at 4%. * * * [5]
It is planned to have a field officer make a search of the records of your agency * * * to secure records of the volume of each specie removed from each description of land, and the moneys received for same. It will require some months to secure the data. * * *
(e) On February 25,1932, the Assistant Commissioner of Indian Affairs wrote to the Chief Clerk of Wisconsin’s Commissioners of Public Lands with reference to the State’s claim for 40-acre tracts lying within the exterior boundaries of sections 16 in the Lac du Flambeau Reservation, “if such lands could be properly designated as ‘swamp’.” The letter said:
* * * This matter was brought to the attention of the General Land Office informally. * * * the Assistant Commissioner of the General Land Office * * * [ruled] * * * that the State would not be entitled to the lands * * * whether the field notes should show them to be swamp or they should actually be found to be of that character through field examination.[6]
Evidently the same rule would apply to lands within Sections 16 on other reservations in Wisconsin.
(f) On March 3,1932, the Logging Engineer submitted to the Commissioner of Indian Affairs his “report of the volume and value of the timber removed from the lands on Lac du Flambeau * * * Reservation claimed by * * * Wisconsin under the swamp land Act * * In a much more complicated accounting than had been required for the Bad River Reservation, the Logging Engineer reviewed the cutting from 22,691.83 acres in the Lac du Flambeau Reservation and found the total value to have been $243,188.37, without interest.
*599 110. (a) On May 2, 1932, the Commissioner of the General Land Office forwarded to Wisconsin a notice of the filing of the plat of survey of lands in Langlade County. The notice contained the following:
* * * According to the field notes of survey more than fifty percent of each of the following described subdivisions is swamp land and was of that nature * * * [on] * * * September 28, 1850 * * ®, and accordingly it would appear that said tracts inured to the State * * * as swamp land * * *. Applications adverse to the State will be rejected unless accompanied by a showing, in affidavit form and duly corroborated, that the land applied for is non-swamp in character.
(b) On December 2, 1932, the Acting Assistant Commissioner of the General Land Office forwarded to Wisconsin’s Commissioners of Public Lands his decision in a case wherein an individual had challenged the characterization of specified tracts as swamp. In holding that the contestant had sustained the burden of proof by showing that the lands were in fact non-swamp in character on September 28, 1850, wherefore they did not inure to the State, although shown on the field notes of survey as swamp, the ruling said:
* * * The State of Wisconsin has elected to make the field notes of survey the basis for determining what lands passed to it under the swamp land grant. * * *
111. (a) On December 1, 1932, Wisconsin’s Commissioners of Public Lands submitted to the Governor (Philip F. La Follette) the report of the same date addressed to the Commissioners by their Chief Clerk. His report said:
Two years ago I made an important part of my report to you the work looking to obtaining from the Federal Government the value of the swamp lands in the Wisconsin Indian Keservations. This had been a matter of contention between the state and government for more than 60 years. * * *
* * * [This] is only one of the many contests in other states as well as Wisconsin in efforts to secure their rights to land under the swamp land grant.
* * * That grant imposed upon the Secretary of the Interior the duty of preparing lists of such land, supplying them to the governors of the respective states and *600 upon their request issuing patents thereto. His failure to do so caused Congress to pass acts in 1855 and 1857, commanding him to issue patents to all lists then in his hands from the various states. * * * Immediately delay was renewed. This state made continuous effort to get the swamp lands due it. By 1880 the pressure became so strong that the state and government agreed that a commission be created to * * * make a list of the. remaining lands to which the state was entitled, which was completed after more than a year of work. * * *
* * * in September, 1929, * * * the Indian Service * * * objected to the 1880. lists on the ground that some of the forties were not swamp under the terms of the grant, to which I answered that these lists were made by a commission created by both state and government, that they had been in the hands of government 49 * * * years * * * without protest, that they were made on a plan imposed upon the state against its protest, and that if the government insisted on omitting forties on the list the state would insist upon adding any shown by the government maps as swamp that our cruisers might find to be swamp under the grant. This last point was impressive and caused us to agree to recommend to our departments, that a joint resolution by the Wisconsin legislature stating that when the lists as they then stood should be patented no more land would be asked for under the swamp grant, then patents would issue. * * * the resolution was adopted by the legislature, but the government refused to abide by it. * * *
. In addition to the Menominee, the important reservations are the Lac du Flambeau and Bad Liver. The timber on these reservations was cut by contract between the government and private companies. One of two plans had to be adopted — get the government to open its books of sale of timber or estimate from the badly burned and decayed stumps — the latter an almost impossible task. Constant effort for a year and a half finally gave access to the books. William Heritage of the Indian Service and J. J. McDonald, this commission’s cruiser, spent two months examining the books at Ashland and Flambeau. In the Bad Liver Leservation they found from lists of swamp lands furnished by the government to Mr. Heritage, the value received by the government for sale of timber, $156,822.06. The value of the land was found by the state’s cruisers to be $15,877.39 and of the timber still standing $574.00, making the total due the state in the Bad Liver Indian Leservation $173,273.45.
*601 On the Lac du Flambeau Reservation the amount received by the government for timber sold by the government from the list of swamp lands furnished by it to Mr. Heritage was $243,188.37. The state’s cruisers found the value of the land to be $36,706.32, making the total value of the timber and land $279,894.69.
In the case of each of these Indian Reservations, the government is in the position of an individual who has conveyed the same to two different parties. It must buy from one in order to make good its conveyance to the other. In this case it is manifest that the purchase should be made from the state, to avoid the disturbance of the Indians.
The total amount (without interest) due the state is as follows:
Bad River reservation timber_$156,822.06
Bad River reservation standing timber_ 574.00
Bad River reservation land_ 15,877.39
173,273.45
Lac du Flambeau reservation timber_ 243,188.37
Lac du Flambeau reservation land_ 36,706.32
279,894.69
With the cooperation of the government this transaction could have been closed in the spring of 1930. I submit that a conclusion should be urged at the earliest possible date.
(b) On December 1, 1934, Wisconsin’s Commissioners of Public Lands submitted to the Governor (Albert G. Schmede-man) the report made to them on the same date by their Chief Clerk for the past biennium. The report said:
In my last report I went so fully into the most important single item we have before us — disposal of the state’s land and timber in the Indian Reservations — that I shall treat the subject briefly in this report.
Since that report the situation has materially cleared up. We now have in charge of the Indian Office at Washington and in the Reservations in Wisconsin, men of mental complex that fit in with the Wisconsin idea of how to advance the condition of the Indians. The result appears to be an agreement that Congress in its 1935 session should, by appropriation from the general fund, purchase from the state all its land and timber and reimburse for timber already cut, with a view of solidifying the Reservations. * * *
*602 In the case of the Lac du Flambeau and Bad Biver Beservations, the timber was cut and sold by the government and the receipts placed in escrow awaiting determination of title.
I suggest that an active effort be made to consummate this matter now, while conditions are very favorable.
112. On February 15,1935, an interoffice memorandum of the Office of Indian Affairs recorded the following:
(1) That the swamp lands in the Bad Biver Beservation selected by Wisconsin on July 30,1870 (released by the Governor of Wisconsin in 1918, but now claimed) totaled 11,565.93 acres.
(2) That the swamp lands in the Lac du Flambeau Beser-vation, according to the list of October 15,1859 and the list of the 1881 commission, totaled 22,595.40 acres.
(3) That the swamp lands in the Lac Court Oreilles Bes-ervation claimed by Wisconsin comprised a small area.
(4) That the timber cut on the swamp lands in the Bad Biver Beservation had a value, according to the Government record, of $156,822.08; that by the State’s value the standing timber was worth $574.00, while the swamp lands themselves were worth $15,877.39. Total value, $173,273.45.
(5) That the timber cut on the swamp lands in the Lac du Flambeau Beservation had a value, according to the Government record, of $243,188.37; and that by the State’s value the swamp lands were worth $36,706.32. Total, $279,894.69. No value was given for standing timber.
(6) That timber (standing and cut) and swamp lands in the Menominee Beservation had a value (according to the State) of $1,005,715.29.
(7) That $10,000 was the estimated value of timber taken from swamp lands in the Stockbridge and Lac Court Oreilles Beservations, no values being available for lands.
(8) That the grand total of all the foregoing values was $1,468,883.43.
(9) That the total area of the Bad Biver Beservation was approximately 118,000 acres, of which 116,132 acres had been allotted, leaving 1,766 acres as tribal lands for a population of 1,164 Indians.
(10) That the total area of the Lac du Flambeau Beservation was approximately 70,000 acres, of which 45,756 acres *603 bad been allotted, leaving 24,363 acres as tribal lands for.a population of 838 Indians.
No comparable figures were given for the Lac Court Oreil-les Reservation.[7]
113. (a) On March 8, 1935, the Secretary of the Interior wrote to the Governor of Wisconsin (Philip F. La Follette);
I have asked Mr. William H. Heritage, Logging Engineer, U. S. Indian Service, to discuss with you and with the members of the State Land Commission the possible settlement of the long standing dispute concerning the swamp lands on Indian reservations within the State of Wisconsin. * * *
* * * In my opinion, the settlement should include transfer to the United States of title to all the swamp lands in dispute and satisfaction of all claims for timber cut from those * * * lands by the payment of a lump sum to the State. * * * a portion of * * * [the sum paid] should be earmarked for the benefit of the Indians of Wisconsin. * * *
(b) On March 27, 1935, Mr. Heritage reported tentative agreement on a proposal of settlement whereby the United States would pay to Wisconsin the sum of $1,631,699.83, for the full value of the land, timber, cash, and interest, in return for which Wisconsin would convey to the United States all of its rights and interests in all of the Indian reservations in the State and assume the total expense of all Indian education in Wisconsin.
(c) On June 19, 1935, a Special Agent reported to the Director of Investigations of the Department of the Interior recommending that the field examination of the swamp lands theretofore ordered [8] be abandoned, in view of the pending negotiations for settlement. He also reported that the Chief Clerk of Wisconsin’s Commissioners of Public Lands had expressed the opinion that the State would not consent to *604 another field examination of the lands unless such examination was to cover all the lands in the reservations, because of expenditures previously made by the State in which the Government had failed to join.
(d) On June 14,1935, S. 3045, a bill to authorize payment to the State of Wisconsin for swamp lands within Indian reservations in that State, was introduced by Senator La Follette.
(e) On July 22, 1935, the Secretary of the Interior submitted to the Chairman of the Committee on Indian Affairs of the Senate a report reviewing the proposed settlement which the bill, if adopted, would effectuate. The closing paragraph of the report follows:
* * * the settlement here proposed of this long-standing controversy will be to the advantage of the Indians and the Government. While I personally favor the enactment of S. 3045, the Assistant Director of the Bureau of the Budget has advised “that the proposed legislation would not be in accord with the financial program of the President.”
(f) On June 30, 1936, the 74th Congress adjourned. No action had been taken on S. 3045. The proposed settlement was never implemented by appropriation by Congress.
114. On February 8, 1939, the Assistant Commissioner of the General Land Office wrote to the Chief Clerk of Wisconsin’s Commissioners of Public Lands in response to the latter’s request for information “as to the final disposition of certain * * * tracts * * * which were not conveyed to the State notwithstanding that they appear by the field notes of survey to have been reported as swamp * * * within the meaning of the Act of September 28,1850 * * After reviewing the situation relative to several tracts involved in resurveys in recent years, the letter continued:
* * * [Tracts] * * * [9] containing 48.47 acres, as shown on the plat of survey approved December 21, 1931, are described in the field notes of survey as more than 50% swamp land. A selection list will be prepared in this office, under authority of the opinion of the * * * Su *605 preme Court in * * * United States v. Minnesota * * *, and the decision of the * * * Secretary * * *, dated January 2,1929, in the case of Wisconsin vs. * * * Hines * * *.
Such a selection list was prepared and filed in this office June 2, 1938 * * * covering * * * [tracts] * * * containing 89.77 acres, as shown on the plat of survey approved June 23,1936 * * *. Under date of September 7,1938, you wrote this office, enclosing data on the island * * * and an affidavit by J. J. McDonald, appointed by your office to examine the lands shown on the plat of survey, claiming that all of the island is swamp * * *. If you wish to submit a formal application for the tracts not shown by the field notes of survey do be swamp * * * within the meaning of the grant, the same will be considered together with the evidence already filed, and a hearing ordered, if desiredI[10] (Italics supplied.)
In the event no such application is filed within thirty days * * *, it will be considered that you do not wish to dispute the findings of the surveyor, and steps will be taken * * * looking to the preparation of a clear list * * * with a view of eventual issuance of patent to the State.
115. (a) On November 15,1943, the Superintendent of the Great Lakes Indian Agency wrote to the Assistant Commissioner of Indian Affairs:
In working up post-war programs for the reservations * * * we are confronted with the problem of the use of the State swamp lands * * *. Recently * * * the State Land Commission * * * advised me that they are willing and anxious to sell these lands back to the Government for Indian use * * *. * * * they have placed an approximate valuation of $2.00 an acre on all of these lands. * * *
At the present time there is on deposit * * * to the credit of the Lac du Flambeau Band, $179,176.94, broken down * * * [into] * * * Receipts $119,450.50 [and] Interest * * * $59,726.44.
The principal was derived from the sale of timber from the State swamp lands and is held in escrow pending a decision as to the rightful owners. * * *
*606 Each year * * * we post these figures * * * and every time they are posted it is necessary to explain to the Indians * * * why the band cannot use * * * [the funds]. * * *
(b) On June 6, 1944, the Assistant Commissioner of Indian Affairs wrote to the Chief Clerk of Wisconsin’s Commissioners of Public Lands:
* * * at Bad Biver and at Lac du Flambeau there are swamp lands which are needed for Indian projects * * *. With the Menominee precedent before Us * * *[11] we should be able to work out an early settlement involving these * * * lands. * * * Who should make the first move and what should it be ?
(c) On January 23,1945, the Chief Clerk of Wisconsin’s Commissioners of Public Lands replied to the letter addressed to him on June 6, 1944, by the Assistant Commissioner of Indian Affairs:
* * * this Commission at a recent meeting approved the following acquisition costs to the federal government of the swamp lands * :!: * in * * * the Bad Biver and Lac du Flambeau * * * Beservations * * * subject * * * to a possible recruise of the timber * * * within the Lac du Flambeau Beservation. * * *
116. On November 12, 1946, the Assistant Secretary of the Interior, writing to the Attorney General in connection with the present case, said:
* * * This Department has taken no action on the requests dated February 25 and 26, 1930, and they are, therefore, still pending. There is no application for patents covering land on the Lac Court Oreille Beservation pending in this Department.
* * * the sum of $119,450.50, together with * * * interest * * *, is held in the * * *_ Treasury * * *. In the absence of a judicial determination of the ownership of the * * * swamp lands involved, it has not been possible to determine the owner or owners of the funds
The funds for the sale of * * * timber on the Lac du Flambeau Beservation comprise the * * *'$119,450.50 mentioned * * *.
*607 * * * No swamp lands within either of the three reservations other than the small parcel * * * [in Lac Court Oreilles] * * * were patented to the State. * * *
117. On June 4,1951, the Commissioner of Indian Affairs, writing to the Area Director concerning the salvage of windblown timber on swamp lands in the Lac du Flambeau Reservation, said:
* * * if a sale of timber from State-claimed swamp land is to be made it should * * * be made * * * by advertising * * * and * * * contract * * *. The proper deduction should be made * * * and the balance * * * placed in special deposit pending final determination of the ownership of the timber. Such sales should be made only with the consent of authorized representatives of * * * Wisconsin. * * *
118. The parties have agreed upon the following facts: (a) Parcels of land claimed by the State of Wisconsin in this action were allotted by the defendant to approximately 70 individual Indians who were members of the respective plaintiff bands and to whom defendant issued certificates of competency for approximately 85 parcels of land. The certificates of competency were issued as follows (years and numbers):
1914_8
1916_1
1917_1
1918_1
1919_7
1920_4
1921_3
1922_3
1923_2
1924_5
1925_ 4
1926_ 1
1927_ 4
1928_25
1929_ 8
1930_ 6
1931_ 2
1932_ 4
1951_ 1
Total. 85
In approximately one-third of these instances the certificates of competency were duly recorded in accordance with the requirements thereof and became the basis of transfers of parcels of land.
(b) Certain of these parcels were sold and transferred by the allottees to individuals who were non-Indians.
*608 (c) In the approximately one-third of the eighty-five instances recited in subparagraph (a) above, proceedings were had in behalf of the counties in which the parcels were situated which resulted in the taking of tax deeds by the counties.
(d) In certain of the instances recited in the preceding sub-paragraph, the counties for consideration executed and delivered instruments of conveyance of the parcels to the United States through a Federal agency, the Resettlement Administration, which by administrative action returned the parcels to the status of tribal land.
(e) In certain of the instances recited in the preceding sub-paragraphs the counties for consideration executed and delivered instruments of conveyance of the parcels to non-Indians other than the United States.
(f) Taxes have been levied by the counties and paid in certain of the above parcels by non-Indians other than the United States to the counties both before and since 1932.
(g) The State of Wisconsin has received portions of these taxes since 1932.
RECAPITULATION
Indian Title and Public Lands
119. (a) By the Treaty of July 29, 183T, the parties intended for the Indians (1) to relinquish their ancient rights of occupancy of the lands ceded by the treaty and (2) to convey to the United States the Indian title to such lands.[12]
(b) By the Treaty of October 4,1842, the parties intended for the Indians (1) to relinquish their ancient rights of occupancy of the lands ceded by the treaty and (2) to convey to the United States the Indian title to such lands.[13]
(c) The Executive order of February 6, 1850,[14] was intended to terminate the temporary rights of occupancy of the ceded lands granted by the treaties named in subpara-graphs (a) and (b) above.
120. (a) In the creation of the Chippewa Land District, by the Act of March 3, 1847,[15] and in other statutes relating *609 to tbe public lands,[16] it was the intent of Congress to include in the public lands of the United States the lands ceded by the treaties named in subparagraphs (a) and (b) of finding 119.
(b) The United States made no mention (by way of exception, reservation, or otherwise) of swamp lands in the Treaty of September 30, 1854, or in the Executive orders providing for the reseiwations of plaintiff bands.
(c) The General Land Office has consistently administered the lands ceded by the treaties of 1837 and 1842 as public lands of the United States, except as to those areas withdrawn and set aside as reservations for the plaintiff bands pursuant to the Treaty of September 30, 1854. Such administration has applied to the swamp lands in the ceded areas outside of the reservations.
Selection of Swamp Lands: In General
121. (a) The Swamp Land Act of 1850[17] directed the Secretary of the Interior “* * * as soon as practicable after the passage of this act, to make out an accurate list and plats of the * * * [‘swamp and overflowed lands * * * made unfit * * * for cultivation, which remain * * * unsold’] * * * and transmit the same to the governor * *
(b) The Secretary of the Interior has never made out or transmitted to the Governor of Wisconsin such a list or plats of swamp lands within the State of Wisconsin.[18]
(c) In 1851, Governor Nelson Dewey, of Wisconsin, advised defendant’s surveyor general that Wisconsin would “adopt the field notes of the surveys” as the basis of selection.[19] At the time of this advice, the Wisconsin legislature *610 had authorized the Governor “to appoint persons to act under his direction in selecting swamp lands,” [20] and less than two years later the legislature “required” the Governor “to make an actual survey and report of all overflowed lands granted to the state.”[1]
(d) Wisconsin has twice (in 1859, and again in 1897) made field examinations to determine the swamp lands within the State (outside of the reservations) ,[2] and has submitted to the General Land Office swamp land selections based on such examinations, in addition to selections based on the showing by the field notes of survey.[3]
(e) Governors of Wisconsin who succeeded Governor Dewey sought release from his commitment to be bound by the field notes of survey, continuing their protests for 80 years (until 1880) .[4] Such release was consistently denied to them by the Secretary of the Interior.[5]
(f) The General Land Office has consistently adhered to the policy and requirement that Wisconsin’s selections of swamp lands outside of Indian reservations be limited to the tracts indicated as swamp on the field notes of survey.[6]
122. (a) Wisconsin protested the policies of the General Land Office and its administrative procedures for the selection and approval of swamp lands outside of Indian reservations from 1855 to 1880. The protests ceased after the report of the joint commission in 1881.
(b) Wisconsin has seldom used the administrative procedures available in the Department of the Interior (by appeal from the decisions of the General Land Office to the *611 Secretary) in connection with the rejection by the General Land Office of the State’s selections of swamp lands outside of Indian reservations.
(c) Wisconsin has not sought clarification of the policies and administrative procedures of the General Land Office relating to the selection and approval of swamp lands outside of Indian reservations (1) by Congressional enactment or (2) by court review.
• (d) Since 1881,- the responsible executive and administrative officials of Wisconsin (the Governors and the Commissioners of the Public Lands[7]) have reluctantly but uniformly acquiesced in the policies, regulations, and procedures of the General Land Office relating to the selection and approval of swamp lands outside of the Indian reservations. Such acquiescence has included observance of (1) the restriction of initial selections of such lands by the State to tracts indicated as swamp by the field notes of survey; (2) the challenge of any such selection by a third party on the ground that the selected lands were not swamp or overflowed in physical fact on September 28, 1850; and (3) the rejection of the State’s selection if the third party’s challenge was sustained by proof adduced by such third party.
Wisconsin’s Claim for Swamp Lands: In General
123. (a) As a result of a series of administrative mishaps, for which the responsible officials of Wisconsin thought the State should not be held accountable, the State lost the opportunity to select more than 400,000 acres of swamp lands outside of the reservations.[8]
(b) Wisconsin’s officials acclaimed the agreement in 1880 between the Governor and the Secretary of the Interior and the report in 1881 by the joint commission as pointing the way to a settlement of the long standing controversy. These officials recognized that the swamp lands (outside of the reservations) , which the State should have had, were then beyond reach. They had been sold by the United States, and the titles had passed into the stream of commerce. The Wisconsin officials were nevertheless confident that, with the *612 equity of the State’s claim established, Congress would authorize (1) the selection of lands in lieu or (2) the payment of indemnity for the lands lost.[9]
(c) These hopes were disappointed. More than 20 years after the 1881 report, Governor La Follette pressed for legislation by Congress to authorize the payment of indemnity.[10] His effort was unsuccessful. As far as revealed by the evidence in this case, Wisconsin has never received indemnity for the non-reservation swamp lands[11] of which it was deprived as hereinabove reported.
Wisconsin’s Claim for Swamp Lands in the Reservations
124. (a) Wisconsin submitted to the General Land Office selections of swamp lands lying within the reservations of plaintiff bands in 1857 (Lac Court Oreilles[12]), in 1866 (Lac du Flambeau[13]), and in 1870 (Bad River[14]). The right of the State to these selections, and the relation to such right of the fact that the selected tracts lay within Indian reservations, first became a subject of discussion between Wisconsin and the General Land Office in 1869.[15]
(b) Six years passed before the Secretary of the Interior, in 1875, officially recognized the Swamp Land Act of 1850 as a present grant.[16] His decision at that time went no further than to concede that legal title to the swamp lands in the reservations passed to the State upon the adoption of the Swamp Land Act. It left for later clarification the rights of the Indians under the Treaty of September 30, 1854, and the relative positions of the rights of the State and the Indians.[17]
*613 (c) By the time the Governor of Wisconsin and the Secretary of the Interior agreed (in 1880) upon the appointment of a joint commission to examine the field notes of survey,[18] Wisconsin was claiming the swamp lands within the reservations as a matter of right and without qualification as to the extinguishment of Indian title.[19] The State was not then demanding possession, the Governor having recognized “the difficulties which might arise from permitting the sale and occupancy of these lands.”[20] Meanwhile, although Interior recognized the legality of Wisconsin’s claim to the lands, patents therefor were withheld for the protection of the Indians.[1]
(d) The report of the joint commission, in August 1881, supplied some additional, potential swamp land selections in each of the three reservations. Wisconsin submitted such selections for approval.[2]
125. (a) Except for the submission of these additional reservation swamp land selections, Wisconsin did not press the General Land Office for settlement of the State’s claim for such lands, either by the issuance of patents or the payment of indemnity. Twenty-five years passed before the State’s claim for such lands again became the subject of discussion.
(b) In the meantime, Congress, by the Act of February 11, 1901, and the Act of February 3,1903, authorized additional allotments to the Indians on each of the three reservations of plaintiff bands,[3] and many allotments were made, particularly in the Bad Fiver and Lac Court Oreilles Eeservations. Wisconsin must be deemed to have had knowledge of this action. The State did not protest, although the State must further have known that many of the allotments were being, and of necessity had to be, taken from lands which the State claimed as swamp. The foregoing assertions also apply to the allotments (as distinguished from the proceeds of timber) made *614 under the Act of August 1,1914,[4] to Indians on the Bad River Reservation.
(c) In 1906, the Supreme Court decision in Wisconsin v. Hitchcock,[5] upholding the power of Interior- to administer the school lands in the Bad River Reservation for the benefit of the Indians, alerted both the intervenor and the defendant to the necessity for determining the ultimate right, of the-State or the Indians, to the proceeds of timber cut from swamp as well as school lands.[6]
(d) On August 1, 1906, the Acting Secretary of the Interior directed that certain proceeds of timber cut from swamp lands “* * * be retained by the [Indian] agent to his official credit, until the controversy between the Government and * * * Wisconsin as to which has title to the swamp lands has been finally settled.”[7] The evidence is silent as to any conversations, negotiations, or exchanges between officials of intervenor and defendant antedating the instruction by the Acting Secretary of the Interior above quoted. The instruction was nevertheless the beginning of a course of action by the Department of the Interior in placing the proceeds of timber in accounts held by it in the nature of escrow. Wisconsin acquiesced in this course of conduct, and came eventually to rely upon it. The separation of accounts was given formal recognition in the Act of May 18, 1916.[8] The practice was continued for approximately 12 or 13 years.[9]
(e) It is not established by the evidence (1) that either defendant or intervenor ever specified any limitation to the duration of the escrow accounts or any method of determining their release and distribution other than final settlement of the controversy between them as to the title of the lands or (2) that defendant and intervenor ever had any agreement on the subject other than what may be implied from their course of conduct.
*615 126. (a) After the Supreme Court’s decision, in 1918, of Wisconsin V. Lane, which definitely settled in defendant’s favor the issue relating to school lands, Wisconsin made representations to the Department of the Interior indicating a waiver and abandonment of its claims to the swamp lands in the Bad River and Lac du Flambeau Reservations.[10]
(b) In May 1923, the United States began an action in the Supreme Court to secure the cancellation of patents to swamp lands in Indian reservations theretofore issued to the State of Minnesota.[11] During the same month, the Secretary of the Interior asked the Governor of Wisconsin to secure appropriate action by that State’s legislature to cancel the patents that had been issued covering swamp lands in the Menominee and Lac Court Oreilles Reservations.[12] The Deputy Attorney General of Wisconsin replied to this request with (1) a denial of the authority of State officials to relinquish Wisconsin’s claims, (2) a reassertion of the State’s claims to all reservation swamp lands, and (3) a suggestion that the issue be tried in court.[13]
(c) After the Supreme Court’s decision, in 1926, of United States v. Minnesota, which definitely settled in the State’s favor the issue relating to swamp lands, Wisconsin renewed her demands upon the Department of the Interior (1) for the proceeds of timber cut from swamp lands in the Menominee Reservation[14] and (2) for the swamp lands in the Bad River and Lac du Flambeau Reservations.[15] These demands were renewed in-1927 and 1930, respectively. In 1931, Wisconsin increased her demands by the inclusion, for the first time, of the swamp lands lying within the sections 16 contained in the Indian reservations.[16]
(d) Wisconsin’s demands for the swamp lands (including the overflowed lands in sections 16) in the reservations were accompanied by demands for an accounting of the proceeds of timber cut from such lands.[17] In the meantime, corre *616 spondence passed between the Commissioner of Indian Affairs and Wisconsin’s Commissioners of the Public Lands relating to the securing of legislation which would authorize or provide for the payment to Wisconsin by the United States for the reservation swamp lands.[18]
(e) In 1935, the Governor of Wisconsin and the Secretary of the Interior agreed upon the terms of a settlement, whereby the United States was to pay Wisconsin a stated sum, in return for which the State would convey to the Government all of its rights in the reservation swamp lands.[19]
127. (a) At the time of the 1880 agreement between the Governor of Wisconsin and the Secretary of the Interior relating to the examination of the field notes of survey by a joint commission, and for some years before, Wisconsin had been pressing for indemnity for non-reservation swamp lands that had been lost to it as a result of the policies and procedures of the General Land Office.[20] The State’s position was that it should be indemnified for such loss by cash payments or the grant of lieu lands or a combination of the two.
(b) As early as 1878, the Office of Indian Affairs had taken the position that the State should be reimbursed for the swamp lands in the reservations of plaintiff bands.[1]
(c) From the evidence as a whole it is inferred that Wisconsin, from the time it first asserted its unconditional right to the swamp lands in the reservations, in 1876,[2] down to the present, has looked to indemnification in money or lieu lands as the only practical means of satisfying its claims against the United States for swamp lands in the State, wherever situated (i. e., in or out of the reservations), to the extent that such swamp lands had been sold or conveyed to third parties or devoted to such a public use as an Indian reservation ; and that all of the State’s efforts to obtain such satisfaction of its claims, including its claim for an accounting of the proceeds of timber cut from reservation swamp lands, have been tailored accordingly.
*617 (d) In the effort to obtain Congressional enactment providing settlement of its swamp land claims, Wisconsin has never sought to separate its claim for reservation swamp lands from its claim for non-reservation swamp lands, although it has supported the two efforts of the Department of the Interior to do so.[3]
(e) Wisconsin has never sought a court review of its claims for reservation swamp lands, although it invited the Secretary of the Interior to initiate a test by litigation, which the Secretary did.[4]
Selection and Determination of Swamp Lands in the Reservations
128. (a) The General Land Office has consistently adhered to the policy and requirement that Wisconsin’s initial selections of swamp lands lying within the reservations of plaintiff bands be limited to the tracts indicated as swamp on the field notes of survey. In this respect the General Land Office has made no distinction between swamp lands in the reservations and swamp lands outside the reservations.[5] The only selections of swamp lands lying within the reservations that have been approved by the General Land Office are those based upon the showing of the field notes of survey.
(b) All of Wisconsin’s initial selections of swamp lands lying within the reservations of plaintiff bands had been submitted by the end of 1881, except the selections of swamp lands in the sections 16 within the reservations. The evidence is silent as to the extent, if any, to which the State has submitted to the General Land Office for its approval specific selections of swamp lands in the sections 16 in the Bad River and Lac du Flambeau Reservations.
(c) In the initial selection of swamp lands lying within the reservations of plaintiff bands, the responsible officials of Wisconsin have acquiesced in the policies, regulations, and procedures of the General Land Office.[6] The State has occasionally, but not uniformly, used the administrative procedures available in the Department of the Interior, by appeal *618 ing a ruling of tlie General Land Office to tlie Secretary;[7] It has not sought clarification of the policies and administrative procedures of the General Land Office relating to the selection and approval of swamp lands in the reservations (1) by Congressional enactment or (2) by court review.
129. (a) The Office of Indian Affairs did not encounter questions involving specific tracts in Wisconsin’s selections of swamp lands in the reservations of plaintiff bands (except as to a few allotments [8]) until nearly 50 years after the original grant. When it did encounter such a question, in 1898, it took the position that the character of the land as swamp and overflowed should be determined by physical examination.[9] Although the State objected to such isolated, unilateral determination (whereupon the Secretary of the Interior receded from his support of the Indian Office, leaving General Land Office procedures to prevail), Wisconsin’s Governor almost simultaneously advised the State’s Commissioners of Public Lands that “* * * the State should not waive its right to any alleged swamp lands heretofore selected, until it has been determined by an examination in the field whether the claim is valid.”[10]
(b) The cutting of timber on reservation lands during the 1890’s and early 1900’s had made both the State and the Office of Indian Affairs aware of the unsatisfactory nature of the indications on the field notes of survey as the governing distinction between swamp and non-swamp land. During the first decade of the present century, the Office of Indian Affairs became concerned with additional allotments to be made on the reservations of plaintiff bands,[11] and the State of Wisconsin first began the development of a program of forestry on State lands.[12]
(c) By the time Wisconsin and the Office of Indian Affairs were alerted, in 1906, to the importance of the ultimate right to the proceeds of the timber cut from the swamp lands within the reservations,[13] it was apparent to both that the *619 characterization of specific tracts of land as swamp or non- ■ swamp was of greater moment than ever, since it would govern tlie final disposition of substantial funds. Neither parly took any action on the matter at the time. Both put off the question by referring to “so-called” swamp lands and to “swamp lands,” until 1929, when the Chief Supervisor of Forests of the Indian Service recommended to the Commissioner of Indian Affairs that all of the lands be examined to determine their character.[14]
(d) In 1929 or early 1930, Wisconsin officials arranged for an examination of the lands by agents of the State, and were preparing to claim for the State all lands in the reservation which were found by the examination to have been swamp on September 28,1850.[15] It is not established by the evidence that this examination was ever made.
(e) Wisconsin’s selections of swamp lands in the Bad Biver and Lac du Flambeau Beservations were resubmitted in 1930.[16]
(f) The General Land Office suggested to the Office of Indian Affairs that it protest the State’s application;[17] the Indian Office did so;[18] and the application has been held in abeyance ever since.[19]
(g) Action on the State’s application was suspended pending an examination by the Indian Office to determine the character of the lands.[20] The Indian Office failed to obtain an appropriation for the work,[1] and the examination was never made.[2]
130. (a) In the meantime, the General Land Office took the position, in an unreported decision (in a case to which Wisconsin was a party) that “* * * as to the selection of swamp lands, * * * there has been no formal agreement, ratified by the legislature of the State, as to the method *620 which should control.” The ruling further held that “* * * the State may, in a proper manner, select as swamp, a tract not shown to be such by the field notes, and if the showing made by the State is not overcome, receive patent for the tract.” [3]
(b) On April 20,1931, the General Land Office issued new regulations relating to (1) the selection and patenting of swamp lands and (2) the disposition of applications in conflict with a State’s claims to swamp lands.[4] These regulations did not touch specifically upon the point covered in the unreported decision quoted in the preceding subparagraph, but they did specify the procedure to be followed when a State’s selection was challenged by a third party.
131. (a) Since 1929, and down to the present time, Wisconsin has insisted that, unless and until the United States agrees to some specific basis of settlement, the swamp lands within the reservations of plaintiff bands for which the State should receive indemnity (including the proceeds of timber cut from such lands) should include (1) lands indicated as swamp on the field notes of survey and (2) all other tracts which upon examination in the field may appear to have been swamp and overflowed on September 28, 1850.[5]
(b) Pending examination in the field by the Office of Indian Affairs,[6] the General Land Office has not officially altered its historic position that selections of swamp lands within the reservations (as well as outside of them) should be based on the showing of the field notes of survey. Such selections may be challenged by third parties, and if the tracts can be shown not to have been swamp on September 28,1850, their selection as swamp will be rejected.
(c) Pending examination in the field, to determine the character of the lands within the reservations which the State *621 claims as swamp, the Office of Indian Affairs has taken the position (1) that Wisconsin’s selections should be limited to the showing of the field notes of survey and (2) that such selections should be rejected upon a showing by the Indian Office that any particular tract or tracts were not swamp on September 28, 1850.[7]
(d) Both the Office of Indian Affairs and the General Land Office have taken the position that swamp and overflowed lands in sections 16 within the Bad Biver and Lac du Flambeau Reservations, regardless of how their character may be determined, are not subject to selection by the State under the swamp land grant.[8] The Secretary of the Interior has made no ruling on the matter.[9]
132. (a) Twenty-five years ago, Wisconsin sought, and thought it had obtained, an agreement with the Department of the Interior to dispose of the issue between them concerning the determination and selection of swamp lands in the reservations of plaintiff bands. • Wisconsin’s commitment to the agreement was formalized by a joint resolution of the State legislature.[10]
(b) Whatever the understanding may have been between officials of Wisconsin on the one hand and officials of the Department of the Interior on the other, it was not formalized by any ruling or commitment on the part of the United States.
(c) Meanwhile, Wisconsin has continued the acquiescence theretofore established on its part in the policies and procedures of the General Land Office relating to the selection of swamp lands from the field notes of survey and the challenge of such selections by third parties who assume the burden of showing that specific tracts so selected were not in physical fact swamp and overflowed lands on September 28,1850.
(d) The narrow, unresolved issue between Wisconsin and the Department of the Interior is whether or not the Office of Indian Affairs should be permitted to challenge the State’s selections, upon the basis of a field examination of its *622 own, and to bring about a rejection of those selections as to such tracts as can be shown not to have been swamp and overflowed lands on September 28,1850, in the same maimer that swamp land selections generally may be challenged by third parties.[11]
Summary of Wisconsin’s One Time Waiver of Its Claims
133. (a) Following the Supreme Court’s decision, in 1918, of Wisconsin v. Lane, holding that Wisconsin did not receive the school lands within the Indian reservations,[12] the Commissioners of the Public Lands of Wisconsin adopted a resolution stating that “* * * the State * * * makes no claim to the swamp lands embraced within the Bad River reservation * * * because of or under the Swamp Land Grant, and makes no claim to any timber thereon * * The Governor sent a copy of the resolution to the Assistant Secretary of the Interior, as he was specifically authorized by the resolution to do.[13]
(b) After receiving the foregoing resolution and in reliance upon it, the Department of the Interior (1) formally rejected Wisconsin’s claim to swamp lands in the Bad River Reservation, in regular administrative procedures, and clear listed such lands; (2) sold all remaining swamp land timber on the Bad River Reservation; and (3) paid out to the Indians on the Bad River Reservation all proceeds of timber cut from swamp and school lands, regardless of when such proceeds accrued.[14]
134. (a) After Wisconsin v. Lane, the Attorney General of Wisconsin advised the Office of Indian Affairs that “* * * it is * * * my opinion that, under the decisions, * * * Wisconsin has no right * * * to the swamp and school lands within the Lac du Flambeau Reservation and can make no claim thereto.”[15] The Attorney General was ex officio a member of the State’s Commissioners of Public Lands.
*623 (b) After receiving the foregoing opinion, and in reliance upon it, the Department of the Interior (1) formally rejected Wisconsin’s claim to the swamp lands in the Lac du Flambeau Reservation by regular administrative procedures and clear listed such lands, and (2) asked for and obtained legislative authority to make additional allotments of land to the Indians living on the reservation.[16]
135. (a) Although the Office of Indian Affairs asked the Governor of Wisconsin for an expression relating to the Lac Court Oreilles Reservation, as well as the Bad River and Lac du Flambeau Reservations,[17] no mention was made of the Lac Court Oreilles Reservation in Wisconsin’s replies.[18]
(b) Wisconsin has no formal application pending before the Department of the Interior for swamp lands in the Lac Court Oreilles Reservation other than the selections submitted in 1857 and 1881.[19]
Swamp Land Administration of the Reservations: Bad River
136. (a) The Indians of the Bad River (La Points) Band were given a reservation which was described by metes and bounds by the Treaty of September 30,1854.[20] No other size was specified, in acreage or townships. No lands within such boundaries were reserved or excepted. The reservation as finally surveyed contained 124,133 acres.[1]
(b) Swamp lands, overflowed in fact and indicated as such on the field notes of survey, and lying within the Bad River Reservation, total 10,000 acres, more or less.[2]
(c) Wisconsin has received from the United States swamp land patents which included one 40-acre tract in the Bad River Reservation.[3] The inclusion of this tract in a patent issued in 1881 was an oversight.[4]
*624 (d) In 1935, the unallotted lands in the Bad Liver Reservation totaled less than 2,000 acres, as compared with more than 116,000 acres that had been allotted.[5]
(e) Indians on the Bad Liver Reservation have received all of the proceeds of timber cut from swamp lands within the reservation.[6]
(f) The United States has reasonably protected the Indians of the Bad Liver Band in their possession and use of the lands in their reservation and in their enjoyment of the proceeds of timber taken from the swamp and school lands therein.
Lac Court Oreilles
137. (a) The Treaty of September 30,1854, provided a reservation for the Indians of the Lac Court Oreilles Band which would comprise three townships (69,120 acres).[7] The reservation as finally surveyed and set apart contained 69,136 acres.[8] No lands within the areas set apart were reserved or excepted.
(b) Some of the lands (comprising relatively a small portion) within the Lac Court Oreilles Reservation were swamp and overflowed on September 28,1850, and were so indicated on the field notes of survey.[9]
(c) Wisconsin has received from the United States swamp land patents which have included four separate 40-acre tracts in the Lac Court Oreilles Reservation.[10] One of these tracts was included in a patent in 1895 by oversight. The other three were patented in 1930 and 1931, under circumstances which fail to establish a conscious departure from the policy theretofore followed, of withholding from patent any swamp lands lying within Indian reservations.[11]
(d) In 1935, the unallotted lands in the Lac Court Oreilles Reservation totaled less than 1,100 acres, as compared with the allotment of more than 68,500 acres.[12]
*625 (e) There is no evidence that the Indians living on the Lao Court Oreilles Reservation have not received whatever proceeds have accrued from timber cut from the swamp lands in the reservation.
(f) The United States has reasonably protected the Indians of the Lac Court Oreilles Band in their possession and use of the lands in their reservation and in their enjoyment of the proceeds of timber taken from the swamp lands therein.
Lac du Flambeau
138. (a) The Treaty of September 30, 1854, provided a reservation for the Indians of the Lac du Flambeau Band which would comprise three townships (69,120 acres) .[13] The reservation as finally surveyed and set apart contained 69,824 acres.[14] No lands within the areas set apart were reserved or excepted.
(b) Swamp lands, overflowed in fact and indicated as such on the field notes of survey, and lying within the Lac du Flambeau Reservation, total 20,000 acres, more or less.[15]
(c) Wisconsin has received from the United States no swamp land patent covering land within the Lac du Flam-beau Reservation.[16]
(d) In 1935, the unallotted lands in the Lac du Flambeau Reservation totaled more than 24,000 acres, as compared with more than 45,150 acres that had been allotted.[17]
139. (a) The evidence discloses variations in the administration of the Lac du Flambeau Reservation from the pattern followed in the Bad River and Lac Court Oreilles Reservations with respect to (1) the timing and extent of allotments and (2) the distribution of proceeds of timber cut from swamp lands. The evidence does not explain these variations.
(b) In the Lac Court Oreilles Reservation allotments had been made of substantially all of the lands as early as 1914.[18] By 1935, the same situation existed on the Bad River Reserv *626 ation.[19] On each, of these reservations the unallotted lands presently account for less than two percent of the total area of the reservation. In the Lac du Flambeau Reservation, as of 1935, allotments accounted for 65 percent of the area, the unallotted lands containing 35 percent.[20]
Statutory authority for additional allotments on the Bad River Reservation was obtained in 1914.[1] Presumably, such additional allotments were made. Certainly, the provisions of the statute relating to timber were executed, and, after Wisconsin’s purported waiver of its claims to the swamp lands, the timber proceeds were distributed among the Indians.[2]
Similar statutory authority with respect to the Lac du Flambeau Reservation was obtained in 1924.[3] Just prior to the passage of this act, the issue as to the title to the swamp lands had been placed before the Supreme Court.'[4] The inference follows that the Act of May 19, 1924,[5] was never fully executed because of the initiation and outcome of the litigation. On the other hand, it is not established by the evidence that any of the proceeds of timber taken from swamp and school lands, allotted or unallotted, have been withheld from the Lac du Flambeau Indians except as stated in the next succeeding subparagraph.
(c) As a consequence of the question raised by the 1906 Supreme Court decision in Wisconsin v. Hitchcock[6] concerning the ultimate right to the proceeds of timber cut from reservation swamp lands,[7] the Office of Indian Affairs in 1918 posted to an account it had been keeping since 1909 under the Act of March 3,1883, the sum of $119,450.50, representing proceeds of timber cut from swamp lands on the Lac du Flambeau Reservation.[8] This account was somehow immobilized. The evidence does not explain when, how, or why.
*627 This fund of $119,450.50 represents proceeds of timber that had accrued prior to the Act of May 18, 1916.[9] The Office of Indian Affairs held it intact, and on July 1,1980, it was transferred to an interest bearing account in conformity with the Act of February 12,1929, as amended by the Act of June 13, 1930.[10] By 1943, the interest amounted to nearly $60,000.[11] As far as revealed by the evidence, this fund is still retained- and is still drawing interest, while the Indian Office patiently explains to the Indians year after year that the money cannot be distributed to them until the title to the swamp lands is finally determined.[12] This is done in spite of the further facts (1) that (as far as revealed by the evidence, and based on inference drawn from the evidence as a whole) such proceeds of timber as were accrued from swamp lands in the Lac du Flambeau Preservation under the Act of May 18, 1916, have been distributed to the Indians; (2) that there has been no agreement between Wisconsin and the Department of the Interior for the impounding of funds except such as may be inferred from the course of conduct recited in finding 125 (d); and (3) that there has been no renewal of this agreement, except by the further conduct of the Office of Indian Affairs in retaining this particular fund and in starting a new one in 1951,[13] since Wisconsin’s Attorney General made his purported waiver of the State’s claims to the Lac du Flambeau swamp lands.[14]
140. (a) It is not established by the evidence that the United States has failed to afford to the Indians of the Lac du Flambeau Reservation reasonable protection in the possession and use of the lands in their reservation.
(b) It is not established by the evidence that the United States has failed to afford to these Indians reasonable protection in their enjoyment of the proceeds of timber taken from the swamp lands in their reservation, except as to the impounding of the fund described in finding 139 (c). As to that fund, the Office of Indian Affairs has been remiss, at least since 1919 (when that Office resolved all similar *628 questions as to all three of plaintiff bands), in not resolving the ownership and distribution of this fund.
Wisconsin’s Claim in This Action
141. (a) The legal issues presented by the intervenor in its pleadings in this case[15] have a basis in fact as well as law.
(b) The responsible officials of the State, including the Governors, the Commissioners of Public Lands, and succeeding legislatures, have never wanted and have never sought, the concomitants of legal title, namely possession and use, of the swamp lands in the Indian reservations within the State.[16] These officials have, through the years, had an interest in the condition and well-being of the Indians in the State.[17]
(c) Wisconsin officials have long been aware of their responsibility to the State and its citizens in the administration of lands acquired by Federal grants, and the application of the proceeds of such lands to the public purposes provided by the State’s constitution and statutes.[18] This sense of responsibility was sharpened and clarified by the decision of the Wisconsin Supreme Court in State ex rel. Owen v. Donald,[19] in 1915.
(d) In the application of the proceeds of the public lands of the State, Wisconsin officials have likewise been aware of their responsibility to try to obtain from the Federal Govern *629 ment lands in lieu or indemnity in cash for Federal public lands which would have inured to the State under Federal grants but which were not acquired by the State because of delays, oversights, and shortcomings in the Federal administration of such grants.[20]
(e) From 1880 until 1905 or later Wisconsin sought indemnity through Congressional enactment for the swamp lands it had lost.[1] In 1905, and again in 1917, the State sought to force the school lands issue through litigation.[2] All of these efforts failed.
(f) Wisconsin’s officials did not seriously address themselves to the legal status of the State’s claim for the swamp lands in the Indian reservations until after the Supreme Court disposed of the school lands issue in 1918. The analysis they made then, they concluded after further reflection, was wrong. The State’s position, with respect to its legal rights in the controversy, was first stated simply and in perspective in 1931, when Senator Blaine (former Governor, and Attorney General[3]) wrote the Assistant Commissioner of Indian Affairs: “* * * the Federal Government is * * * obligated both to the State and to the Indians * * * [and should] * * * make compensation accordingly.” [4]
142. The relief sought by the intervenor in this action, whether phrased as a prayer for judgment “decreeing the fee simple title in * * * Wisconsin to all swamp * * * lands located within the * * * Reservations” or “that the intervenor * * * recover * * * the proceeds of sale of timber cut from said lands”, is part and parcel of a claim against the United States for cash indemnity which the intervenor first asserted 75 years ago and which it has clearly recognized as such for more than 20 years.
*630 143. Following are the portions of the text of the Treaty of July 29, 1887, which counsel have specified in their requested findings of fact as pertinent to the issues in the case:
Article 1. The said Chippewa nation cede to the United States all that tract of country included within the following boundaries:
_ Beginning at the junction of the Crow Wing and Mississippi rivers, between twenty and thirty miles above where the Mississippi is crossed by the forty-sixth parallel of north latitude, and running thence to the north point of Lake St. Croix, one of the sources of the St. Croix river; thence to and along the dividing ridge between the waters of Lake Superior and those of the Mississippi, to the sources of the Ocha-sua-sepe a tributary of the Chippewa river; thence to a point on the Chippewa river, twenty miles below the outlet of Lake De Flambeau; thence to the junction of the Wisconsin and Pelican rivers; thence on an east course twenty-five miles; thence southerly, on a course parallel with that of the Wisconsin river, to the line dividing the territories of the Chippewas and Menomonies; thence to the Plover Portage; thence along the southern boundary of the Chippewa country, to the commencement of the boundary line dividing it from that of the Sioux, half a days march below the falls on the Chippewa river; thence with said boundary line to the mouth of Wah-tap river, at its junction with the Mississippi; and thence up the Mississippi to the place of beginning.
Article 5. The privilege of hunting, fishing, and gathering_ the wild rice, upon the lands, the rivers and the lakes included in the territory ceded, is guarantied [sic] to the Indians, during the pleasure of the President of the United States.
144. Following are the portions of the text of the Treaty of October 4, 1842, which counsel have specified in their requested findings of fact as pertinent to the issues in the case:
The Chippewa Indians of the Mississippi and Lake Superior, cede to the United States all the country within the following bounderies [sic]; viz: beginning at the mouth of Chocolate river of Lake Superior; thence northwardly across said lake to intersect the boundery line between the United States and the Province of Canada ; thence up said Lake Superior, to the mouth of the St. Louis, or Fond du Lac river (including all the islands in said lake); thence up said river to the American Fur Company’s trading post, at the southwardly *631 bend thereof, about 22 miles from its mouth; thence south to intersect the line of the treaty of 29 th July 1837, with the Chippewas of the Mississippi; thence along said line to its southeastwardly extremity, near the Plover portage on the Wisconsin river; thence northeastwardly along the boundary line, between the Chippewas and Menomonees, to its eastern termination, (established by the treaty held with the Chippewas, Menomonees, and Winnebagoes, at Butte des Morts, August 11th 1827) on the Skonawby river of Green Bay; thence northwardly to the source of Chocolate river; thence down said river to its mouth, the place of beginning; it being the intention of the parties to this treaty, to include in this cession, all the Chippewa lands eastwardly of the aforesaid line running from the American Fur Company’s trading post on the Fond du Lac river to the intersection of the line of the treaty made with the Chippewas of the Mississippi July 29th 1837.
The Indians stipulate for the right of hunting on the ceded territory, with the other usual privileges of occupancy, until required to remove by the President of the United States, and that the laws of the United States shall be continued in force, in respect to their trade and intercourse with the whites, until otherwise ordered by Congress.
It is agreed by the parties to this treaty, that whenever the Indians shall be required to remove from the ceded district, all the unceded lands belonging to the Indians of Fond du Lac, Sandy Lake, and Mississippi bands, shall be the common property and home of aÜ the Indians, party to this treaty.
145. Following are the portions of the text of the Treaty of September 30,1854, which counsel have specified in their requested findings of fact as pertinent to the issues in the case:
ARitcle 1. The Chippewas of Lake Superior hereby cede to the United States all the lands heretofore owned by them in common with the Chippewas of the Mississippi, lying east of the following boundary-line, to wit: Beginning at a point, where the east branch of Snake River crosses the southern boundary-line of the Chippewa country, running thence'up the said branch to its source, thence nearly north, in a straight line, to the mouth of East Savannah River, thence up the St. Louis River to the mouth of East Swan River, thence up the East Swan River to its source, thence in a straight line *632 to the most westerly bend of Vermillion Liver, and thence down the Vermillion Liver to its month.
The Chippewas of the Mississippi hereby assent and agree to the foregoing cession, and consent that the whole amount of the consideration money for the country ceded above, shall be paid to the Chippewas of Lake Superior, and in consideration thereof the Chippewas of Lake Superior hereby relinquish to the Chippewas of the Mississippi, all their interest in and claim to the lands heretofore owned by them in common, lying west of the above boundry-line [sic].
Aeticle 2. The United States agree to set apart and withhold from sale, for the use of the Chippewas of Lake Superior, the following-described tracts of land, viz:
1st. For the L’Anse and Vieux De Sert bands, all the unsold lands in the following townships in the State of Michigan: Township fifty-one north range thirty-three west; township fifty-one north range thirty-two west; the east half of township fifty north range thirty-three west; the west half of township fifty north range thirty-two west, and all of township fifty-one north range thirty-one west, lying west of Huron Bay.
2d. For the La Pointe band, and such other Indians as may see fit to settle with them, a tract of land bounded as follows: Beginning on the south shore of Lake Superior, a few miles west of Montreal Liver at the mouth of a creek called by the Indians Ke-che-se-be-we-she, running thence south to a line drawn east and west through the center of township forty-seven north, thence west to the west line of said township, thence south to the southeast corner of township forty-six north, range thirty-two west, thence west the width of two townships, thence north the width of two townships, thence west one mile, thence north to the lake shore, and thence along the lake shore, crossing Shag-waw-me-quon Point, to the place of beginning. Also two hundred acres on the northern extremity of Madeline Island, for a fishing ground.
3d. For the other Wisconsin bands, a tract of land lying about Lac De Flambeau, and another tract on Lac Court Orielles, each equal in extent to three townships, the boundaries of which shall be hereafter agreed upon or fixed under the direction of the President.
Article 3. The United States will define the boundaries of the reserved tracts, whenever it may be necessary, by actual survey, and the President may, from time to time, at his discretion, cause the whole to be surveyed, and may assign to each head of a family or single person *633 over twenty-one years of age, eighty acres of land for his or their separate nse; and he may, at his discretion, as fast as the occupants become capable of transacting their own affairs, issue patents therefor to such occupants, with such restrictions of the power of alienation as he may see fit to impose. And he may also, at his discretion, make rules and regulations, respecting the disposition of the lands in case of the death of the head of a family, or single person occupying the same, or in case of its abandonment by them. And he may also assign other lands in exchange for mineral lands, if any such are found in the tracts herein set apart. And he may also make such changes in the boundaries of such reserved tracts or otherwise, as shall be necessary to prevent interference with any vested rights. All necessary roads, highways, and railroads, the lines of which may run through any of the reserved tracts, shall have the right of way through the same, compensation being made therefor as in other cases.
Aeticle 7. No spirituous liquors shall be made, sold, or used on any of the lands herein set apart for the residence of the Indians, and the sale of the same shall be prohibited in the Territory hereby ceded, until otherwise ordered by the President.
Article 10. All missionaries, and teachers, and other persons of full age, residing in the territory hereby ceded, or upon any of the reservations hereby made by authority of law, shall be allowed to enter the land occupied by them at the minimum price whenever the surveys shall be completed to the amount of one quarter-section each.
Article 11. All annuity payments to the Chippewas of Lake Superior, shall hereafter be made at L’Anse, La Pointe, Grand Portage, and on the St. Louis Liver; and the Indians shall not be required to remove from the homes hereby set apart for them. And such of them as reside in the territory hereby ceded, shall have the right to hunt and fish therein, until otherwise ordered by the President.
Article 13. This treaty shall be obligatory on the contracting parties, as soon as the same shall be ratified by the President and Senate of the United States.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law:
*634 (1) The defendant is liable to tbe plaintiff, Lac du Flambeau Band. Tbe case is remanded to a commissioner of this court to determine the amount of damages, and tbe amount of offsets, if any, to which the defendant is entitled.
(2) The plaintiffs Courte Oreilles Band and Bad River Band are not entitled to recover and the petition is dismissed as to them.
(3) The intervening petition of the State of Wisconsin is dismissed without prejudice.

Notb. — Because of the extensive use of footnotes in these findings, the footnotes have been numbered in sequences of 20. Citations are made in terms of finding number and footnote, e. g., finding 34, footnote 7.

 These findings are concerned only with facts relating to the issue of •liability. The severance of issues was ordered on May 28, 1952.

 The swamp land claim of the Menominee Indians (decided December 1, 1941, 95 C. Cls. 232) was presented under a jurisdictional act (49 Stat. 1085, as amended by 52 Stat. 208), which provided that “* * * if it shall be determined * * * that the united States in violation of the * * * treaty * * * unlawfully failed to convey certain swamp lands to the Menominee * * * Indians the court shall render judgment * * * for a sum equal to (1) the value of the timber removed therefrom since * * * [the date of the treaty] * * * with interest * * * and (2) the present acquisition costs of such lands * * * with a proviso that the united States may in lieu of paying the present acquisition costs * * * acquire and hold said lands in trust for the * * * Menominee * * * Indians.”

Wisconsin, of course, did not acquire its status as a party to the action ■under the jurisdictional act.

 Counsel for plaintiffs, in his opening statement at the trial, said that •"plaintiffs’ claims are: (1) value of the land and timber on said swamp lands whether allotted to individual Indians or tribal land and the amount of ■proceeds from timber removed therefrom; [and] (2) the proceeds from said swamp lands now held by defendant • *

 Defendant has requested a finding as follows: • “The State * * *has declared through counsel orally and by written statement that Wisconsin is not claiming the fair market value of the swamplands, and that this Court does not have jurisdiction to quiet title to the swamplands' * * *. * * * Wisconsin * * * has requested only a money judgment for the damage done to the swamplands by the cutting of timber and other trespasses thereon by the United States or the iilaintiff tribes. * * *'*

 In 1496, Join Cabot was commissioned by the King of England to undertake the discovery of lands unknown to Christian peoples and to take possession of them in the King’s name. Columbus likewise made his first voyage under a royal commission, from the Crown of Spain.

 Whether (and If so, when and how.) Indian title to the lands here in •controversy has been extinguished is one of the issues in this case.

 Cf., Act of March 1, 1793, 1 Stat. 329. Eleven years later an act of •Congress referred to “* * * the public lands of the united States to which the Indian title has been or shall hereafter be extinguished * ♦ Act of March 26, 1804, 2 Stat. 277. The extent to which the Congress adopted and applied concepts, policies, and methods that had been evolved over the years by the judicial and executive branches of the Government is strikingly illustrated in a chronological review of the statutes at large relating to Indian affairs and the public lands. The evolution is so apparent that reliance has been made upon the statutes alone to carry portions of the ensuing narrative.

 Cf., Treaty of August 3, 1795, 7 Stat. 49; Treaty of October 2, 1798, 7 Stat. 62; Treaty of August 13, 1803, 7 Stat. 78; and Treaty of November 3, 1804, 7 Stat. 84. The Chippewas were parties to the Treaty of Greenville (August 3, 1795). Similar provisions relating to hunting and Ashing privileges were contained in subsequent treaties with the Chippewas. Treaty of July 4, 1805, 7 Stat. 87; Treaty of November 17, 1807, 7 Stat. 105; Treaty ■of November 25, 1808, 7 Stat. 112; and Treaty of August 24, 1816, 7 Stat. 146.

 By the Act of March 26, 1804, 2 Stat. 277.

 The act further provided for lines marking quarter-quarter sections of half sections that had been purchased prior to July 1, 1804.

 Act of May 7, 1800, 2 Stat. 58.

 Act of January 11, 1805, 2 Stat. 309.

 Act of February 3, 1809, 2 Stat. 514.

 Act of April 18,1818, 3 Stat. 428.

 Tbe Treaty of August 5, 1826, 7 Stat. 290, between tbe united States (Lewis Cass was one of tbe commissioners) and “tbe Chippewa Tribe ol Indians” contained the following reference to another treaty concluded a year earlier: “Whereas * * * owing to tbe remote and dispersed situation of tbe Chippewas, full deputations of their different bands did not attend at Prairie du Cbien, which circumstance * * * would render the Treaty of doubtful obligation, with respect to the bands not represented * *

 On August 30, 1830, Schoolcraft wrote the Secretary of War: “There is but a single annuity payable by existing treaties to the Chippewas of Lake Superior. It is that of one thousand dollars, annually (during the pleasure of Congress), provided by the Treaty of Fond du Lac. This annuity is pledged, by the Chippewas, for the support of a school, and is paid to the Treasurer of the Baptist Society at Boston.”
The Treaty of Fond du Lac was the Treaty of August 5,1826, wherein Lewis Cass recognized “the remote and dispersed situation of the Chippewas.”

 This act was the first statutory recognition of the policy of removal, which had been in process of development for more than 25 years.

 Cf., Act of July 22, 1790, 1 Stat. 137, which referred to but did not define “Indian country”; Act of March 1, 1793, 1 Stat. 329 ; Act of April 18, 1796, 1 Stat. 452; Act of May 19, 1796, 1 Stat. 469; Act of March 3, 1799, 1 Stat. 743 ; Act of March 30, 1802, 2 Stat. 139 ; Act of April 29, 1816, 3 Stat. 332; Act of May 6, 1822, 3 Stat. 682; and the Act of July 9, 1832, 4 Stat. 564, which authorized the appointment of “* * * a commissioner of Indian affairs, who shall, under the direction of the Secretary of War, and agreeably to such regulations as the President may * * * prescribe, have the direction and management of all Indian affairs * » *.”

 Cf., Act of March 30, 1802, 2 Stat. 139, 146, authorizing the President "to take such measures * » * as to him may appear expedient to prevent or *497 restrain the vending or distributing of spirituous liquors among * * * the ♦ * * Indian tribes * * * and the Act of July 9, 1832, 4 Stat. 564, providing that “* * * no ardent spirits shall be hereafter introduced, under any pretence, into the Indian country.”

 Michigan (minus the upper peninsula) was admitted to the union by the Act of January 26, 1837, 5 Stat. 144.

 The territorial government of Michigan had set up Iowa County (around Mineral Point) in 1829, and Milwaukee County in 1834.

 Latitude is presumed to have been intended.

 Additional portions of the text of the treaty are set forth' in finding 143, in conformity with an agreement with counsel during the trial to include in these findings all or such parts of the text aB the attorney for any of the parties might request,

 In 1841, the Office of Indian Affairs, replying to an inquiry addressed to the Secretary of War by the American Fur Company,' expressed the opinion that “the provisions of the Intercourse Law of 1834, in respect to the introduction of ardent spirits into the Indian Country, or other particulars” were not “in force in the territory ceded to the United States by the Treaty * * *,*’ stating that “The Intercourse Law is in force only in ‘that part of the United States * * * East- of the Mississippi river, and not within any state, to which Indian title has not .been extinguished’.” .

Two counties (Sauk, 1840, and Richland, 1842) were in the southern part, hordering on the Wisconsin River. Excluding these two counties, the white population of the other five counties in 1850 was 5,446.

 Acting Superintendent of Indian Affairs for Michigan.

 Additional portions of the text of the treaty are set forth in finding 144.

 Clauses retaining the provisions of Federal trade and intercourse laws relating to spirituous liquors in areas ceded by Indians were later inserted in other treaties. The inconsistency of treating ceded lands as Indian country for some purposes but not all was debated but never resolved. Cf., Treaty of July 23, 1851, 10 Stat. 949; Treaty of August 5, 1851, 10 Stat. 954; Treaty of February 22, 1855, 10 Stat. 1165; Treaty of February 27, 1855, 10 Stat. 1172; and Treaty of October 2, 1863, 13 Stat. 667. Also see Act of June 27, 1934, 48 Stat. 1245, 25 U. S. C. 254, limiting the application of “the special Indian liquor laws” to Indian reservations.

 Territorial laws of Wisconsin forbade the sale of liquor to Indians, as did the territorial laws of Iowa and Michigan. Experience had proved them ineffectual.

 The act returned to Michigan its present northern peninsula.

 For further refinements of the land districts encompassing the areas containing the lands subsequently set aside as reservations for the plaintiff bands, see: the Act of March 2, 1849, 9 Stat. 351; the Act of July 30, 1852, 10 Stat. 25; also, the Act of February 24, 1855, 10 Stat. 615; and the Act of March 3, 1857, 11 Stat. 185.

 Cf., Act of March 3, 1847, 9 Stat. 178.

 Treaty of August 2, 1847, 9 Stat. 904; and Treaty of August 21, 1847, 9 Stat. 908.

 Opposition to removal was also prevalent among many unprincipled white men who were engaged in exploiting the Indians through the sale of liquor and other means.

 Cf., The Act of March 2, 1849, 9 Stat. 352, “• * * to aid the State of Louisiana in draining the Swamp Lands therein.”

 Wisconsin and Iowa were served by the surveyor general’s office at Dubuque, Iowa.

 Prom the evidence as a. whole it is inferred that, the surveyor general’s failure to transmit the lists in timely manner- was due to lack of funds for staff requisite for the work. •' •• -■ - - '

 Formal demand for the lists was first made upon the Secretary .of tlié Interior by thd Governor of Wisconsin on October 1, 1852. Teh years after the passage of the Swamp Land Act the Governor of Wisconsin was repeating demands theretofore made by his predecessors in office that such lists, be furr nished. As late as 1931, a Wisconsin official wrote to the Commissioner oi Indian Affairs: “* * * If, after being directed to make * *; * determination as soon as practicable, with eighty years * * * now passed, one is led to wonder when the practicable time will come.” .,

 Cf., the Act of July 21, 1852, 10 Stat. 15, appropriating $20,000' “For • * * the survey of the Lake Superior region, Wisconsin * * (which lay within the area ceded by the Treaty of October 4, 1842), and $33,000 “For the completion of the township lines, and the subdivisions of such of the townships as bear valuable pine timber, west of the fourth principal meridian, and between the third and fourth connection parallels * * *” (an,area lying within the cession made by the Treaty of July 29, 1837).

 On August 12, 1930, in a letter to the Chief Clerk of the Commissioners of the Public Lands of Wisconsin, the Commissioner of Indian Affairs said,: * * We feel, and you admit, that the old surveys and classification are quite erroneous * *

 In 1859, Governor Alex. W. Randall caused considerable work to be done under the authority of this statute to determine the swamp lands to which the State inight be entitled. The General Laud Office refused to recognize the State’s claims based on such work, citing Governor Dewey’s election to' abide by the field notes as controlling.

 “The following States elected to make the field notes of survey the basis for determining what lands passed to them under the grant, viz: Louisiana,. Michigan, and Wisconsin. Later the State of Minnesota adopted this method of settlement. * * *” From a General Land Office Circular dated March 17, 1896. The same circular asserted that Alabama, Arkansas, Florida, Illinois, Indiana, Iowa, Mississippi, Missouri, Ohio, and later Oregon, elected to make . their selections by their own agents and present proof that the lands selected ■ were of the character contemplated by the swamp grant.

 While the township and at least some of the section lines had been run prior to the Treaty of September 30, 1854, and were used therein to define the reservation, the detailed surveys of at least some of the subdivisions of sections and possibly of some of the sections were made on various dates from 1855 to 1873.

 The surveys of the Lac du Flambeau Reservation were made on various dates from 1860 to 1865. Township lines had not been run in the vicinity of Lac du Flambeau when the reservation was promised by the Treaty of.' September 30, 1854.

 The reservation was set apart in 1866.

 Township lines had been run in the vicinity of Lac Court Oreilles when the reservation was promised by the Treaty of September 30, 1854. The survey Was completed on various dates from 1855 to 1858.

 The reservation was set apart in 1873.

There were (and are) no sections 16 in the Lac Court Oreilles Reservation.

 From the Commissioner of Indian Affairs' on December 81, 1923 ;*<**• attention * * * is called to one error on the map * * * : The SE% of SH% of Sec. 30, Twp. 39 North, Range 8 West, is indicated as swamp land, whereas it is in fact non-swamp. * * *”

 From the Secretary of the Interior to the Governor of Wisconsin on May 26, 1923: “* * * a very large proportion of the swamp * * * lands within the Lac Court Oreille Reservation have * * * been patented to * * * Wisconsin, and * * * lists for the * * * remainder * * * are on file. * * *" From the Commissioner of Indian Affairs to the Secretary of the Interior on August 2, 1923: “* * * The records of the General Land Office show that a considerable portion of the swamp lands of the [Lac Court Oreilles], reservation were patented to the State between May, 1861, and October, 1895. * * From the Commissioner of Indian Affairs to the Special Supervisor in Charge of the Hayward School [Lac Court Oreilles Reservation] on December 31, 1923; “* » * swamp lands were not selected for * * * [this] reserva.tion. * * *”

 During a period of many years officials of both parties, Wisconsin and the Department of the Interior, referred in their correspondence, more often than not, to “so-called” swamp lands or to “swamp lands.” This was due to the impasse between the State and the Department over the method of selection.

 As hereinafter used in these findings the term is intended in its generic sense of so-called swamp lands unless qualified to give it specific meaning.. ‘

 Cf., finding 21 (d). Also, 34 Congressional Globe 1032, wherein the manager of the bill in the House of Representatives stated that it related to “a ■small portion” of land in Wisconsin.

 Ci., the Act of March 3, 1859, 11 Stat. 431, appropriating $10,000 to the War Department “* * * For the removal of the Court Oreille band * * * on the Red Cedar and Menominee rivers, in Wisconsin, and providing a permanent home for them among the Chippewas of Lake Superior or the upper Mississippi.” When this act was passed, the lands around Lac Court Oreilles had been subdivided and were to be offered for public sale on May 1, 1859. Similar plans were made for the lands around Lac du Flambeau in 1866.

 By the Act of March 3, 1855, 10 Stat. 686, $3,000; the Act of August 18, 1858, 11 Stat. 65, $5,000; and the Act of March 3, 1857, 11 Stat. 169, $7,000. Cf., the Act of March 3, 1859, 11 Stat. 431, appropriating $75,000 “For continuing the survey of the northern and northwestern lakes, including Lake Superior.”

 By the President. March 7, 1855; and by the Secretary of the Interior, November 22, 1859, April 4, 1865, and June 26, 1866.

 From 1855 to 1873.

As indicated in footnote 3, finding 30 (d), nine of the 12 states to which the Swamp Land Act of 1850 originally applied elected to make their own ■determinations, instead of accepting the showing on the field notes. The terms and wording of this statute are some reflection of the generally accepted procedure. Cf., the Act of March 3, 1857, 11 Stat. 251.

 Mean-while, the Commissioner of the General Land Office had rejected a list of swamp land selections submitted by the Wisconsin Governor on the ground that the tracts had been sold by the united States prior to the passage of the Act.

 In one instance the Governor refused to execute the release because individuals had pre-empted the tracts under the laws of Wisconsin and had made improvements on them.

 Cf., Railroad Company v. Smith, 76 U. S. (9 Wall.) 95. (1869), 99 and 100: “* * * By the * * * act * * * it was made the duty of the Secretary * • * to ascertain this fact [whether or not the land was ‘so swampy, overflowed, and wet, as that the major part of the tract was unfit for cultivation’]', and furnish the State with the evidence of it. Must the State lose the land, though clearly swamp land, because that officer has neglected to do this? The right of the State did not depend on his action, but on the act of Congress »**.**«■ Tihe matter to be shown is one of observation and examination * » ». Any other rule results in this, that because the Secretary * » • has failed to discharge his duty in certifying these lands to the StateB, they, therefore, pass under a grant from which they are excepted beyond doubt • * * » lands involved in this case were in Missouri, which State had elected to make its own determination of the swampy character of the land.

 The report of the joint commission in 1881 listed as swamp approximately 4,800 acres additional in the Menominee Reservation. Their selection as such by the State was not approved, and no patent for them was issued by the United States.

 The sequence of treaties between the United States and the Menominee Indians, including the position of the Swamp Land Act of 1850 therein, is set forth in the court’s findings 2 through 9, in Menominee Tribe of Indiana v. United States, 95 C. Cls. 232, 234-237. When the Swamp Land Act of 1850 was adopted, the Menominees were living on lands on which, by the terms of the Treaty of October 18, 1848, 9 Stat. 952, they were to be permitted to remain until the President should notify them that the lands were wanted. After steps had been taken during the early 1850’s to terminate this permission, and to arrange for the removal of the Menominees to the western lands, the time for their removal was extended by successive orders of the President. The intervenor lays stress upon this fact as distinguishing the Menominees’ “right of occupancy” from that of the plaintiff bands.

 The lands covered by this patent, and other swamp lands lying within the Menominee Reservation, were in issue in the Menominee ease, 95 C. CIs. 232. None of the parties to the instant case has cited any fact (1) from the evidence herein or (2) from the course of dealings between the United States and the Menominees as reflected in treaties (of which judicial notice may be taken), to support a distinction between the passage of title to Wisconsin under the 1850 act of the swamp lands in the Menominee Reservation and the similar passage of title to the swamp lands within the reservations of the plaintiff bands.

 The surveyor general’s office at Dubuque was then in the process of being closed, in accordance with the Act of June 12,1840, 5 Stat. 384, which directed that “* * * whenever the surveys * * * of any * * * state shall be completed, the surveyor general thereof shall * * * deliver over to the * * * State * * * all the field notes, maps, records, and other papers, appertaining to land titles, within the same; and the office of surveyor general * * * shall thereafter * * * be discontinued.” Cf., the Act of January 22, 1853, 10 Stat. 152, which required “* * * the allowance of free access to the * * * [field notes and records] by the authorities of the united States * *

The foregoing specification was actually written on June 29, 1870, when the Commissioner of the General Land Office advised the Governor of Wisconsin that again he would “* * * permit the State to make selections [of swamp lands, in two specified districts] in the manner pursued in 1866, viz: * *

 Mean-while, on September 18, I860, the Commissioner of the General Land Office had rejected a request for the approval of a list of swamp lands in-Wisconsin, saying: “♦ * * these lands have never been reported to this office-as swamp. The act of 12th March 1860 * * * fixes a time to the period" within which such selections are to be made. That period, with regard to these tracts, has expired, and consequently they are no longer subject to such: selections or any other actions under the swamp grant.” Cf., finding 41 (e)«.

 The Act of February 6, 1871, 16 Stat. 404, authorized the sale of townships set apart for the Stoctbridge and Munsee Indians, and originally forming a part of the lands of the Menominees.

 In 1823, the Supreme Court observed, in Johnson v. McIntosh, 8 Wheat. 643, that the right of the united States to dispose of the fee of lands occupied by Indians had been recognized by the court from the foundation of the Government. In United States v. Goolc, 19 Wall. 591 (1873), the court held that the Indians had a right of occupancy, although the fee was in the United States. In addition, the court said: “* * * the right of the Indians to their occupancy is as sacred as that of the United States to the fee, but it is only a right of occupancy. The possession, when abandoned by the Indians, attaches itself to the fee without further grant." (italic supplied.) The Goolc case was concerned with the tribal lands of the Menominee Reservation. The above quotation from that decision was cited with approval in Beecher v. Wetherby, 95 U. S. 517 (1877) where the court was concerned with school lands in the Menominee Reservation.

 Defendant contends in this case (1) that Indian title to the lands here in-controversy has never been extinguished (from which it would follow that the lands never became public lands; as to which see findings 5 through 25) and (2) that, in any event, the Indians’ rights of occupancy were never terminated, wherefore the lands in controversy never became public lands.. Cf., footnotes 4 and 5, finding 42.

 By a letter Sated August 1, 1859, tie Secretary of the Interior vigorously defended the department’s position in this matter, on the ground that a change in" the method of selection at that time “* * * would unsettle everything that has been done * * *, delay ». * * administering the grant, * * * [and cause] dissatisfaction and litigation among the citizens * * * and appeals to the Legislature for relief * * He went so far as to suggest that “* * * the best knowledge which Congress possessed in-' 1850 of the Swamp. * * * lands — surveyed and then remaining unsold, — may be presumed to have been derived from * * * the field notes' of survey * * *” wherefore it was the very tracts so shown which Congress intended to grant.

 “ Wisconsin, meanwhile, found indications that the application of the rule was unilateral On July 13, 1857, the Governor of Wisconsin wrote the Commissioner of the General Land Office: “* * * it appears * * * that the Geni Govt has not adhered to this plan * * * but * * * [has] * * * caused a resurvey of the Menasha Land District, with a view of ascertaining which were actually Swamp Lands, and that * * * the Register » * • allowed large quantities of land designated Swamp, upon the plats * * * to be entered, requiring proof simply that the land applied for, was in reality not Swamp Land. * * *”

 In the letter cited in the preceding footnote, the Governor, after referring to the field-note plan election by Governor Dewey, said: “This plan having been adopted, arid assented to by both parties, would seem to have determined the rights affected thereby.” The remainder of his letter was an adroit translation of the subjunctive into an outright negative.

 Cf., finding 30 (c), footnote 2; and findings 50 (J), and 56.

 Details of these developments are set forth in the findings of fact in the decision of case numbered 45162, 126 C. Cls. 596 (findings 38 to 58, pp. 614 to 625).

 19 Wallace 591 (1873).

When Congress later authorized the sale of mature living timber on un-allotted lands of Indian reservations, by the Act of June 25, 1910, 36 Stat. 855, the States of Minnesota and Wisconsin were excepted.

 Cf., the Act of March 3, 1883, 22 Stat. 582, which provided (p. 590) : “* » * the proceeds of all * * * sales of timber * * * of any Indian reservation * * * not the result of the labor of any member of such tribe, shall be covered into the Treasury for the benefit of such tribe under such regulations as the Secretary of the Interior shall prescribe * *

 Cf., footnote 2, finding 40; footnote 4, finding 42 (a) ; footnote 5, finding 42 (b) ; footnote 10, finding 48 (b) ;■ and footnote 11, finding 50 (c).

 On September 30, 1881, the Commissioners of the Public Lands of Wisconsin reported (in their fourth annual report) to the Governor: “» * * a basis of settlement between the state and the United States, agreed to between * * * the governor * * * and * * * the secretary of the interior, was faithfully applied * *

 Findings 49 (a) and (b).

 Cf., findings 49 (a) and (b), and subparagraph (b),. above, of finding 54,

Cf., finding 45 (b), and subparagraph (e), above, of finding 54.

 Cf., finding 39 (n), and subparagraph (h), aboye, of finding 54.

Cf., findings 49 (a) and (b), and 54 (b).

Finding 38 (a).

 The Act of March 3, 1857, 11 Stat. 251, confirmed the selections theretofore made under the Swamp Land Act of 1850, subject to stated qualifications. In 1866, the Attorney General ruled that the indemnities authorised by the Act of March 2, 1855 (finding 38) should be limited to entries on locations made prior to March 3,1857.

 Manifestly, the acreage figures used by the Governor were based on the showing in the field notes, since they were drawn from a tabulation of the report of the joint commissioners.

 The evidence is silent as to the basis of this assertion. It is to be noted that it relates only to lieu lands.

 Cf., the Act of July 2, 1864, 13 Stat. 374, authorizing the Commissioner of the General Land Office to fix a minimum price of not less than $1.25 per acre for the sale of “* * * any reservation of public lands * * * brought Into market under existing laws * *

 Some years later the Commissioners of the Public Lands of Wisconsin recommended the establishment of a minimum price of $2.50 per acre for swamp lands.

 The 55,000 acres of swamp lands were divided on the approximate basis of 20,000 acres in the Menominee Reservation and 35,000 acres in the reservations of plaintiff bands.

 Cf., footnote 8, finding 56. The delay had occurred, and title complications had developed as a result of it.

Excepting the Secretary’s decision of April 28, 1875 (finding 50 (f)), this is the first specific citation in the evidence of the application by the General Land Office of its appeals procedure to claims by the State. Many subsequent instances of such application are in evidence.

 The evidence of exclusion is so graphically illustrated by the plat as to compel the inference that the inclusion of the one 40-acre tract inside the reservation was an oversight. The inference is supported by the Secretary’s, ruling of December 19, 1894, quoted in finding 59 (c).

 Cf., the Act of March 2, 1907, 34 Stat. 1217, saying the rights of the Bad River Indians “whether born before or after the passage of” this act. The Act of August 1, 1914, 38 Stat. 582,' directed the making of a complete roll of the unallotted members of the Bad Kiver Band entitled to aUotments under existing laws. See finding 77.

 On June 22, 1914, the Commissioner of Indian Affairs advised a chief of the Lac Court Oreilles Band: “* * * all of the reservation has been * * * [allotted to Indians in severalty and patents issued thereon] with the exception of approximately 600 acres. * » *”

 As far as appears from the evidence the similarity in this figure of 312,000 acres, and that contained in finding 63 (a), is coincidental.

Nothing came of the suggestion at this time. Cf., finding 79 (b).

 Wisconsin v. Lane, 245 U. S. 427, and United States v. Stearns Lumber Company, 245 U. S. 436.

 Finding 55 (c).

 Finding 60.

 Wisconsin’s abbreviation of townships.

 The 15 years intervening between 1876 and 1892 were consumed in efforts to devise methods and procedures which would protect the Indians to the satisfaction of the Department of the Interior. See Mole Lake Band et al., 126 C. Cls. 596, 615 to 625.

 Since any minimum legal subdivision was to be considered swamp land if the greater part was wet and unfit for cultivation, the lesser, dry parts of many such subdivisions supported normal stands of timber. There is no evidence that timber of the species involved in most of the cutting grew in the overflowed areas where the Indians harvested wild rice, although erne cedar and tamarack did grow on overflowed lands.

 On November 16, 1929, the Chief Supervisor of Forests (of the Indian Service), writing to the Commissioner of Indian Affairs concerning Wisconsin’s claims to swamp lands in the Bad River and Lac du Flambeau Reservations, said: “There is no doubt as to the swampy character of very large areas * * *, but some of the lands claimed * * * are not actually swamp. If the State is disposed to assert its claim, it will be advisable that all lands be examined by the Indian Service.”

 See findings 2, 3, and 4.

 See finding 52 (b).

 See finding 71.

 See finding 69 and footnote 11 thereto.

 See finding 75.

 The operator was a trespasser if the allotted land had not been patented to the allottee. The trespasser was required to pay the value of the timber if his trespass was unwitting, and to pay double the value for a willful trespass. The payment went to the allottee if his title was later perfected by patent; otherwise, it went to the band.

 This doctrine of trespass was not confined, of course, to swamp lands. Defendant has received extensive proceeds of timber, paid as for trespass, in which swamp or school lands were not involved. Cf., finding 74 (a), footnote 2.

 See findings 39 (a) and 54 (h).

 Cf., Mole Lake Band et al., 126 C. Cls. 596, 625, finding 58.

 The directions were based upon a rationalization of the Cook decision as permitting such cutting from tribal lands for the “improvement” of the reservation. See subparagraph (c), below.

 The Act of May 31, 1900, 31 Stat. 221, recited that the “* * * timber ■was not cut on account of suit instituted by the State of Wisconsin against the lumber company * * The suit was not pressed to conclusion.

 Both Cushway (Flambeau) and Stearns (Bad River) had their difficulties with the Indian Office. In 1896-1897, both were authorized and directed to cut timber from tribal lands; then ordered to stop; then required to pay, as for trespass, for what they had cut; and many years later Cushway was penalized, as indicated, for failure to take out the dead timber at the time he was under orders to suspend all cutting on tribal lands. Cushway initially established and consistently maintained a policy of finally yielding every point of a major dispute to the Indians and the Government. Stearns must have followed much the same course. Otherwise, neither could have survived the: vacillations and contradictions of the Indian Office.

 Presumably, the cutting had been done on lands that had been patented to Wisconsin in 1865, although possession was retained by the Indians. On December 17, 1910, the Commissioner of Indian Affairs directed that no further cutting be done on these patented lands, and asserted that in 1908, “* * * 2,665,870 feet of timber were cut from lands claimed by the State * * *" being the 4,800 acres of swamp lands in the Menominee Reservation listed by the joint commission in 1881.

 The tracts, identified in the text by legal subdivision, were not among those that had been selected as swamp in 1857 and 1881.

Fully one-third of the tracts listed had been selected as swamp lands by Wisconsin in 1870.

 Eor the substance of the act, see finding 52 (b), footnote 19.

 Wisconsin v. Hitchcock, 201 U. S. 202 (1906).

 The previous decisions cited in the opinion were: United States v. Thomas, 151 U. S. 577 (1894), and Minnesota v. Hitchcock, 185 U. S. 378 (1902). Cf., Louisiana v. Garfield, 211 U. S. 70 (1908), relating to swamp lands, and Alabama v. Schmidt, 232 U. S. 168 (1914), relating to school lands.

. Wisconsin’s selections of swamp land, insofar as shown by the evidence in this case, bad not included the SE%NE%, 30-40-6, but had included the NE%SE%.

 This tract was listed among Wisconsin’s selections of swamp lands in 1866.

 This is the clearest equation in the correspondence up to this time of unallotted lands with school or swamp lands.

 Any reference hereinafter to moneys in escrow is intended only to reflect the terminology used by officials of the Department of the Interior, and not as a descriptive word encompassing a conclusion of law.

 The account was originally established in conformity with the requirements of the Act of March 3,1883, 22 Stat. 590, as to which see finding 52 (b), footnote 19. The account was carried in the name of the Chippewas of Lake Superior until 1909, when it was broken down by bands.

 None of these lots hail been selected as swamp.

 This tract had not been selected as swamp.

 See finding 80 (a).

 Cf., the Act of February 15, 1901, 31 Stat. 790, authorizing the Secretary of the Interior to permit the use of rights of way through the public lands, forests and other reservations for electric and telephone lines, “* * * and for canals, ♦ * * dams, and reservoirs * *

 The lists themselves are not in evidence.

 The distinction here drawn is between lands merely claimed by Wisconsin as school or swamp lands, and lands of which the State had disposed, such as the 3,080 acres of swamp lands conveyed by the State to individuals (finding 58), thereby sending the title into the stream of commerce. It was such lands as these that were involved in United States v. Steams, then pending in the Supreme Court.

 “Lands not claimed by the State” ostensibly meant lands held by “parties claiming title therefrom,” in the words of the Act. Cf., finding 81.

 As of this time (July 1917) no selections of swamp lands had been made in the school land sections.

 All of the tracts listed had been selected as swamp lands in 1870 and 1881 except those in sections 17, 22, and 23, of township 48 north, range 3 west. Wisconsin’s conveyance of swamp lands for the canal and booms in Ashland County was made in 1882. See finding 58. Ostensibly, these are the same lands.

 Inasmuch as the issue of damages has been severed, to permit argument and decision on the issue of liability only, there was no need for an exact accounting in this proceeding.

 Extensive accounting has been done by the General Accounting Office in connection with the claims of the plaintiffs in case numbered 45X62, including the proceeds of timber.

Finding 75.

Finding 76 (b), footnote 6.

. Cf., finding 66 (b).

 Wisconsin v. Lane, 245 U. S. 427.

. Finding 80 (a).

 245 U. S. 436.

 For the text of the escrow clause, see finding 83 (c). The lands from which timber was to be cut under the contracts approved in 1918 were in the main the swamp lands which had not been allotted and which Wisconsin had selected as swamp in 1870 and 1881. For reasons not explained by the evidence, all of one section 16 and 520 acres of three other sections 16 were Included in this contract. Wisconsin had never selected swamp lands in sections 16. Consequently, the total acreage in these contracts representing swamp land selections theretofore made by Wisconsin was not more than 8,400 acres.

Finding 86 (e).

Cf., finding 80 (b).

 This letter was written at the behest of the Governor, in the interest of unfettering the Indian allottees. Cf., finding 86 (c).

 This Wisconsin statute, approved on June 11, 1919, provided: “* * * In case of the sale of any public lands * * * -where the state had no title * * * or its title has failed, * * * the commissioners * * * shall * * * order * * * all * * * amounts * * * paid for the lands * * « refunded * * * to the person entitled thereto * *

 On July 31, 1919, the Commissioner of Indian Affairs advised the Commissioner of the General Land Office that the Attorney General of Wisconsin had ashed for “a list of the swamp * * * lands within the Lac du Flambeau, Lac Courte Oreille, Bad River, Red Cliffe, and Menominee * * * Reservations * * and ashed that the Indian Office be supplied with such lists, since “* * * our records * * * cannot be relied upon as showing accurately the swamp * * * lands within any of said reservations.”
On October 15, 1919, the Assistant Commissioner of the General Land Office supplied to the Commissioner of Indian Affairs, in response to the foregoing request “« * * a list of the lands within the Courte Oreille * * * Reservation which are claimed by * * * Wisconsin as swamp * *
On October 20, 1919, the Commissioner of the General Land Office forwarded to the Commissioner of Indian Affairs a list of the swamp lands within the Bad River Reservation.
If a list of the swamp lands in the Lac du Flambeau Reservation was furnished in response to this request, neither the list nor the letter is in evidence. Cf., subparagraph (d), this finding.

 On November 4, 1919, a further letter from and to, the same officials acknowledged receipt of a decision of the General Land Office and said: “Same Is filed and proper entries made on books of this office.”

 Indians on the reservation had made vigorous protest of the development, through the Indian Agent, who had advised the Commissioner of Indian Affairs that “* * * a part of the land is swampy * * Of the 315 acres (in 14 separate tracts) listed by the power company as being within the reservoir site, one tract of 40 acres had been selected by Wisconsin in 1857 (and again in 1881) as swamp. The Indian Agent’s letter to the Commissioner of Indian Affairs indicates that more than one 40-acre tract was swampy in physical fact.

In 1937, the Wisconsin office of the Federal Emergency Relief Administration built another, smaller reservoir in or near the Lac Court Oreilles Reservation, resulting in the flooding of some additional swamp lands within the reservation.

 The letter of May 15, 1918, from the Assistant Secretary of the Interior to the Governor of Wisconsin asked whether the State had any further claim to the swamp lands in the Lac Court Oreilles, Lac du Flambeau, and other Reservations. This was the letter which the Governor failed to answer. Finding 85 (g). When the correspondence was resumed by the State’s Attorney General, it related only to the Lac du Flambeau Reservation. Finding 86 (b), (d), and (e).

 Cf., finding 42.

 The Secretary had been misinformed as to the issuance of patents covering lands in this reservation. See finding 34, footnote 11. A patent had beea issued covering one 40-acre tract. Findings 60 and 66.

 On October 5, 1921, tbe Governor of Wisconsin (Mr. Blaine) wrote the Secretary of the Interior concerning the school lands in the Indian reservations, offering to certify that the State had no claim thereto. His letter added: * * * As to the swamp lands, I think another question may be presented * * *. Nearly ten years later, on February 19, 1931, Senator John J. Blaine, of Wisconsin, wrote the Assistant Commissioner of Indian Affairs, in reply to the latter’s request for the Senator’s help in inducing Wisconsin to waive its claim to the swamp lands within the Indian reservations: * * * the Federal Government is * * * obligated both to the State and to the Indians * * * [and should] * * * render compensation accordingly. * * *

 On December 5, 1922, the Attorney General of Wisconsin advised the Commissioners of the Public Lands, with respect to certain swamp lands in the Bad River Reservation, that a claimant for refund on the ground that the State’s title had failed had not established the fact. In the course of discussion he expressed the opinion that “* * * when the question is squarely raised the [Supreme] court will hold the state’s title to these swamp lands to be good.”

 Cf., findings 58 and 83. The cutting on these same lands for which contracts were awarded in 1917 must have been concerned largely with second growth timber.

 Referring to alleged trespasses by Stearns and others In the 1890’s or 1900’s.

 The 40-acre tract described had been selected as swamp by Wisconsin in 1857.

 Wisconsin’s selection of the tract had not been approved by the General Land Office. When the appeal was finally determined, the First Assistant Secretary took occasion to say in his opinion: “There is no intimation that this tract is not of the character contemplated by the granting act.”

 270 U. S. 181.

 The stated exceptions are not material here.

 273 U. S. 769.

 A-11706, Wisconsin v. Edward Hines Hardwood and Hemlock Co., et al. The State received notice of the decision. Cf., finding 102 (a).

 The opinion referred in passing to the Supreme Court decision in United States v. Minnesota, and to the dismissal of United States v. Wisconsin, but rested its conclusion as herein stated.

 Findings 96 and 100.

Finding 99.

 Finding 101 (c) and (d).

 The lands In the Bad River and Lae du Flambeau Reservations were all of those selected by Wisconsin as swamp in 1866, 1870, and 1881.

 The tracts specified were lots 2 and 3, of 10-41-5, and lot 2, 11-41-5. They had been selected as swamp by Wisconsin in 1866.

 The appropriation was never obtained.

 These lots were in the Lac du Flambeau Reservation.

 This lot was also in the Lac du Flambeau Reservation. No patent for it was issued to the State.

 This observation was based on his interpretation of the Supreme Court’s decision in United States v. Minnesota.

 The chronology and volume of the patents follow: one In 1931; two In 1932 ; two In 1933; three In 1934; three In 1937; one In 1939; one in 1940; one In 1942; one in 1943; two in 1944; and one in each of the years 1945, 1946, 1947, 1949, and 1951. Of the 140 tracts covered by the patents, 130 were designated as lots. Three of the ten tracts described by quarters were 80-acre tracts ; the other seven were 40-acre tracts.

 The emphasis was supplied by the author of the letter.

 Code of Federal Regulations, 1949 Edition, Title 43, Part 271. The General Land Office ivas combined with the Grazing Service to form the Bureau of Land Management by Reorganization Plan No. 3 of 1946, effective July 16, 1946. 6 U. s. C. 133y — 16, Note.

 Chapter 144, Laws of 1931.

 The value did not include interest. The dollar amount is much smaller than that later recorded in the correspondence from the Indian Office. The discrepancy is not explained by the evidence.

Cf., findings 77 (g) and 103 (c).

 The basis of the ruling, as given by the Assistant Commissioner of the General Land Office, was that: “It was never intended that the * * * swamp land act of 1850 should operate adversely to the school land granting act.”

 “In the Lac Court Oreille, * * * 68,511 acres have been allotted * • » leaving but 1,079 acres of tribal land.” From the letter of July 22, 1935, from the Secretary of the Interior to the Chairman of the Committee on Indian Affairs of the Senate. Finding 113 (e).

 The field examination had been ordered on July 28, 1934, by the Acting Assistant Commissioner of the General Land Office with the concurrence of the Commissioner of Indian Affairs. Both officials were concerned with the fact that “* * * Wisconsin’s applications pending since 1930 for patents covering 21,316.36 acres of swamp lands in the Lac du Flambeau reservation and 11,618.99 acres * * * in the Bad River reservation * * were still suspended in the General Land Office at the request of the Indian Office.

 The tracts described were: lot 10, 21-43-4W, and lots 8 and 11, 22-43-4W. There is no township 43 north, range 4 west, in any of the reservations of plaintiff bands. The significance of the reference to the decision in United States v. Minnesota is not explained by the evidence.

This offer to consider Wisconsin’s application for “tracts not shown by the field notes of survey to be swamp” represents a departure from the practice which the General Land Office had always followed theretofore, of considering only such of Wisconsin’s applications as were based on the showing of the field notes.

 Menominee v. United States, 95 C. Cls. 232, was decided on December 1, 1941. Thereafter, Wisconsin and the Department of the Interior arrived at a. settlement.

 Finding 16.

 Eluding 21 (b).

 Finding 24.

Finding 22 (b).

Finding 22 (c), footnote 12.

 Finding 26.

 The delivery in 1866 of the original notes and plats of the public survey was made in accordance with the requirement of the Act of June 12, 1810. Finding 43, footnote 6. Possession of these notes and plats made it possible for Wisconsin to make selections of swamp lands indicated as such on the field notes of survey. There was no segregation in such notes of the lands so shown. No list was ever “approved” by the Secretary of the Interior as required by the regulations issued on November 21, 1850. Finding 28. Whether or not the original notes and plats showed the lands “remaining unsold” is not established by the evidence.
The report In 1881 by the joint commission listed the swamp and overflowed lands shown by the field notes of survey. It was never given official sanction or status by the Secretary of the Interior.

 Finding 30 (b).

 Finding 30 (a).

 Finding 30 (c).

 Finding 30, footnote 2, and finding 61 (e).

 Finding 51 (d). One of the complicating factors of the early years of the controversy between Wisconsin and Interior was the State’s apparent determination to insist on both types of selections. Cf., finding 56, wherein it appeared that “* * * of the lands previously patented to the state as swamp, 319,900 acres were not of that character * *

Findings 30 (d) and 41 (d).

Findings 30 (d), 41 (a) and (c), and 44.

Findings 51 (c), 53 (a), 61 (b), and 110 (b). The only exceptions shown In the evidence are (i) the ruling contained in an unreported decision in 1929 (finding 99), on which the General Land Office appears never to have acted, mating it obiter dictum, and (ii) the instance in 1939 when the State was given the opportunity to select island lands, if overflowed in fact, although not so indicated on the field notes of survey. Finding 114, and footnote 10 thereto.

The Attorney General of the State, and the Secretary of State were ex officio members of the Commissioners of the Public Lands.

 Finding 56, and footnotes 8 and 9 thereto, and finding 57 (a).

It was recognizes on all sides that additional legislative authority would be required. The General Land Office had only limited authority to grant lieu lands (finding 56, footnote 8) and no authority whatever to malee indemnity payments for swamp lands of which it had disposed after the adoption of the Swamp Land Act. Eindings 56 and 57.

Findings 63 (b) and (e).

 The nature of these findings mates necessary a distinction between swamp lands outside of Indian reservations and swamp lands within such reservations which is not reflected, at least not with so much emphasis, in the correspondence and claims of the State. Cf., finding 124 (f).

Finding 39 (a).

Finding 45 (a).

 Finding 49 (a) and (b).

Finding 48 (b).

Finding 50 (f).

 For the various and varying positions of both the State and the General Land Office during the 1870’s concerning these rights, see findings 48 (a), and 60.

Finding 53 (a).

Finding 51 (b).

Finding 51 (b).

 Finding 51 (a).

 Finding 54.

 Finding 62 (a).

 Finding 78.

Finding 75 (a).

Finding 75 (b).

Finding 75 (d). The lands to -which these instructions related were in the Lac du Flambeau Reservation. For some reason, not explained by the evidence, the direction was more literally and more consistently applied as to this reservation than as to the Bad River or the Lac Court Oreilles Reservation.

Finding 81.

One of the accounts, containing the proceeds of timber cut from swamp lands in the Lac du Flambeau Reservation between 1906 and the end of 1915, was still in existence when this case was tried. Findings 77 (g) and 103 (e).

 Findings 85 (c) and 88 (b). Also, see findings 133 to 135.

Finding 93 (a).

Finding 93 (b).

Finding 93 (c).

Finding 98.

Finding 101 (a), (c), and (d).

Finding 109 (a).

Finding 109 (a).

 Finding 104 (b).

Finding 113.

 Finding 123 (b).

 Finding 50 (1).

Finding 50 (i).

 In 1879 or 1880, finding 50 (h) ; and in 1935, finding 113.

 Finding 93 (c).

 Cf„ finding 121 (f).

 Cf., finding 122 (d).

 Findings 50 (f), 59 (b), and 65 (a) and (c).

 Findings 50 (b) and (j) and 59 (b).

Finding 61i (e).

Finding 61 (f).

Finding 62.

Finding 63 (a).

Finding 125 (c).

Finding 67 (f), footnote 7.

 Finding 102 (a).

Finding 101 (c) and (d). The major portions of these submissions were indicated as swamp on the field notes of survey; the minor portion was not so indicated. Finding 102 (b).

 Finding 102 (b).

 Finding 102 (c).

 Finding 116.

Findings 102 (c) and 113 (c), footnote 8.

 Finding 104 (b), footnote 16.

Finding 113 (c).

 Finding 99. It does not appear from the evidence that this ruling has ever been given practical application. Apparently, the statement of it was obiter dictum,.

 Finding 107.

 Findings 102 (a) and 111 (a). The Wisconsin legislature adopted a resolution in 1930 to the effect that when the lists as they then stood should be patented, no more land would be ashed under the swamp grant. This resolution was presented and adopted subject to an understanding that the united States would agree to a similar commitment. No official recognition of the understanding has been given by the United States.

 This examination has been pending since 1930. Finding 129 (g).

Finding 111 (a).

 Finding 109 (e).

 There has been no occasion for the Secretary to rule.

Finding 111 (a).

The computation of the proceeds of timber cut from swamp lands would be affected by this issue.

Eluding 85 (b).

Finding 85 (c).

Finding 92 (a) (2).

Finding 88 (b).

Finding 92 (b) (3).

Finding 85 (g).

Finding 92 (e), footnote 17.

Finding 116 (a). Cf., finding 137 (c).

 Finding 81.'

 Finding 32 (a). Cf., finding 112 (9).

 Finding 101 (d).

Finding 195 (e).

 Finding 66 (a).

Finding 112 (9).

Finding 91 (a).

Finding 31.

 Finding 34 (a).

Finding 34 (d).

Finding 105 (c).

Findings 101 (e) and 105 (a), (b), and (c).

 Finding 112, footnote 7.

 Eluding 31.

Finding 33 (a).

Finding 101 (c).

Finding 105 (g).

Finding 112 (10).

 Finding 62, footnote 17, and finding 112, footnote 7.

Finding 112 (9).

 Finding 112 (10).

 Finding 78.

 Finding 91 (b).

 Finding 95 (a).

 Finding 93 (a) and 94 (b).

Finding 95 (a).

Finding 75 (a).

 Finding 75 (b).

Finding 77 (g).

 Eludings 77 (g) and 81.

 Eluding 108.

Finding 115 (a).

Eluding 115 (a).

 Finding 117.

Finding 86 (e).

 Finding 4 (a) and (b), and footnote 5 to (c).

 In 1880, the Governor of Wisconsin was aware of “* * * the difficulties which might arise from permitting the sale and occupancy of these lands * * Finding 51 (b). Cl., finding 75 (a), reciting Wisconsin’s bill in equity to restrain the Secretary of the Interior from interfering with the State’s use, possession, and enjoyment of the school lands in the Bad Kiver Reservation. In 1919, Governor Philipp was seriously concerned by the failure of the Indian Agent to complete allotments on the Bad River Reservation from the school and swamp lands. Finding 86 (c). .The same Governor undertook to expedite similar allotments on the Lac du Flambeau Reservation. Finding 88 (b), footnote 11.

 In 1931, an act of the Wisconsin legislature authorized the State’s Attorney General to investigate and prosecute against the united States the claims of Indians living on reservations in Wisconsin, including claims for the proceeds of timber. Finding 108. In 1935, the settlement upon which the Governor of Wisconsin and the Secretary of the Interior agreed would have provided for the State to assume all expenses for schools for Indian children. Finding 113 (b).

Finding 63 (a).

 151 N. W. 331.

 Some 400,000 acres of swamp lands were lost to Wisconsin as a result of the actions and inaction of the General Land Office. Finding 123. The school lands in the reservations would have gone to Wisconsin had it not been for the time element in the completion of surveys.

 Finding 63 (b).

Findings 75 (a) and 85 (a).

Mr. Blaine was the Attorney General who wrote the disclaimer of the State’s demands for the swamp lands in the Lac du Flambeau Reservation. Finding 88 (b). He wrote the letter at the insistence of Governor Philipp, (finding 88 (b), footnote 11), and apparently against his own better judgment. Finding 86 (e).

Finding 93 (e), footnote 1.